# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JOHN WALSH,         ) | |
|     Plaintiff,         ) | |
|       vs.         ) | CIVIL ACTION NO. 04-11240-RCL |
| TRUSTEES OF BOSTON UNIVERSITY,   ) | |
|     Defendant.         ) | |

### DEFENDANT TRUSTEES OF BOSTON UNIVERSITY'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56(c), Defendant Trustees of Boston University (the "University") submits this memorandum in support of its motion for summary judgment.

## INTRODUCTION

Plaintiff was employed as an Operations Manager in the University's Office of Housing, Department of Residential Safety. In June 2000, he applied for, but did not receive, a position that was ultimately given to John Battaglino, Jr. Plaintiff did not believe that Battaglino, who by virtue of his appointment became Plaintiff's supervisor, was qualified for the job.

Thereafter, Plaintiff's job performance deteriorated. He became increasingly insubordinate and abusive, refused to honor directives, or complete assigned tasks. His employment was terminated on November 30, 2001, after he initiated a physical altercation with Mr. Battaglino. That altercation, a history of insubordination, and abysmal attendance—he abused sick leave, and either failed to report to work or worked less than a full day, on 142 out of

230 possible work days in calendar year 2001, but never missed a day's pay—justified the University's decision to terminate his employment.

The complaint contained five causes of action, one of which (Count IV, alleging a violation of Massachusetts General Laws, c. 93, § 103) was dismissed. The remaining claims, alleging violations of the Family and Medical Leave Act, the Americans with Disabilities Act, and the Massachusetts companion statute, G.L. c. 151B, § 4(16), generally assert disability discrimination and retaliation.

The relevant statutes of limitations serve as a jurisdictional bar to all these claims. To the extent that any survive, they must be dismissed on their merits because the undisputed material facts fail to support the necessary elements of any of the remaining causes of action.

<u>PROCEDURAL HISTORY</u>

The complaint was filed in Suffolk Superior Court on May 18, 2004. On June 7, the University removed the case to the United States District Court, pursuant to 28 U.S.C., § 1331, and 28 U.S.C., § 1367(a), and subsequently filed a motion to dismiss certain aspects of the complaint. At the conclusion of oral argument, the Court granted the University's motion to dismiss Count IV, alleging violations of the Massachusetts Equal Rights Act, G.L. c. 93, § 103.

<u>STANDARD OF REVIEW</u>

Summary Judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to a material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A "genuine" issue is one that can be resolved in favor of either party, and a "material fact" is one that has the potential of affecting the outcome of the case.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50, 106 S. Ct. 2505 (1986); Putnam v. Town of Saugus, 365 F. Supp. 2d 151, 166 (D. Mass. 2005).

Once the moving party has demonstrated the absence of genuine issues of material fact, the opposing party must identify disputed facts that compel a trial. The mere existence of a dispute is not enough to bar summary judgment. "It is only when a disputed fact has the potential to change the outcome of the suit under the governing law if found favorably to the nonmovant that the materiality hurdle is cleared." Parrilla-Burgos v. Hernandez-Rivera, 108 F.3d 445, 448 (1st Cir. 1997) (citation omitted); Nat'l. Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995); Agri-Mark, Inc. v. Niro, Inc., 233 F. Supp. 2d 200, 202 (D. Mass. 2002).

The nonmovant "may not rest upon the mere allegations or denials of the [moving] party's pleading," but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); Bradley v. City of Lynn, 403 F. Supp. 2d 161, 165 (2005); Bryant v. Caritas Norwood Hosp., 345 F. Supp. 2d 155, 162 (D. Mass. 2004). The nonmovant's failure to make "a showing sufficient to establish the existence of an element essential to [its] case and on which [it] will bear the burden of proof at trial" compels summary judgment against it. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986); St. Paul Fire & Marine Ins. Co. v. Birch, Stewart, Kolasch & Birch, LLP, 379 F. Supp. 2d 183, 189 (D. Mass. 2005).

The evidence compels the conclusion that there are no material facts in issue, and the law requires the entry of judgment in favor of the University.

<u>ARGUMENT</u>

I.    <u>Count I Must Be Dismissed because Plaintiff's FMLA Claim Is Barred by the Statute of Limitations.</u>

The Family and Medical Leave Act of 1993 (FMLA) was enacted to balance the demands of the workplace with the needs of families to care for children and sick family members.  29 U.S.C. §§ 2601(a), (b).  The FMLA statute of limitations expires two years from the last date of an alleged violation.  29 U.S.C. § 2617(c)(1).  The complaint, filed in May 2004, alleges that Plaintiff requested FMLA leave in August 2001.[1]  Thus Count I is barred by the statute of limitations.

The First Circuit has defined a narrow set of circumstances under which a claim would rise to the level of a "willful" violation of the FMLA, expanding the statute of limitations to three years pursuant to 29 U.S.C., § 2617(c)(2):

> We hold that in order to establish a willful violation of the FMLA, a plaintiff must show that "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute."

<u>Hillstrom v. Best Western TLC Hotel</u>, 354 F.3d 27, 33 (1st Cir. 2003) (quoting <u>McLaughlin v. Richland Shoe Co.</u>, 486 U.S. 128, 133, 108 S. Ct. 1677 (1988)).  The First Circuit concludes that to avoid dissolving the distinction, a two-tiered statute of limitations requires a limited definition of willfulness.  <u>Hillstrom</u>, 354 F.3d at 32-34.  Willfulness must be proved.  Here, the evidence fails to support a conclusion that the University acted in "reckless disregard" of the FMLA.

---

[1]    The record indicates that Plaintiff requested FMLA leave on September 19, 2001.  Ex. 26.  The difference of one month does not alter the analysis.

All exhibits are appended to Defendant's L.R. 56.1 Statement of Undisputed Material Facts.

