## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN WALSH, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> TRUSTEES OF BOSTON UNIVERSITY, ) <br> ) <br> Defendant. ) <br> ) | CIVIL ACTION NO. 04-11240-RCL |

### DEFENDANT'S L.R. 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS

1. Plaintiff was employed as an Operations Manager, Residential Safety, in Boston University's Office of Housing. In the spring of 2000, he applied for, but did not receive, the position of Assistant Director of Housing. Instead, the position was offered to, and accepted by, John Battaglino, Jr. When Mr. Battaglino began work in late June 2000, Plaintiff reported directly to him. Ex. 2: Walsh dep., 41.[1]

2. Plaintiff believed that Mr. Battaglino was unqualified for the position, and that it had been awarded to him at least in part because his father was a member of the University's Board of Trustees. Ex. 2 at 42-43. Plaintiff was openly critical of Mr. Battaglino. He told his, and therefore Battaglino's, subordinates that Battaglino was unqualified for the job. Id. at 43-45. During the course of calendar year 2000, Plaintiff's relationship with Battaglino steadily deteriorated. In addition to openly expressing his belief that Mr. Battaglino did not deserve the job, he was rude and intimidating. Ex. 3: Battaglino dep., 108; Ex. 4: Battaglino aff.,

---

[1] Ex. 1 is Boston University's List of Exhibits.

¶¶ 9,10,12.  On one occasion, Plaintiff disagreed with a decision Mr. Battaglino made and uttered an insulting remark about Battaglino's brother, who has Down's Syndrome.  Ex. 4:  ¶ 9.

3.      Mr. Battaglino was given responsibility for maintaining accurate records of vacation time his staff had accrued and used.  Several Residential Safety supervisors, including Plaintiff, were concerned that Mr. Battaglino's predecessor had failed to maintain adequate records regarding vacation time.  Ex. 4:  ¶ 4; Ex. 5:  Robillard dep., 49-51.  Mr. Battaglino established each supervisor's balance of accumulated vacation and sick leave time, and gave each person the opportunity to confirm or contest his conclusions.  Every manager except Plaintiff eventually reached agreement with Battaglino and signed off on his/her vacation record. Ex. 4:  ¶ 5; Ex. 5 at 59.

4.      During the fall and winter of 2000-2001, Battaglino encouraged Plaintiff to provide evidence to support his claim that Battaglino's conclusions were inaccurate.  Battaglino frequently asked Plaintiff to reconcile the records he claimed to possess with the University's records.  Ex. 6:  Miscellaneous E-mails:  BU 0242, 0243.  Plaintiff refused to cooperate.  Ex. 3: ¶ 6; Ex. 4 at 59.  He challenged the accuracy of the University's records, but never produced his own records, or any other evidence to support his claim that the University's records were inaccurate or that he had been deprived of accrued vacation and leave.  Ex. 3 at 88; Ex. 4:  ¶¶ 4-7; Ex. 5 at 43-49, 59, 128; Ex. 6:  BU 0131-33; Exs. 7-10:  Memoranda from Battaglino to Plaintiff.

5.      The University hires "casuals," i.e., temporary employees, for a limited duration. They have no benefits, and when the task for which they are hired has been concluded, they are released.  An individual named Lindsay McLean had worked as a casual in campus dormitory

security stations and mailrooms in the spring of 2000, but was released after he made several racially insensitive remarks. Ex. 5 at 24-25; Ex. 11: Robillard aff., ¶ 9; Ex. 4, ¶ 8.

6. Mr. McLean returned to work as a casual in August 2000. Ex. 4, ¶ 8. Battaglino told Plaintiff that several employees had complained that Mr. McLean should not have been allowed to return to the University in light of previous complaints about his language, and racially insensitive remarks. Ex. 3 at 48; Ex. 5 at 204. Battaglino told Plaintiff that he wanted McLean released after "the early crunch subsided." In response, Plaintiff said, "Lindsay McLean is handicapped. How would you like it if someone treated your brother [who has Down's Syndrome] like that? I'm sure your daddy would be very proud of you treating someone this way." Ex. 4, ¶ 9.

