## Page 1

Volume 1
Pages 1-207
Exhibits: 1-41

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 104-CV-11240-RCL

- - - - - - - - - - -
JOHN WALSH,
    Plaintiff

v.

BOSTON UNIVERSITY,
    Defendant
- - - - - - - - - - -

DEPOSITION OF JOHN WALSH, taken on behalf of the Defendant, pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Carol A. Fierimonte, Certified Shorthand Reporter and Notary Public within and for the Commonwealth of Massachusetts, (#134693), at the Offices of Boston University, Office of General Counsel, 125 Bay State Road, Boston, Massachusetts, on Monday, August 8, 2005, commencing at 10:15 a.m.

SHEA COURT REPORTING SERVICES
(617) 227-3097

## Page 2

APPEARANCES:

PYLE, ROME, LICHTEN, EHRENBERG &
LISS-RIORDAN, P.C.
By: Rebecca G. Pontikes, Esquire
18 Tremont Street
Boston, Massachusetts 02108
On behalf of the Plaintiff

BOSTON UNIVERSITY
OFFICE OF GENERAL COUNSEL
By: Lawrence S. Elswit, Esquire, General Counsel
125 Bay State Road
Boston, Massachusetts 02215
On behalf of the Defendant

ALSO PRESENT:
Michelle Koch

## Page 3

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

JOHN WALSH

By Mr. Elswit  6

(Mr. Elswit retained exhibits.)

## Page 4

EXHIBITS

| NO. | | PAGE |
|---|---|---|
| 1 | Resume | 21 |
| 2 | MCAD Complaint | 21 |
| 3 | MCAD Dismissal | 22 |
| 4 | Battaglino Affidavit notes | 24 |
| 5 | Intake Interview | 25 |
| 6 | MCAD Complaint | 33 |
| 7 | Rebuttal Statement | 37 |
| 8 | MCAD Dismissal | 38 |
| 9 | Complaint | 38 |
| 10 | Answers to Interrogatories | 40 |
| 11 | Memo | 54 |
| 12 | E-mail | 56 |
| 13 | Memo dated December 26, 2000 | 58 |
| 14 | Memo dated January 3, 2001 | 68 |
| 15 | Notes of Verdis Robinson | 74 |
| 16 | Letter dated January 4, 2001 | 76 |
| 17 | Letter dated January 4, 2001 | 77 |
| 18 | Memo dated January 5, 2001 | 77 |
| 19 | Letter dated January 19, 2001 | 81 |
| 20 | Doctor's note | 84 |
| 21 | E-mail | 95 |
| 22 | Doctor's note | 99 |

Page 29

1  something to the effect of he hoped he
2  didn't stress me out to give me shingles
3  again.
4  Q. Any other teasing?
5  A. There was some minor teasing about the
6  kidney stone attacks I was having and I
7  can't recall.
8  Q. Do you remember what he said?
9  A. I remember him questioning me -- no, I
10 don't.
11 Q. What about intentional falsification of
12 records, what is that all about?
13 A. I believe there was an intentional
14 falsification of some of the records to
15 show that I was being uncooperative and
16 some backdating of documents to make it
17 appear as if I had been told to have my
18 time off request in or told to reconcile
19 my time off records. Then with regards to
20 my attendance, there were a number of
21 times that I thought I had shown to
22 Mr. Battaglino that I was on the property,
23 and he disagreed and docked me pay. So I
24 thought that was falsifying a record.

Page 30

1  Q. When you say he docked you pay, does that
2  mean your paycheck was less than full?
3  A. No. I should have termed it he docked me
4  vacation and sick balance.
5  Q. So you got paid, but it was against your
6  accumulated sick or vacation balance?
7  A. Yes.
8  Q. Okay.
9  A. I also thought, and why, if I can go back
10 to possibly why you were mentioned as the
11 employer or discriminating official
12 figures, I wasn't sure about the
13 no-trespassing order and I thought you may
14 have had something to do with that. I
15 know Marc Robillard wrote about it. I
16 thought that was discriminatory. And I
17 thought Mr. Battaglino's claim that he was
18 afraid of me physically was a
19 falsification in his affidavit. That is
20 my --
21 Q. Well, let's take these two things --
22 A. Yes, sir.
23 Q. -- that you have mentioned.
24 A. Yes, sir.