On August 22, 2001, Plaintiff's physician "excused" him from work "due to illness" until September 1, and thereafter, approved his return to unspecified "restricted duty." Ex. 24. Because Plaintiff failed to provide the University with either advance notice or a sufficient explanation for his unexpected absence, he was told not to return to work until he could be counted on to reliably perform his job. Ex. 25. Thereafter, on September 19, 2001, he requested FMLA leave. Ex. 26.[2] Even though he failed to provide the University with information sufficient to evaluate his request, and instructed his own physician not to provide certain information to the University's Director of Occupational Health (Exs. 27-29), Plaintiff was compensated for the entirety of his absence, from August 22, 2001, to November 26, 2001—a period of more than thirteen weeks. Ex. 2 at 30, 58, 104-05, 167-68. Thus, Plaintiff received the statutory benefit. The evidence does not even hint at a willful violation of the FMLA.

Plaintiff was terminated on November 30, 2001 (Ex. 35), but he did not file his complaint in this case until May 18, 2004—nearly thirty months following the last possible event that might give rise to a cause of action under the FMLA. Count I is time-barred.

II.    The University Did Not Violate Plaintiff's Rights Under the Family and Medical Leave Act.

Even if the Court concludes that Plaintiff has adduced evidence of a prima facie case of willfulness, thereby extending the statute of limitations to three years, there is no evidence to support Plaintiff's FMLA claim on its merits.

---

[2] A May 24, 2001, e-mail exchange between Plaintiff and Battaglino included a discussion about whether Plaintiff had requested FMLA leave. He had not. Battaglino encouraged him to determine if he was entitled to leave (Ex. 6: BU 0341-42), but he did not do so until September 2001.

The FMLA creates two distinct sets of rights.  First, eligible employees are entitled to "a total of 12 work weeks of leave during any 12-month period," 29 U.S.C. § 2612(a)(1), and to return to the same or an equivalent position upon return from a qualified absence.  29 U.S.C., § 2614(a)(1).  With respect to this right, "[t]he issue is simply whether the employer provided its employee the entitlements set forth in the FMLA—for example, a twelve-week leave or reinstatement after taking a medical leave."  Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 159 (1st Cir. 1998).  Second, the FMLA prohibits employers from discriminating against employees who use FMLA leave.  29 U.S.C., § 2615(a).  Hodgens, 144 F.3d at 159-60.  To assess whether an employer has discriminated against an employee, courts use the familiar burden-shifting framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800-06, 93 S. Ct. 1817 (1973).  Hodgens, 144 F.3d at 160.

A.     Plaintiff Received the Full Duration of Leave Authorized by the FMLA.

Plaintiff signed a Records Release Form on September 12, authorizing "a BU-designated physician to inquire/speak w/ Dr. Abreu regarding a pending need to make use of the FMLA. . . ."  Ex. 38.  But he refused to authorize his physician to provide documentation supporting his request for leave.  Exs. 27-29.

On September 19, Plaintiff submitted a five-page, handwritten letter to the University requesting "an intermittent and/or reduced schedule under the FMLA.  This leave will allow me to do many things medically necessary:  such as attend scheduled health provider appointments, reduce time for unanticipated medical needs (i.e., migraines, dental process, etc.), or recovery time."  The letter then segued into complaints about the way Plaintiff's supervisors were treating him.  Ex. 26.

On October 1, Plaintiff's physician sent an uninformative letter to the University, stating that Plaintiff had "applied for Family and Medical Leave due to his episodic inability to work as well as to attend regularly scheduled appointments."  Ex. 30.  The letter failed to identify the medical conditions causing his "episodic inability to work," or provide any information to allow an evaluation of Plaintiff's need for leave.[3/]  The University requested additional information; in response, Plaintiff sent uninformative and insulting letters to the Director of Occupational Health and a member of the staff of the Office of Personnel.  Exs. 32, 33.  Eventually, Plaintiff authorized his physician to provide more information.  Ex. 34.  But he had already received more than thirteen consecutive weeks of paid medical leave, and was instructed to return to work. Ex. 28.

Paid sick leave may be counted retroactively against the twelve weeks of approved FMLA leave when the employer learns that leave is for an FMLA purpose.  See 29 C.F.R. 825.208(d).[4/]  Shortly after Plaintiff began his extended leave on August 22, 2001, he advised the University that he intended to seek protection under the FMLA.  The entirety of his absence between August 22, 2001, and November 26, 2001, was paid leave, and, pursuant to 29 C.F.R. § 825.208(d), it is retroactively attributed to the FMLA.  See Dube v. J. P. Morgan Investors Servs., 2005 WL 1140766 at *3 (D. Mass., May 13, 2005) (employee's paid leave while pursuing FMLA leave should be retroactively counted as FMLA leave).

---

[3/]     An employer is allowed to require that a request for leave be supported by certification from a health care provider.  29 U.S.C. § 2613.

[4/]     The absence of preliminary notification per 29 C.F.R. 825.208(e)(2) does not create an independent cause of action.  Daley v. Wellpoint Health Networks, Inc., 146 F. Supp. 2d 92, 99 (D. Mass. 2001) (plaintiff cannot assert cause of action against employer who failed to notify her that requested leave constituted FMLA leave); Cormier v. Littlefield, 112 F. Supp. 2d 196, 200 (D. Mass. 2000) (no private right of action for violation of notice provision, particularly where plaintiff received more leave than he would have received under the FMLA).

Thus Plaintiff was not denied any substantive rights under the FMLA, and the University should be awarded summary judgment on Count I.

III.    Counts II, III, and V Are Barred by the Statute of Limitations.

A person seeking relief under c. 151B may file a civil action within three years "after the alleged unlawful practice occurred." G.L. c. 151B, § 9; Swaida v. Gentiva Health Servs., 238 F. Supp. 2d 325, 331 (D. Mass. 2002); Weber v. Cmty. Teamwork, Inc., 434 Mass. 761, 784, 752 N.E.2d 700, 717 (2001). In the federal scheme, disability discrimination claims are treated as personal injury actions. In Massachusetts, the pertinent statute of limitations is also three years. G.L. c. 260, § 2A; Sigros v. Walt Disney World Co., 190 F. Supp. 2d 165, 168 (D. Mass. 2002); Downs v. Mass Bay Transp. Auth., 13 F. Supp. 2d 130, 136 (D. Mass. 1998).[5]

Both statutes of limitations are jurisdictional. They begin to run when a plaintiff knows or should have known of the factual basis for his claims. Vesprini v. Shaw Indus., Inc., 221 F. Supp. 2d 44, 53 (D. Mass. 2002), aff'd, 315 F.3d 37 (1st Cir. 2002). Here, Plaintiff believed that he was the victim of discrimination and retaliation far more than three years before he filed this lawsuit.