7. Battaglino thought that it was inappropriate for Plaintiff to discuss his brother and his father in this context. He told Plaintiff never to talk about his family like that. Plaintiff responded, "Are you threatening me? Get the fuck out of my office." Ex. 4, ¶ 10.

8. Plaintiff testified under oath that his difficulties with Mr. Battaglino began around the time of this incident. Ex. 2 at 33-34, 52-53. He claims that shortly thereafter, the University began to retaliate against him by denying him medical leave and engaging in other inappropriate conduct. Id.; Ex. 12: Dec. 28, 2000 MCAD Complaint.

9. Plaintiff claims that Mr. McLean has Attention Deficit Disorder. Plaintiff has no expertise in the field, and has not seen any medical or other records supporting his belief. Ex. 2 at 140-48.

10. Lindsay McLean never asserted that he had a disability. He never told Mr. Battaglino, or Marc Robillard, the Director of Housing, that he had a disability. There is no record that he ever requested an accommodation for a disability. Ex. 11, ¶ 10. He may or may

not have claimed to Plaintiff that he had a disability—Plaintiff's testimony on this point is completely unclear. Ex. 2 at 140-145.

11. In December 2000, Plaintiff and Robillard met with Peter Cusato, Vice President for Business Affairs, to discuss Plaintiff's wide-ranging complaints. Ex. 5 at 72. Mr. Cusato concluded that Plaintiff's disagreement with certain of Battaglino's decisions was unfounded. Mr. Cusato also concluded that Plaintiff had "been a major obstacle to clearing up any past vacation discrepancies," that the tone of Plaintiff's discussion was "outside the boundaries of acceptable conduct," and that Plaintiff's e-mail communications had been "insulting and inflammatory." Ex. 13: Memorandum from Peter Cusato to Plaintiff, December 26, 2000.

12. On December 28, 2000, Plaintiff filed a complaint with the Massachusetts Commission Against Discrimination. Plaintiff claimed that he was the victim of age discrimination and retaliation. He also claimed that beginning "in or around 9/00, when I refused to terminate the services of a handicapped individual I was told to comply, or I would be terminated. Since that time I have been denied my personnel files, have been threatened with termination. . . ." Ex. 12.

13. The Commission dismissed Plaintiff's age discrimination claim because it was barred by the then-applicable six-month statute of limitations. Ex. 14: MCAD Decision.

14. The Commission also concluded that Plaintiff was "unable to show that he suffered any retaliation as he cannot prove that any alleged retaliation stems from his participation in a protected activity." Id.

15. Shortly after Plaintiff filed a complaint with the MCAD, his attendance began to deteriorate. His supervisor, Mr. Battaglino, asked him to "curtail . . . frequent disappearances." Ex. 9. Battaglino regularly emphasized that he needed Plaintiff to come to work and perform his

job responsibilities.  Ex. 6:  BU 0311, 0319, 0341-42, 0345-46, 0347, 0349.  During 2001, Plaintiff sent long, rambling e-mails to Battaglino and others, in which he complained about unfair treatment, accused his supervisors and other administrators of misconduct, and addressed work-related issues.  He also sent confusing e-mails regarding his schedule, and his need to take time off to attend to his health care.  Ex. 6:  BU 0136; 0131-33; 0282, 0284, 0286, 0290-92, 0308, 0309, 0310, 0332-38, 0341-42, 0349, 0355-56; Ex. 3 at 139-41.