Page 31

1  Q. First is the no-trespassing order. Would
2  you explain that, please?
3     MS. PONTIKES: Objection.
4  A. Upon my termination, I received a letter
5  on early December 2000, terminating me.
6  And at the end of it, it said I was no
7  longer allowed on the property. I had
8  paid COBRA payments and had some -- I was
9  seeing a BU physician, general
10 practitioner as well as BU dentist, and I
11 wanted to continue to see them. I had
12 been invited to graduation by Colonel
13 Mikolajek and a few other people. So this
14 letter had to do with a no-trespassing
15 order. And I didn't think that there was
16 a need to put a no-trespassing order on
17 me. I didn't cause trouble at the
18 University.
19 Q. Eventually, that was sorted out, wasn't
20 it? You were told you could come to
21 campus for all of your medical needs?
22 A. Yes, sir, you did, yes.
23 Q. All right. What was discriminatory about
24 that order, about the no-trespass order,

Page 32

1  how did that discriminate against you?
2  Now, I am not asking whether it was right
3  or wrong. I just want to know why you
4  think it has to do with discrimination.
5  A. Become other terminated employees, to my
6  knowledge, in my department weren't
7  treated the same way. They would come
8  back to work or they would go to a
9  basketball game or use the gym.
10 Q. Do you think that this no-trespass order
11 had to do with some discriminatory issue
12 or was simply a bad judgment on the part
13 of the University?
14    MS. PONTIKES: I object.
15 A. I am not sure what to think. But I
16 thought it was done in an act of
17 retaliation, meanness, make my life a
18 little more difficult.
19 Q. But do you think that had anything to do
20 with discrimination as opposed to
21 meanness?
22    MS. PONTIKES: Objection.
23 A. I think it had to do with discrimination.
24 Q. Why is that?

Page 33:

```
 1  A. Because I had filed these charges.
 2         (Document marked as Exhibit No. 6
 3     for identification.)
 4  Q. Okay. Please identify Exhibit No. 6.
 5         (Witness perusing document.)
 6  A. Yes. I am sorry. Yes, it is a
 7     typewritten complaint made out by the
 8     MCAD.
 9  Q. The second page of Exhibit No. 6, is that
10     your signature?
11  A. Yes, sir.
12  Q. Okay. Right below your signature it
13     indicates that you filed this complaint on
14     May 23, 2002. Is that about right so far
15     as you can remember?
16  A. Yes.
17  Q. Okay. Mr. Walsh, on the first page, the
18     last paragraph, the last two sentences,
19     would you read them to yourself, please.
20         (Witness perusing document.)
21  A. Yes.
22  Q. All right. The last sentence indicates
23     that you were initially permitted time off
24     but then the University began to deny your
```

Page 34:

```
 1     requests for time off.
 2         When did that change happen?
 3  A. Approximately September or October of
 4     2000.
 5  Q. All right. What happened as far as you
 6     can tell?
 7  A. My supervisor, Mr. Battaglino, Jr., was
 8     not happy with my refusal to terminate the
 9     services of Lindsey McLean, M-C-L-E-A-N.
10     And at that point, I started having some
11     difficulty in getting accommodations.
12  Q. Okay. Had you written requested
13     accommodations at this point?
14  A. Prior to that, sir?
15  Q. Yes.
16  A. Yes.
17  Q. And what kind of accommodations did you
18     request?
19  A. Two, one was to take care of my medical
20     needs. Mr. Battaglino was aware I had
21     some stress issues.
22  Q. All right.
23  A. And the second one was my parents weren't
24     in the best of health.
```

Page 35:

```
 1  Q. So this was right after, within a couple
 2     of months of his arrival?
 3  A. Yes. This was right when he arrived.
 4  Q. Okay.
 5  A. And my prior boss, Mr. Sadri, S-A-D-R-I,
 6     was aware of that.
 7  Q. Okay. So just to summarize, it sounds
 8     like things began going downhill shortly
 9     after Mr. Battaglino arrived.
10         Would that be fair?
11         MS. PONTIKES: Objection.
12  A. Our first couple of months was pretty
13     good, if not very good, I thought.
14  Q. All right. But by September or October of
15     2000 --
16  A. Pretty quickly, it turned.
17  Q. Sir, in your mind, this relates to the
18     Lindsey McLean event?
19         MS. PONTIKES: Objection.
20  A. I can guess that that is my estimation,
21     sir.
22  Q. Well, that is fair, that is fair.
23  A. Yes, okay.
24  Q. Now, on the second page of this document,
```