Plaintiff's first MCAD complaint, filed on December 28, 2000, described an array of retaliatory measures evolving from his purported refusal to terminate an employee he thought had a disability. See Ex. 2 at 33-34, 51-53, and Section V(A), infra, p. 22-24. Plaintiff claims he was threatened with termination; he was denied copies of his personnel files; his mail was opened; he was "tracked through campus"; he was issued warning letters; and he was docked

---

[5]    Plaintiff satisfied the requirement of G.L. c. 151B, § 5, to file timely claims with the MCAD. The ADA, like c. 151B, requires aggrieved parties to exhaust their administrative remedies by filing a charge with the EEOC or the appropriate state or local agency before filing suit. 42 U.S.C., § 12117(a); 42 U.S.C., § 2000(e-5)(e)(1). Again, Plaintiff fulfilled his obligation under this statute by filing with the MCAD.

vacation time.  This complaint makes it clear that Plaintiff believed that his refusal to terminate an employee with a disability is the event that precipitated retaliation.  Ex. 12.[6/]

Plaintiff's sworn deposition testimony is consistent.  He claims that after he refused to terminate the employee he believed had Attention Deficit Disorder, "at that point, I started having some difficulty in getting accommodations."  Ex. 2 at 34, 48-49.

The delayed recognition of a claim "is more likely to occur in cases of ongoing harassment where pinpricks may only slowly add up to a wound."  Keeler v. Putnam Fiduciary Trust Co., 238 F.3d 5, 12 (1st Cir. 2001).  That concept does not apply in this case.  A plaintiff who recognizes a claim must assert his rights within the appropriate limitations period.  The First Circuit has held that filing a charge with the MCAD is evidence that a plaintiff is aware of the existence of a claim.  Morris v. Gov't. Dev. Bank of Puerto Rico, 27 F.3d 746, 749 (1st Cir. 1994) (notice of adverse employment action starts running of limitation period); Ching v. Mitre Corp., 921 F.2d 11, 14-15 (1st Cir. 1990).  Plaintiff's December 28, 2000, MCAD charge establishes that by no later than that date he believed he had claims of discrimination and retaliation.

Plaintiff also believed that he was given an assignment on January 3, 2001, in retaliation for filing the MCAD complaint.  Ex. 2 at 76.  His belief that he has a claim starts the running of the statute of limitations.  Thomas v. Eastman Kodak Co., 183 F.3d 38, 50 (1st Cir. 1999) (limitations period begins when "some tangible effects of discrimination [are] apparent to the plaintiff") (quoting Johnson v. General Electric Co., 840 F.2d 132, 137 (1st Cir. 1988)).

---

[6/]     The MCAD dismissed the complaint as untimely, concluding that there was no evidence of a continuing violation sufficient to toll or otherwise extend the statute of limitations governing the filing of actions before that agency.  The MCAD also found no causal connection between any protected activity in which Plaintiff claimed to have undertaken and any adverse employment action.  Ex. 14.

The First Circuit, recognizing that "[t]he continuing violation concept has provoked endless confusion," has allowed plaintiffs to assert otherwise time-barred claims only if, at the time of the alleged offense, the plaintiff had no reason to know that a wrong had been committed. Keeler, 238 F.3d at 11; see also Provencher v. CVS Pharmacy, 145 F.3d 14-15 (1st Cir. 1998) (same). Here, Plaintiff had formed a belief that he was the victim of retaliation by the fall of 2000. Because he knew of his injury shortly after it occurred, the continuing violation theory is inapplicable. Rossiter v. Potter, 357 F.3d 26, 35 (1st Cir. 2005). The record establishes that, more than three years prior to the filing of this lawsuit, Plaintiff believed that the University was denying him accommodations. Ex. 2 at 53-54; Ex. 39, p. 9 (Answer to Int. No. 11); Ex. 20 (March 12, 2001, therapy notes). His delay is fatal to his claims.

Plaintiff formed a belief that he was the victim of disability discrimination and retaliation more than three years before Plaintiff filed this lawsuit. The statutes of limitations therefore compel the dismissal of Counts II, III, and V.

IV.     Plaintiff Cannot Prove that He Is the Victim of Discrimination.

A.     Introduction

If Plaintiff's disability discrimination claims under the ADA and Chapter 151B survive the jurisdictional bar imposed by the statute of limitations, they must be assessed in accordance with the burden-shifting framework outlined by the Supreme Court in McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973). See also Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 104-05 (2005). To establish a prima facie case, he must show that (1) he suffers from a disability or handicap as defined by the ADA and c. 151B; that (2) notwithstanding his disability, he is capable of performing the essential functions of his job, either with or without a

reasonable accommodation; and that (3) the University took an adverse employment action because of his disability.  Id.; Carroll v. Xerox Corp., 294 F.3d 231, 237 (1st Cir. 2002).

If Plaintiff meets this burden, the University must produce evidence of a legitimate, non-discriminatory reason for its employment decision, and show that this reason was the real reason for the challenged actions.  McDonnell-Douglas, 411 U.S. at 802; Tobin, 433 F.3d at 105. Finally, the burden shifts back to Plaintiff, who must prove that the University's justification "is mere pretext, cloaking discriminatory animus."  Id.; McDonnell-Douglas, 411 U.S. at 804.  At all times, Plaintiff bears the burden of proving unlawful discrimination.  Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 143, 120 S. Ct. 2097 (2000).