16.     On January 19, 2001, Plaintiff's physician wrote a note "excusing [Plaintiff] from work thru February 2nd" without explanation.  Ex. 15.  The next several months were punctuated by multiple absences.  For example, in April and early May 2001, Plaintiff requested time off on sixteen of twenty-two possible working days during that month.  Ex. 6:  BU 0308, 0309, 0321, 0324-325, 0334-335; Ex. 16:  Time Off Requests, May 2001.  Of these, Battaglino approved one full day (May 11, vacation and snow time), two half-days, and two days where Plaintiff left two hours early.  Ex. 16:  BU 0440, 0441.  Battaglino denied the other requests.  Ex. 6:  BU 0140; Ex. 16: BU 0447, 0446.  Notwithstanding this, in addition to the approved time, Plaintiff took four and one half days off which had been expressly denied by Battaglino, and claimed them as sick leave.  Ex. 17:  BU 0438.

17.     On May 15, 2001, Neil S. Gore, a psychologist, wrote a note that Plaintiff presented to the University.  The body of Dr. Gore's note, in full, states:

> This is to certify that I see Jack Walsh in counseling on Tuesdays.

Ex. 18.  The note did not indicate the length of Plaintiff's visits with Dr. Gore, or how long the Tuesday sessions would last.  On one occasion, he told his supervisor, "on Tuesdays I am in therapy all day."  Ex. 19.  Although the sessions lasted approximately one hour (Ex. 2 at 99),

Plaintiff generally missed an entire day of work when he met with Dr. Gore.  Ex. 17; Ex. 20: Dr. Gore's therapy session notes.

      18.     On or about May 22, 2001, Plaintiff "self-identified" himself as a person with a disability.  Plaintiff claimed that he had had a stroke in 1984 and that it impaired his peripheral vision.  He claimed he suffered from Post Traumatic Stress Disorder, Acute Stress Disorder, depression, and migraines.  He requested the following accommodation:

> Ability to attend medical appointments & follow treatment w out interference:  which is limited to use of accrued sick time.  Same treatment as others in this department on use of time.

Ex. 21:  Self-Identification of Disabled and/or Veteran Status.

      19.     Although Plaintiff's medical conditions occasionally caused him to miss work, and required the attention of his health care providers, none of his conditions, taken together or separately, interfered with any of his major life activities, including work.  Ex. 2 at 118-123.

      20.     Neither of Plaintiff's medical experts, both of whom treat Plaintiff, assert that he has a disability.  Exs. 22, 23.

      21.     Plaintiff's job required him to be at work.  His supervisor, Mr. Battaglino, was frustrated by his chronic absences.  Frequently, Plaintiff failed to give Mr. Battaglino advance notice of his absences, or would request medical leave without explanation or documentation.  Ex. 6:  BU 0136, 0140, 0311, 0319, 0341, 0345, 0347, 0349.  Nonetheless, the University approved the overwhelming majority of Plaintiff's requests to be absent.  Even though the University was concerned that Plaintiff was abusing his sick leave benefit, he never missed a day's pay.  Ex. 2 at 30, 58, 104-05, 167-68.

      22.     On August 22, 2001, Plaintiff's physician, Steven Abreu, M.D., sent the following note:

> Mr. Walsh is excused from work until September 1 due to illness. He may then return to restricted duty until being next evaluated by me September 4, 2001 [sic].

Ex. 24. Dr. Abreu did not specify the nature of Plaintiff's condition.

23. Marc Robillard, Director of Housing (and the head of Plaintiff's department), was frustrated and disturbed that Plaintiff intended to be absent, and then return for an undefined period of "restricted duty," as students were moving into the University's dormitories to begin the fall semester—the busiest time of the year. Ex. 5 at 128. On August 27, 2001, Mr. Robillard told Plaintiff to inform him "when, and if, I can expect you to return as a significant full-time contributor to this department." Ex. 5 at 123-26; Ex. 25.

24. On September 19, 2001, Plaintiff told the University that he wanted to take leave pursuant to the provisions of the FMLA. Ex. 26. But he refused to authorize his physician to provide information to the University. Exs. 27-29. On October 1, 2001, Plaintiff's physician sent a letter to the University supporting Plaintiff's FMLA request. Ex. 30. But it was vague and uninformative, and did not provide the University with a basis for determining if Plaintiff was actually eligible for leave. Ex. 31.