Page 36:

```
 1     the first sentence there, you write, "The
 2     complaint alleges that the termination was
 3     in retaliation for his internal complaints
 4     against a former officer's associates who
 5     used racial epithets but were never
 6     disciplined."
 7         Did I read that first sentence
 8     correctly?
 9  A. You did, sir.
10  Q. Can you tell me what you are referring to
11     here?
12  A. Of course, you know, I didn't write this.
13     And I was just trying to figure out,
14     against a former officer's associate who
15     used racial epithets, I don't know if we
16     were talking within the department there.
17     We did have some employees using the N
18     word, who was never disciplined. And we
19     did have a supervisor being called
20     "buckwheat". That person was never
21     disciplined. I don't understand a former
22     officer's associate, if that had anything
23     to do with -- I don't think the police
24     officer -- I am not sure what she wrote or
```

John Walsh - August 8, 2005                                    Walsh vs. Boston University

Case 1:04-cv-11240-RCL    Document 19-3    Filed 04/21/2006    Page 4 of 5

**Page 41**

1  A. Yes.
2  Q. Or believed it?
3  A. I am sorry for interrupting. Yes.
4  Q. Mr. Walsh, we have talked about
5     Mr. Battaglino, but we haven't identified
6     him yet. Who is he?
7  A. Mr. Battaglino, Jr., sir, right, correct.
8  Q. Yes. John Battaglino.
9  A. Okay, right. He is the Associate Director
10    of Housing.
11 Q. Okay. Do you remember when he started?
12 A. In June of 2000.
13 Q. And did you also apply for that position?
14 A. Yes.
15 Q. Okay. So he got it and you didn't?
16 A. Yes.
17 Q. And he immediately became your supervisor?
18 A. Yes.
19 Q. Okay. Do you think he deserved the job?
20        MS. PONTIKES: Objection.
21 A. No.
22 Q. Okay. Why not?
23 A. He wasn't qualified.
24 Q. And why not?

**Page 42**

1  A. He didn't have the prerequisites for the
2     job requirements, which was a college
3     degree plus one to three years' experience
4     in security. He didn't have any
5     experience with security. He didn't have
6     any experience with union personnel.
7     Educationally, of course, as I mentioned,
8     he didn't meet the requirements for the
9     job. And Marc Robillard had a policy of
10    promoting from within. So for those
11    reasons, that I can recall, I didn't think
12    he qualified.
13 Q. Who is Marc Robillard?
14 A. Marc Robillard is the Director of the
15    Division of Housing.
16 Q. Mr. Battaglino's direct supervisor?
17 A. Either him or Kitt McGinn might be, she is
18    a Senior Associate Director. So he would
19    be one of Mr. Battaglino's direct
20    supervisors, absolutely.
21 Q. All right. Would it be fair to say that
22    you believed that Mr. Battaglino got the
23    job at least in part because his father
24    was a member of the University's Board of

**Page 43**

1     Trustees?
2  A. That would be fair.
3  Q. Do you think there are any other reasons
4     that he got the job?
5  A. I wouldn't know.
6  Q. Okay. You let people know -- did you let
7     people know your views on this subject?
8  A. Yes.
9  Q. Who?
10 A. Marc Robillard.
11 Q. Mm-hmm.
12 A. Other applicants for the job met with me,
13    and they didn't think it was fair and I
14    didn't think it was fair either.
15 Q. Who were these other applicants?
16 A. Within Residential Safety, there was an Al
17    Morse and there was a Jean Dalton that
18    were applicants for the job. They were
19    pretty upset. They met with me.
20 Q. Were they your subordinates or your
21    coworkers?
22 A. Technically, coworkers.
23 Q. Coworkers?
24 A. But in the reporting chain it was somewhat