The remainder of this Memorandum will establish that Plaintiff cannot meet his burden.

B.    Plaintiff Is Not a Qualified Handicapped Individual, and Therefore Cannot Assert Claims under Either the ADA or Chapter 151B.

Counts II and V of the complaint allege that the University discriminated against Plaintiff on the basis of his disability in violation of G.L. c. 151B, § 4(16), and the ADA, 42 U.S.C., § 12101, et seq.  The ADA mandates that "[n]o covered entity . . . shall discriminate against a qualified individual with a disability because of the disability."  42 U.S.C., § 12112(a). Discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship."  Id. at § 12112(b)(5)(A).[7]

---

[7]    The Massachusetts Supreme Judicial Court has held that, because Chapter 151B and the ADA provide similar protections, it is appropriate to rely on federal case law to interpret the Massachusetts statute. Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34, 40 n.11, 825 N.E.2d 522 (2005); City of New Bedford v. MCAD, 440 Mass. 450, 463 n.26, 799 N.E.2d 578 (2003); Wheatley v. American Tel. & Tel. Co., 418 Mass. 394, 397, 636 N.E.2d 265 (1994); Baer v. Nat'l. Bd. of Med. Exam'rs., 392 F. Supp. 2d 42, 46 n.1 (D. Mass. 2005).

Plaintiff's claim that the University engaged in discrimination by failing to reasonably accommodate his disability requires that he first establish that he is entitled to the protections of the ADA, i.e., that he is a "qualified individual" with a "disability" as those terms are defined in the Act. Then he must prove that the University violated the ADA by failing to provide him with a reasonable accommodation. Here, Plaintiff cannot meet either burden.

The ADA defines "disability" as:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such impairment.

42 U.S.C., § 12102(2). The statute defines a "qualified individual with a disability" as:

> an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this sub-chapter, consideration shall be given to the employer's judgment as to what functions of a job are essential.

42 U.S.C., § 12111(8). The evidence proves that Plaintiff is neither disabled nor a qualified individual with a disability.

A recent decision of the Supreme Judicial Court, analyzing Chapter 151B, summarized the analysis:

> Not all physical or mental impairments constitute a "handicap" under the Massachusetts antidiscrimination statute. General Laws c. 151B, § 1(17), provides that a "handicap" is (a) an actual "physical or mental impairment which substantially limits one or more major life activities; (b) a "record having <u>such</u> impairment"; or (c) "being regarded as having <u>such</u> impairment." Subparts (b) and (c), by their terms ("such impairment"), incorporate all of the requirements of subpart (a); every plaintiff must demonstrate that an actual impairment, "record of . . . impairment," or being "regarded as having [an] impairment" "substantially limits one or more major life activities."

City of New Bedford, 440 Mass. at 462 (emphases in Opinion of the Court).

Plaintiff has certain medical conditions that require attention,[8/] but there is nothing in the record to suggest that he either has a record of an impairment, or is "regarded as having such an impairment." There is no evidence that these conditions, considered individually or together, constitute "a physical or mental impairment that substantially limits one or more of the major life activities" in which Plaintiff participates. 42 U.S.C., § 12102(2). It is telling that his designated experts—his physician and his therapist, both of whom have known him for years—do not claim that Plaintiff has a disability, or is disabled, or cannot perform any major life activities. Exs. 22, 23.

"Merely having an impairment does not make one disabled for purposes of the ADA." Toyota Motor Mfg., Ky., Inc., v. Williams, 534 U.S. 184, 195, 122 S. Ct. 681 (2002). Indeed, "[n]ot all physical impairments rise to the level of disability under the ADA." Libron-Torres v. Whitehall Labs., 251 F.3d 236, 239 (1st Cir. 2001); Bryant, 345 F. Supp. 2d at 163. To establish that Plaintiff's impairment substantially limits a major life activity, he must show that it "prevents or severely restricts [him] from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long-term." Toyota Motor Mfg., Ky., 534 U.S. at 198. The evidence proves exactly the opposite.

Plaintiff admits that his impairments do not substantially limit any major life activity. Although he requested (and took) time off to attend appointments with his health care providers, he never claimed that his impairments prevented him from doing his job. Rather, he claimed he was fully capable of working. Ex. 2 at 118-123. Plaintiff's May 22, 2001, request for

---

[8/]     Plaintiff testified that in 1984 he had a stroke that impairs his peripheral vision but does not prevent him from driving. He suffers from sporadic migraines that can range from mild to debilitating. He testified that

accommodations lends credence to the University's position that he did not have a disabling impairment:

> ability to attend medical appointments & follow treatment w/o interference:  which is limited to use of accrued sick time.  Same treatment as others in this department on use of time.

Ex. 21.[9]  There is no evidence that Plaintiff was treated more harshly than any other, similarly situated employee—indeed, the record in this case suggests that Plaintiff manipulated his supervisors and used laws designed to protect disabled employees as a sword, not a shield.

Plaintiff's failure to show—or even allege—that his impairments imposed a long-term barrier to his ability to perform his job functions is fatal to his claim.  See, e.g., Carroll, 294 F.3d at 240-241 (employee who took three-month leave from work for psychiatric problems and offered no evidence of "medical restrictions or other limitations" on his ability to work thereafter, had failed to "produce evidence that his condition was of sufficient duration and severity to substantially limit him in working," and therefore could not be found disabled under the ADA); Bryant, 345 F. Supp. 2d at 164 (plaintiff's acknowledgement that she had resumed "normal activities of daily living" in less than eight months after she first went out on medical leave establishes that she does not have an impairment that substantially limits her ability to engage in major life activities).

---

he has depression and acute stress disorder (but he is uncertain whether he was actually diagnosed for these conditions); shingles; and kidney stones.  He occasionally experiences incontinence.  Ex. 2 at 105-121, 155.

[9]   See also Plaintiff's Answers to Interrogatories (Ex. 39) which repeat this theme of identifying his need and simultaneously suggesting mistreatment:

> INT No. 9.  Please state each and every accommodation you believe you needed in order to fulfill your responsibilities as an employee of the University.