25. Plaintiff wrote several confusing and, at times, insulting communications to various University employees regarding his leave request. Exs. 26, 32, 33.

26. Eventually Plaintiff's physician, apparently with Plaintiff's approval, provided documentation relating to Plaintiff's health. Ex. 34: Certification of Health Care Provider.

27. On November 16, 2001, the University told Plaintiff that it was unable to determine his eligibility for FMLA leave, and instructed him to return to work. Ex. 28; Ex. 5 at 141-42.

28.     Plaintiff returned to work on November 26, 2001, in the same position he had held before he went on leave in August, when he last worked.  Ex. 2 at 215.  Although he had not worked since approximately August 21, 2001, he was fully compensated for more than thirteen weeks of continuous absence.  Ex. 2 at 30, 58, 104-05, 167-68.  As of November 26, Plaintiff failed to report to work on some part or all of 142 out of 230 work days during calendar year 2001.  Ex. 17.

29.     On November 27, Plaintiff initiated a physical confrontation with Mr. Battaglino, his supervisor.  That, his continued insubordination, and his abuse of sick leave, led the University to terminate Plaintiff's employment on November 30, 2001.  Ex. 35.

30.     On May 23, 2002, Plaintiff filed his second complaint with the MCAD, alleging discrimination on the basis of his disability and retaliation because of his participation in protected activities.  Ex. 36.  The complaint named as Respondents Boston University, several senior executives and members of the University's Board of Trustees (none of whom had anything to do with this case), a staff member in the Office of Personnel, and the University's Director of Occupational Health.  On September 17, 2004, the Commission dismissed this complaint as well.  The MCAD concluded that Walsh had "not met the burden of proof necessary to hold any of the individually named parties liable for alleged discrimination based on disability or retaliation for participation in protected activity."  Memorandum of MCAD Investigator, attached hereto as Ex. 37.

31.     The Commission also dismissed Plaintiff's claims against the University:

> Complainant's allegations of disability discrimination should be dismissed as he has failed to provide any evidence of a disabling condition.  Indeed, this Commission is unable to identify exactly what condition he suffers. . . .  [The University] provided this Commission with direct evidence of their attempt to engage [Plaintiff] in a dialogue and learn of his condition.  In contrast,

> [Plaintiff] appears to have acted to thwart these inquiries . . . in direct contradiction to his responsibility at that time. . . . While he alleges that other employees and supervisors were absence without consequences, he has failed to provide any additional information to support his contention. . . . His contentions that his supervisor harassed and eventually assaulted him are similarly unsupported. In fact, the available evidence suggests the opposite occurred. . . .
>
> Complainant's allegations of retaliation must be dismissed as well. He alleges that his prior complaints concerning a former employee's use of racial epithets motivated [the University]. Assuming for the purposes of this investigation that [Plaintiff] made an internal complaint, he still does not set forth a prima facie case of retaliation as [the University] set forth legitimate explanation for each of their actions in this matter.
>
> It is apparent from the evidence submitted by [the University] that they terminated [Plaintiff] because of his absence from work without adequate explanation in addition to his insubordinate behavior. . . . . . . [F]rom the beginning of 2001 until his termination, he missed 142 out of 230 work days. Absent any explanation, which as discussed was not forthcoming, [the University] determined this course of behavior to be unacceptable. Further, [Plaintiff's] insubordinate behavior provided [the University] motivation to terminate him. Not only did he communicate with his superiors using inappropriate tone and language, the evidence suggests that he at best attempted to physically intimidate one of his supervisors and at worst assaulted him. This behavior is intolerable under any circumstances and provided [the University] with legitimate reasons for his termination. . . .

Ex. 37

Respectfully submitted,

TRUSTEES OF BOSTON UNIVERSITY,
By its attorney,


s/Lawrence S. Elswit
Lawrence S. Elswit
(BBO #153900)
Boston University
Office of the General Counsel
125 Bay State Road
Boston, Massachusetts  02215
Date:  April 21, 2006               (617) 353-2326

- 9 -