**Page 44**

1     different.
2  Q. Okay.
3  A. They -- I would say yes, they were my
4     subordinates. I am sorry for being --
5  Q. No, that is all right. Sir, you talked to
6     them, you talked to your subordinates
7     about your perception that Mr. Battaglino
8     had gotten the job because of his father's
9     position?
10 A. Yes, I did. Eventually talked to them
11    about that that was my impression.
12 Q. When you say eventually, when did you
13    have those conversations?
14 A. Somewhere around late summer of 2000.
15 Q. After Mr. Battaglino had been on the job
16    for a few months?
17 A. Yes, he had the position.
18 Q. Okay. Do these other individuals that you
19    just mentioned, tell me their names again,
20    please. Sorry. Jean Dalton?
21 A. Yes.
22 Q. And Al Morse?
23 A. Yes.
24 Q. Did Mr. --

John Walsh - August 8, 2005     Walsh vs. Boston University

Case 1:04-cv-11240-RCL    Document 19-3    Filed 04/21/2006    Page 5 of 5

**Page 45**

1   A.   And Brian -- I am sorry for interrupting.
2      Brian Clougher, C-L-O-U-G-H-E-R, was
3      another manager in Residential Safety. I
4      also had conversations with him.
5   Q.   So you have told at least three people
6      your views that Mr. Battaglino did not
7      deserve the job?
8   A.   No.
9        MS. PONTIKES: Objection.
10       THE WITNESS: I am sorry. This
11      was a discussion that took place between
12      us. I am not sure as if I told them that
13      he didn't deserve the job. They were
14      upset about not being interviewed. I was
15      upset about not being interviewed. I
16      surmised the reason probably was because
17      of his father's position at the
18      University.
19   Q.   Okay.
20   A.   But I couldn't tell them that that was the
21      reason that he got the job because I
22      didn't know. No one told me that was the
23      reason he got the job.
24   Q.   But you shared your opinion anyway?

**Page 46**

1   A.   I did share, yes, sir, yes.
2   Q.   All right. Okay.
3   A.   Yes.
4   Q.   I gather that struck you as grossly
5      unfair?
6        MS. PONTIKES: Objection.
7        MR. ELSWIT: Strike that.
8   Q.   Did that strike you as unfair?
9   A.   I didn't think it was fair.
10   Q.   All right. Mr. Walsh, as a general
11      matter, do you see yourself as a kind of
12      guy who stands up against unfairness and
13      injustice?
14        MS. PONTIKES: Objection.
15   A.   Sometimes I lack the courage. Sometimes
16      I, I do speak up against it.
17   Q.   Okay. Would you say that your position
18      vis-a-vis Lindsey McLean is an example of
19      having that courage, to use your word, to
20      stand up against injustice?
21   A.   Yes.
22   Q.   Okay. Any other examples?
23   A.   Of me not having the courage?
24   Q.   Well, let's talk about your courage first.

**Page 47**

1   A.   There is not a lot of it. I had a couple
2      of black students work in my office that
3      weren't allowed to get the housing that
4      they were promised. I spoke up against
5      that.
6   Q.   Did that help get them the housing they
7      were promised?
8   A.   No, sir.
9   Q.   Okay. Who did you speak to?
10   A.   I spoke to Marc Robillard. It was about
11      Tamara and Alisha.
12   Q.   Two women?
13   A.   I thought that -- those were the two
14      students, yes. They were both black and
15      they thought there was a racist motivation
16      for them not getting the assignments that
17      they wanted, as well as being allowed to
18      go to school in the summer because some
19      other students were allowed to go to
20      school in the summer.
21        There was a black gentleman in, I
22      am not sure when, who was a student, I
23      refused to fire. I spoke up to Babek
24      Sadri, B-A-B-E-K, S-A-D-R-I. I -- I -- I

**Page 48**

1      mean I can't recall any other time I had
2      the courage.
3   Q.   Did you -- did you have a point of view
4      about their claims or did you speak up
5      because you knew you had access to people
6      who might hear you, or something else?
7   A.   Could you repeat that, please.
8   Q.   Sure. You have spoken about three people
9      who believed that they may have been the
10      victims of race-based prejudice.
11   A.   Correct.
12   Q.   Did you also believe that they were the
13      victims of race-based prejudice?
14   A.   I wasn't sure.
15   Q.   Okay. Now, a little while ago you said
16      that by September or October of the year
17      2000, you felt that you were not being
18      treated fairly by Boston University. Is
19      that about right?
20   A.   By Mr. Battaglino, yes, sir.
21   Q.   Okay. And the area that you felt like you
22      were not being treated fairly in related
23      to your requests for accommodations in the
24      form of time off. Is that correct?