> ANS No. 9.  Walsh states that he required the ability to visit his medical providers for treatment of his health conditions without being penalized. . . .

"Congress obviously did not mean to extend the protections of the ADA to every physical impairment that precluded the performance of some particularly difficult manual task." Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 22-23 (1st Cir. 2002).  Here, the evidence does not support a finding that Plaintiff's medical condition limited any major life activity. There is no genuine issue of material fact concerning the question of whether he is disabled within the meaning of, and therefore entitled to the protections of, the ADA.

      C.      <u>By Abusing his Sick and Vacation Leave, Plaintiff Failed to Fulfill an "Essential Function" of his Job.</u>

Plaintiff is not a "qualified individual with a disability" pursuant to 42 U.S.C., § 12111(8).  He performed his job duties to the satisfaction of his superiors, but as his relationship with Mr. Battaglino began to deteriorate (Ex. 5 at 39), in 2001, Plaintiff stopped performing one of the "essential functions of the employment position," 42 U.S.C., § 12111(8):  he failed to come to work.  His absences skyrocketed, frequently without explanation.  Abundant evidence leads to the conclusion that he abused his sick and vacation leave.

Plaintiff claims that he was absent from work to attend to medical appointments, but the record provides scant support for this position.  For instance, in January 2001, his physician sent a note indicating that he would be away from work for approximately two weeks.  Ex. 15.  There was no explanation.  His physician did not request approval from Plaintiff's supervisor—he simply informed the University that Plaintiff would not show up.

In the month of May, Plaintiff missed parts or all of eleven days of work (out of a possible twenty-two).  Ex. 17:  BU 0438.  Late in the month, he submitted a note from his therapist, Dr. Neil Gore, indicating that they would be meeting "on Tuesdays."  Ex. 18. Dr. Gore, one of Plaintiff's expert witnesses, did not state whether this meant that Plaintiff would miss an hour, a morning, or an entire day of work.  Plaintiff had sixteen sessions with Dr. Gore

between February 5 and July 3 (corresponding, roughly, to one session per week). Plaintiff testified that each session lasted approximately one hour. Ex. 2 at 99. Plaintiff claimed vacation or sick leave for the entire day for fourteen of the days he visited Dr. Gore, and a half day of sick leave for a fifteenth visit. Exs. 17, 20.[10]/

By late August, Plaintiff had missed all or parts of 97 out of a possible 169 days of work during calendar year 2001. His supervisors had on several occasions communicated their concern and frustration about his absences, which meant that he was unable to perform his job. Ex. 6: BU 0311, 0319, 0341-42, 0345-46, 0347, 0349. On August 22, Dr. Steven Abreu, Plaintiff's physician (who has also been designated as an expert witness), attempted to excuse Plaintiff from attending work for more than a week as his Department approached its busiest time of year (students moving into on-campus dormitories), and, thereafter, said he could return to undefined sporadic duty. Ex. 24, Ex. 5 at 128. Dr. Abreu's note led the University to conclude that they could not rely on Plaintiff to perform one of the essential functions of his job—coming to work. Ex. 25.[11]/

In this Circuit, "[i]t is well settled that an employer need not accommodate a disability by forgoing an 'essential function of the employment position.' " Laurin v. The Providence Hosp., 150 F.3d 52, 56 (1st Cir. 1998); Calef v. Gillette Co., 322 F.3d 75, 86 n.8. Plaintiff bears the burden of showing that he is capable of performing the essential functions. U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 400, 122 S. Ct. 1516 (2002); Gillen, 283 F.3d at 24. Here, Plaintiff failed to perform the fundamental job duty of appearing for work.

---

[10]/     A sixteenth visit took place on a University holiday, when Plaintiff was not required to work.

[11]/     Plaintiff has offered no evidence to suggest that he was able to perform his job without actually being present on the Boston University campus. His own narrative description of his responsibilities is further evidence of that point. Ex. 2 at 217-230.

Courts have recognized and acknowledged that an employee's physical attendance in the workplace can be an essential function of the job. Kvorjak v. Maine, 259 F.3d 48, 57 (1st Cir. 2001); Mulloy v. Acushnet Co., __ F. Supp. 2d __, 2005 WL 1528208 *7 (D. Mass. 2005) (citing cases). Plaintiff's supervisors made it clear that an essential element of Plaintiff's job involved reliable attendance. They became increasingly frustrated with their inability to rely on Plaintiff's attendance. Ex. 3 at 139-41; Ex. 19. Eventually, Plaintiff was told that he could not return to work until he could assure the University that he would be able to attend, and perform his duties, on a regular basis. Ex. 25. He was, however, paid during the entirety of his absence.

Plaintiff has failed to suggest that he could perform his work offsite. Ex. 2 at 221-25. The University has provided substantial evidence to support its position that his presence on campus was essential. Ex. 6: BU 0140; 0311; 0341-42; 0345-46. In the absence of evidence of discriminatory animus—and there is none here—the Court should give "substantial weight" to the University's judgment as to what functions are "essential." Kvorjak, 259 F.3d at 55 (citation omitted).

The University had a legitimate basis for concluding that Plaintiff could not perform an essential function of his job—coming to work. He is not, therefore, a "qualified individual," as that term is defined in the ADA.

D.      Plaintiff Cannot Establish that He Was Denied Accommodations.

Although Plaintiff was not a qualified handicapped individual (see Sections IV(B) and (C), supra), and therefore was not entitled to accommodations, he received them. The record does not support his claim that the University denied him time off attend to medical appointments.

Plaintiff has designated his health care providers, Steven Abreu, M.D., and Neil Gore, Ph.D., as expert witnesses. Section IV(C), supra, pp. 15-17, demonstrates that Plaintiff relied on, or manipulated, Dr. Abreu and Dr. Gore to assist his abuse of sick and vacation leave. The same discussion also established that—contrary to his claim—Plaintiff was granted, or took without penalty, more time than he needed for his health care appointments (the only accommodation he requested).

On January 19, 2001, Plaintiff's physician wrote a note "excusing [Plaintiff] from work thru February 2nd" without explanation. Ex. 15. The next several months were punctuated by multiple absences. For example, in April and early May 2001, Plaintiff requested time off on sixteen of twenty-two possible working days during that month. Ex. 6: BU 0308, 0309, 0321, 0324-325, 0334-335; Ex. 16: Time Off Requests, May 2001. Of these, Battaglino approved one full day (May 11, vacation and snow time), two half-days, and two days where Plaintiff left two hours early. Ex. 16: BU 0440, 0441. Battaglino denied the other requests. Ex. 6: BU 0140; Ex. 16: BU 0447, 0446. Notwithstanding this, in addition to the approved time, Plaintiff took four and one half days off which had been expressly denied by Battaglino, and claimed them as sick leave. Ex. 17: BU 0438.

Plaintiff spent an hour with Dr. Gore on June 12, June 19, June 26 and July 3, taking the entire day off on each of those four days. Ex. 17: BU 0436, 0437; Ex. 20. Plaintiff canceled his July 17 appointment with Dr. Gore, advising him that "Boss is denying him time off." Ex. 20. Plaintiff did not see Dr. Gore again until September 11, when he attended a one-hour appointment and told his therapist that "Boss is still denying time off." Ex. 20.

Dr. Gore's expert report opines that "it was not acceptable for Mr. Walsh to be denied time off to attend therapy appointments during the period from 7/17/01 to 9/9/01." Ex. 22.[12] His opinion would hold more weight if it were based on the evidence:  during the month of August 2001 alone, Plaintiff used 11.5 sick days out of a total of 23 working days. Ex. 17:  BU 0433.  But Plaintiff did not request time off for medical leave at any point during July or August 2001, with one exception:  on August 20 and 21, he requested (and was granted) time off to see a dentist and a physician.  He did not use that time to see Dr. Gore.  Ex. 40:  BU 0434.

Thus Plaintiff's claim that he was denied time to attend to his medical needs is simply untrue.  Dr. Gore did not talk with University personnel, and his expert report must be viewed skeptically at best, because Plaintiff misrepresented the truth to his own therapist.

Dr. Steven Abreu, Plaintiff's internist, also submitted an expert report.  Dr. Abreu writes, "[i]n late August 2001, Mr. Walsh stated that he hadn't been able to see his therapist in over eight weeks."  This apparently led him to recommend that Plaintiff "take further time away from work to see if this could alleviate some of the severe anxiety and migraines he was experiencing. Return to work was then advised with the restriction that he needed to be able to attend to medical appointments."  Ex. 23.

Plaintiff also misled Dr. Abreu.  The record reflects that he did not see his therapist for several months in the summer of 2001, but it was not because "he hadn't been able to"—rather, it was because he chose not to.

The last paragraph of Dr. Abreu's report concludes that Plaintiff

> would need approximately two to four one-hour visits with
> Dr. Gore per month.  He would need to see his Urologist at most

---

[12]    September 9, 2001, the date cited in Dr. Gore's expert report, was a Sunday.  But his medical records reflect that he saw Plaintiff on Tuesday, the 11th.  Ex. 20.

one hour per month. Visits to my office would be approximately
forty minutes per month.

Id. Thus, Dr. Abreu concludes that Plaintiff could safely anticipate between four and six hours

of medical appointments per month (exclusive of additional time for dental visits and

unanticipated emergencies). But Plaintiff took far more medical leave than Dr. Abreu suggests

he might need. Yet, Dr. Abreu writes, "[u]nfortunately, his inability to seek medical care

contributed to the severity of his illness." Id. Once again, an expert's judgment—that Plaintiff's

inability to seek medical care exacerbated his health problems—is undermined by the evidence.

In fact, Plaintiff had the ability to seek medical care. He declined to do so. But he cannot blame

the University for his own failure to pursue the accommodation to which he was entitled.

The duty to provide accommodations does not require an employer to grant every

accommodation requested. Plaintiff was allowed to take either vacation or sick leave to see his

health care providers virtually every time he put in a request. When his requests were denied, he

took time off anyway. Plaintiff's attendance record strongly supports the conclusion that he

abused his leave benefit. The University certainly satisfied its obligation to provide Plaintiff

with the accommodations he requested.

Boston University was accommodating to a fault. Plaintiff's own confused and

ambiguous communications strongly suggest that he manipulated his supervisors while he

misrepresented their conduct to his health care providers. See generally Ex. 6; Exs. 22, 23. The

University had a legitimate non-discriminatory justification for terminating Plaintiff's

employment. The record cannot support Plaintiff's claim of pretext.

V.     Plaintiff Cannot Establish a Retaliation Claim Pursuant to G.L. Ch. 151B.

The vast majority of retaliation cases are brought by employees who claim to be the

victim of discrimination, and who either filed lawsuits and/or administrative actions to challenge

the discriminatory conduct[13] or made internal complaints about the discrimination.[14] A handful of reported cases involve employees who claimed that their employer retaliated against them for assisting a fellow employee who did not make a formal claim.[15] Plaintiff attempts to straddle these themes, alleging that he was fired, in part, "in retaliation for his complaining about what he reasonably believed to be discriminatory actions."  Complaint, ¶ 27.

A retaliation claim under Chapter 151B requires evidence that Plaintiff believed reasonably and in good faith that his employer was engaged in acts forbidden by Chapter 151B, that he acted reasonably in response to his belief, and that the desire to retaliate was a "determinative factor" in the decision to eliminate his position.  Tate v. Dep't of Mental Health, 419 Mass. 356, 364, 645 N.E.2d 1159 (1995).  See also Abramian v. President & Fellows of Harvard Coll., 432 Mass. 107, 121, 731 N.E.2d 1075 (2000); Ryan v. Raytheon Data Sys. Co., 601 F. Supp. 243, 247 (D. Mass. 1984).  The key word is "reasonable."

Where, as here, Plaintiff cannot present direct evidence of a retaliatory motive, he must establish a prima facie case of retaliation.  To make out a prima facie case, Plaintiff must show that he engaged in protected conduct, that he suffered an adverse action, and that "a causal connection existed between the protected conduct and the adverse action."  Mole v. Univ. of Mass., 442 Mass. 582, 591, 814 N.E.2d 329 (2004).  The University's evidence of a non-retaliatory reason for the termination shifts back to Plaintiff the burden of proving that the articulated nonretaliatory reason was pretextual.  Id.; Mesnick v. General Elec. Co., 950 F.2d

---

[13]  McMillan v. Mass. Soc. for the Prevention of Cruelty to Animals, 140 F.3d 288, 296 (1st Cir. 1998); Mesnick v. General Elec. Co., 950 F.2d 816, 821 (1st Cir. 1991); Columbus v. Biggio, 76 F. Supp. 2d 43, 58 (D. Mass. 1999); MacCormack v. Boston Edison Co., 423 Mass. 652, 654, 672 N.E.2d 1 (1996).

[14]  Edwin v. Blenwood Assocs., Inc., 9 F. Supp. 2d 70, 74 (D. Mass. 1998); Ritchie v. Dep't of State Police, 60 Mass. App. Ct. 655, 665 (2004); Tate, 419 Mass. at 358-59.

[15]  Lewis v. Gillette Co., 22 F.3d 22, 23 (1st Cir. 1994); Mole v. Univ. of Mass., 442 Mass. 582, 602, 814 N.E.2d 329 (2004); Melnychenko v. 84 Lumber Co., 424 Mass. 285, 293, 676 N.E.2d 45 (1997).

816, 827 (1st Cir. 1991). Courts routinely grant summary judgment where, as here, Plaintiff is unable to establish a prima facie case of retaliation. See, e.g., McMillan, 140 F.3d at 309; Lewis v. Gillette Co., 22 F.3d 22, 25(1st Cir. 1994); Oliver v. Digital Equip. Corp., 846 F.2d 103, 110-11 (1st Cir. 1988).

    A.    <u>Plaintiff Cannot Establish a Causal Connection between the Protected Conduct and an Adverse Employment Action.</u>

Plaintiff claims that in approximately April 2000, he refused to terminate a "casual"[16] employee named Lindsay McLean, who was released because he made certain racially insensitive remarks that offended other members of the staff. At Boston University, casuals like McLean are hired for a limited duration assignment with no promise or expectation of permanence, advancement, or promotion. Ex. 2 at 128-133; Ex. 4, ¶ 8; Ex. 11, ¶ 9.

Plaintiff further claims that in August 2000, Mr. Battaglino rehired McLean and that he (Plaintiff) refused to fire him. Ex. 2 at 134-38. But Battaglino attested that <u>Plaintiff</u> rehired McLean. See footnote 18; infra, p. 23. Regardless, Battaglino released McLean from his position as a casual when his assignment had been completed. The University had two legitimate, nondiscriminatory reasons for releasing McLean: (1) he had made inappropriate remarks, and (2) his job was finished. Ex. 4, ¶¶ 8-11.

Plaintiff believes that Mr. McLean had Attention Deficit Disorder. He based that conclusion on his own observations of Mr. McLean's behavior. He does not know whether Mr. McLean ever requested an accommodation. Plaintiff was not licensed to treat individuals with learning disabilities or Attention Deficit Disorder. He was uncertain whether McLean ever told him that he had Attention Deficit Disorder. Plaintiff never spoke with a mental health

professional about McLean's condition.  Ex. 2 at 140-46.  In fact, McLean never advised the

University's Office of Disability Services that he had a disability, and never requested an

accommodation.[17/]  Ex. 11, ¶ 10.

Thus, Plaintiff's retaliation claim rests entirely upon his own guesswork.  But Plaintiff's

belief is not reasonable.  There is no basis in the record to support Plaintiff's belief that the

University engaged in either discrimination against Lindsay McLean, or in retaliation against

Plaintiff for his purported advocacy.[18/]

The absence of any <u>fact</u> supporting Plaintiff's conclusion that Mr. McLean had a

disability supports the University's position that that conclusion is not reasonable.  Further, "the

question of reasonableness, though generally one for the jury, may be decided as a matter of

law."  <u>Padrah v. Children's Hosp.</u>, 55 Mass. App. Ct. 1108, 771 N.E.2d 229, 2002 WL 14992240

at *2 (unpublished) (2002) (granting summary judgment for defendant on retaliation claim and

explaining that the question of the plaintiff's reasonableness may be decided as a matter of law).

"Under Chapter 151B, a retaliation claim is viable only when retaliatory conduct is due

to the plaintiff's opposition to any practice forbidden by Chapter 151B."  <u>LaRosa v. United</u>

---

16/    At Boston University, casual employees are hired for limited periods of time to perform discrete functions.  They are not treated as regular, fulltime employees, in that they do not receive any benefits but, rather, work to complete a specific task and are then released.  Ex. 5 at 24-25.

17/    Individuals with Attention Deficit Disorder do not necessarily have a disability under the ADA, absent proof that the condition substantially limits a major life activity.  <u>Calef</u>, 322 F.3d at 87.

18/    Plaintiff's various complaints were eventually brought to Manuel Monteiro, the University's Associate Vice President for Human Resources.  He investigated a wide range of Plaintiff's grievances, including those relating to Mr. McLean.  On May 24, 2001, he informed Plaintiff that he found nothing to substantiate Plaintiff's claim that he put himself at risk by refusing to terminate McLean.  Monteiro concluded that the Office of Housing "had every expectation that you would have exercised better judgment and should not have rehired this individual in light of the concerns raised about his interactions with students and staff.  The administrative decisions to terminate and not rehire the casual employee were handled properly."  Ex. 41.  This contemporaneous evaluation suggests, among other things, that Plaintiff's assertion that Battaglino rehired McLean is inaccurate.  <u>See</u> p. 22, <u>supra</u>.

Parcel Serv., Inc., 23 F. Supp. 2d 136, 151-52 (D. Mass. 1998) (granting defendant's motion for summary judgment where alleged conduct "is not prohibited by Chapter 151B").  See also Edwin, supra, 9 F. Supp. 2d at 74 n.11 ("a retaliation claim is viable only where retaliatory conduct is due to plaintiff's opposition to any practice forbidden by Chapter 151B").  As a result, even if the facts were as Plaintiff alleges (which they are not)—that the University retaliated against him because he complained about the treatment of Lindsay McLean—that does not provide a basis for a retaliation claim under Chapter 151B.

The First Circuit recently observed,

> That an employer knows of a discrimination claim, and takes some adverse action against a complaining employee does not, by itself, establish causation.  "Were the rule otherwise, then a disgruntled employee, no matter how poor his performance or how contemptuous his attitude toward his superiors, could effectively inhibit a well-deserved discharge by merely filing, or threatening to file, a discrimination complaint."

Mole, 442 Mass. at 592 (quoting Mesnick, 950 F. 2d at 828).  Here, Plaintiff cannot link the fact that he was concerned about Mr. McLean, or that he filed a complaint with the MCAD, with his termination in November 2001.  The evidence does not show any causal connections.  Count III must be dismissed.

    B.    <u>Plaintiff Cannot Establish that the Challenged Conduct Was a Factor in his Termination.</u>

Plaintiff clings to the notion that he was terminated because he asserted some undefined rights on behalf of another employee, and because he asserted his own rights under the ADA.  Assuming, without conceding, that Plaintiff has presented enough evidence to support a prima facie case, the University has presented overwhelming evidence of a non-discriminatory justification for the termination of his employment—that he initiated a physical confrontation

with his supervisor; he was consistently insubordinate;[19] and his unacceptable attendance record proved that he was not reliable and reflected an abuse of sick and vacation leave. Plaintiff cannot meet his burden of showing that these reasons are "mere pretext and that the actual reason for the adverse employment action was disability discrimination." Rivera-Garcia, et al., v. Sistema Universitario Ana G. Mendez, et al., ___ F.3d ___, 2006 WL 709060 (No. 05-1659, 1st Cir., March 22, 2006).

"It is not enough for a plaintiff merely to impugn the veracity of the employer's justification; he must elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive." Tobin, 433 F.3d at 105 (quoting Mesnick, 950 F.2d at 824 (internal quotations omitted)). A "claim of disparate treatment based on comparative evidence must rest on proof that the proposed analogue is similarly situated in material respects." Tobin at 106 (quoting Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 751 (1st Cir. 1996)). Plaintiff has not asserted, and cannot identify, any facts that support the theory that the decision to terminate his employment was pretextual.

Plaintiff cannot point to any evidence to support the argument that he did not initiate a physical confrontation with Mr. Battaglino.[20] He raised the issue in his second MCAD complaint. The Commission dismissed that complaint, noting, in part:

> [Plaintiff's] contentions that his supervisor harassed and eventually assaulted him are similarly unsupported. In fact the available evidence suggests the opposite occurred. As before, the Complainant has failed to provide anything that suggests that

---

[19] See, e.g., Defendant's L.R. 56.1 Statement of Undisputed Material Facts, ¶¶ 6-7.

[20] The Brighton District Court rejected Plaintiff's request to issue a criminal complaint against Mr. Battaglino. Ex. 2 at 216-17.

events occurred as he stated and if so, that they were motivated by
discriminatory animus.

Ex. 37.

The "McLean incident" may provide Plaintiff a convenient cornerstone for Plaintiff's

retaliation theory, but, as the MCAD noted in dismissing his complaint,

> Assuming for the purposes of this investigation that [Plaintiff]
> made an internal complaint [about the treatment of Lindsay
> McLean], he still does not set forth a prima facie case of retaliation
> as [the University] set forth legitimate explanations for each of
> their actions in this matter.

Id.

Finally, the unchallenged documentary evidence establishes that in calendar year 2001,

Plaintiff was insubordinate, and that he abused his sick and vacation leave benefit by missing all

or part of 142 out of 230 possible work days. Ex. 17. By any measure, this is unacceptable. The

University is paying for its patience with this lawsuit, and perhaps it should have terminated

Plaintiff when it became apparent that he was unwilling to function as a reliable employee.

Plaintiff received the benefit of every doubt while he manipulated the system, but there is no

evidence to support even a hint of pretext in the decision to terminate his employment.

CONCLUSION

Courts have observed that the filing of a charge of discrimination—as Plaintiff did in

December 2000—can be a preemptive strike—"a smokescreen in challenge to the supervisor's

legitimate criticism." Monteiro v. Poole Silver Co., 615 F.2d 4, 8 (1st Cir. 1980); Pardo v. The

Gen. Hosp. Corp., 446 Mass. 1, 23, 841 N.E.2d 692 (2006). Plaintiff was displeased that he was

not promoted to a position that was ultimately awarded to an individual he felt was less

qualified. He responded by filing a wide array of complaints and continuously undermining,

challenging, and ultimately confronting his new supervisor.  He was terminated for job-related

misconduct after a lengthy history of insubordination, inappropriate behavior, and abuse of sick

and vacation leave.  The University acted with caution and restraint, and with due regard for

Plaintiff's health issues.  As a matter of fact and law, the remaining claims in this case have no

merit.  Defendant Trustees of Boston University respectfully requests that this Court grant its

motion for summary judgment and dismiss Counts I, II, III, and V of the complaint.

<div style="margin-left: 40%;">

Respectfully submitted,

TRUSTEES OF BOSTON UNIVERSITY,
By its attorney,


s/Lawrence S. Elswit
Lawrence S. Elswit
(BBO #153900)
Boston University
Office of the General Counsel
125 Bay State Road
Boston, Massachusetts  02215
(617) 353-2326

</div>

Date:  April 21, 2006