Page 49

```
 1   A. That was one of the areas, sir.
 2   Q. Okay. Were there others?
 3   A. Yes, sir.
 4   Q. Okay. What were they?
 5   A. I was being docked vacation and sick time
 6      when I was present. I was not given a
 7      raise. Everyone else in the department
 8      who was salaried was given a raise. I was
 9      put on the off shifts. I had some of my
10      mail opened. I had all of the mail taken
11      out of my mailbox every day.
12           There were a couple other items
13      in the complaint and, off the top of my
14      head, the teasing was a big thing. I was
15      forced to sign in and sign out of the
16      office exceptionally more than other
17      people. If I was to use the bathroom, I
18      was told I was to sign in, sign out. If I
19      went to get a cup of coffee, I was told to
20      sign in, sign out and it wasn't standard
21      for other people. I was talked to about
22      inappropriate use or non-responding on the
23      radio, even though there were reports from
24      Bill Carey, Marc Robillard, John
```

Page 50

```
 1      Battaglino, Brian Clougher all had trouble
 2      with the radios. I was given assignments
 3      that I thought were nearly impossible to
 4      complete in the time frame allowed, all
 5      with the knowledge that I possessed. I
 6      forgot the question already.
 7   Q. I was asking you, I asked you how you felt
 8      like you were treated unfairly.
 9   A. Oh, thank you.
10   Q. So you have stuck with the question the
11      whole way.
12   A. It is unlike me.
13   Q. You are doing fine. I just want to
14      eliminate a few problem areas.
15   A. Yes.
16   Q. Okay. You felt like you were being
17      treated unfairly. Do you feel like this
18      was because of your gender?
19   A. No.
20   Q. Okay. Or your sexual orientation?
21   A. No.
22   Q. Okay. Your age?
23   A. I wasn't sure.
24   Q. Okay. Your disability, if you had, you
```

Page 51

```
 1      know, your disability?
 2   A. I thought I was treated unfairly with
 3      regards to that, yes.
 4   Q. And earlier you mentioned retaliation?
 5   A. Yes, sir.
 6   Q. Okay. So just narrowing the scope of
 7      things so we can continue our discussion
 8      in a fairly informed way, it looks like
 9      your principal concerns resolved around
10      being treated unfairly because of your
11      disability and retaliation for standing up
12      for injustice, perhaps?
13           MS. PONTIKES: Objection.
14   A. The retaliation was a principal concern.
15      And the inability to get an accommodation
16      was a major concern also.
17   Q. Okay.
18   A. The first one I forgot. You mentioned a
19      first one. I went backwards but --
20   Q. I mentioned a first one?
21   A. I thought you mentioned something besides
22      the retaliation and the disability.
23   Q. Well, I asked you about age also.
24   A. Oh, as I mentioned, that was the
```

Page 52

```
 1      impression of two or three supervisors as
 2      well as my own. And we weren't sure if
 3      that was part of the problem with the
 4      hiring process. Subsequently, I withdrew
 5      that charge, of course, from the MCAD.
 6   Q. Well, subsequently that charge was
 7      dismissed from the MCAD, wasn't it?
 8           MS. PONTIKES: Objection.
 9   A. It was dismissed. But on appeal, if it
10      made any difference, I asked them to
11      reconsider it and submitted the reasons
12      why. That I didn't think I was being
13      unreasonable, and thinking that age might
14      have been a factor in the hiring.
15   Q. Okay. So the MCAD dismissed your
16      complaint?
17   A. Yes.
18   Q. The dismissal was upheld on appeal,
19      affirmed?
20   A. Yes, sir.
21   Q. Okay. Now, as I read the record, and you
22      tell me if I am reading it correctly, the
23      overall record of this case, would it be
24      fair to say that most of these things
```

**Page 53**

1 began around the time that you stood up
2 for Lindsey McLean?
3    MS. PONTIKES: Objection.
4 Q. Around or after, shortly after that time?
5 A. Yes, sir.
6 Q. And would it also be fair to say that you
7    stood up for Lindsey McLean because you
8    felt like he may have been the victim of
9    disability discrimination?
10 A. There are a number of reasons why I stood
11    up for Lindsey McLean. But I thought he
12    was being discriminated against.
13 Q. Okay. Now, just in terms of a time
14    line --
15 A. Mm-hmm.
16 Q. You have the Lindsey McLean stuff, which
17    you said happened in September or October
18    of 2000?
19 A. Yes.
20 Q. Right?
21 A. Yes.
22 Q. And around that same time, you felt like
23    you were not getting the accommodations
24    you had requested in terms of your

**Page 54**

1 personal health needs. Is that correct?
2    MS. PONTIKES: Objection.
3 A. Yes.
4 Q. All right. Mr. Walsh, did you and your
5    supervisors disagree about the amount of
6    vacation time you had accrued?
7 A. Yes.
8 Q. Was that an ongoing thorn in your side?
9    MS. PONTIKES: Objection.
10   MR. ELSWIT: Let me rephrase that.
11 Q. Was that a dispute that continued over a
12    period of time?
13 A. Yes.
14 Q. Okay. Please identify Exhibit No. 11.
15    (Document marked as Exhibit No.
16    11 for identification.)
17    (Witness perusing document.)
18 A. It is a memo to me from John Battaglino.
19 Q. Now, there is a typed date and then a
20    handwritten date. The typed date is
21    December 1st of 2000. The handwritten
22    date is November 1st of 2000.
23    Did you receive this memo, if you
24    remember?

**Page 55**

1 A. I don't remember.
2 Q. Okay. Why don't you read the memo and
3    let's talk about it.
4    (Witness perusing document.)
5 A. Yes. I have read the memo.
6 Q. Okay. In this memo in the first paragraph
7    Mr. Battaglino invites you to help correct
8    the discrepancy of the time off record.
9    Is that fair, a fair summary?
10   MS. PONTIKES: Objection.
11 A. Yes.
12 Q. The second paragraph indicates that
13    Mr. Battaglino attached leave records for
14    July, August, September and October of
15    2000, and asks you to either approve them
16    or let him know if there are disagreements
17    with them.
18    Did you respond?
19 A. I am not sure if I saw this memo. But I
20    am sure I responded to the reconciliation
21    of the leave records for July through
22    October.
23    MR. ELSWIT: Okay. Mark that,
24    please, as Exhibit No. 12.

**Page 56**

1    (Document marked as Exhibit No.
2    12 for identification.)
3 Q. Please identify Exhibit No. 12, sir.
4    (Witness perusing document.)
5 A. It is an e-mail from John Battaglino to
6    myself and from myself to John.
7 Q. What is the date?
8 A. November 15, 2000.
9 Q. All right. Your e-mail to Mr. Battaglino
10    indicates that your records that would
11    help you reconcile the dispute over
12    vacation time were, I am reading this now,
13    "I am sure it is down my folks."
14    Does that mean that you thought
15    that you had records at your parents'
16    home?
17 A. I knew I had a phone record, yes, sir.
18 Q. A phone record. Would that resolve time
19    off issues?
20 A. Yes, I thought it should, sir.
21 Q. How is that?
22 A. Because when Mr. Battaglino would say I
23    was off, for example, September 15th, I
24    would sit down and show John the log sheet

Page 57

1  in the office or I would show him e-mails
2  that I had written. And the only place I
3  ever wrote an e-mail was at Boston
4  University, I didn't have a home computer,
5  the only place it would have originated.
6  Or a few times I went in and said to John,
7  John, you docked me a day's pay here and
8  here is my phone record, I made a call
9  from the office at nine, I made a call
10 from the office at one o'clock, I was here
11 that day.
12 Q. Okay. You sat down with Mr. Battaglino
13 and showed him those records?
14 A. Yes, sir.
15 Q. And what was his response?
16 A. Nothing positive for me.
17 Q. Explain that, please.
18 A. Sometime, I believe, in December of 2000,
19 Mr. Battaglino wrote me an e-mail about he
20 hadn't given me back all my time off
21 requests. So what was happening, that
22 there was like a couple of months in
23 between a reconciliation, I argued,
24 discussed with him my attendance and the

Page 58

1  fact I was there. But Mr. Battaglino
2  claimed I wasn't and would dock me the
3  pay. Eventually, I believe, in January of
4  2001, I went over the records again. I
5  had phone records, I had the sign-in front
6  sheet at the front desk. I had e-mails.
7      And at that point, Mr. Battaglino
8  said it was too late, you already had your
9  chance and we had tried to do this before.
10 Q. When you say he docked your pay, can you
11 explain that phrase?
12 A. Yes, sir. I use that phrase, once again,
13 mistakenly. He would dock my vacation or
14 sick time balance, not actually dock my
15 paycheck, sir.
16 Q. Okay. So you got paid for these times?
17 A. That I worked.
18     (Document marked as Exhibit No.
19 13 for identification.)
20 Q. Okay. Please identify Exhibit No. 13,
21 sir.
22     (Witness perusing document.)
23 A. Yes. I have read this or I have seen
24 this, Mr. Elswit.

Page 59

1  Q. Mr. Walsh, Exhibit No. 13 is a memorandum
2  from Peter Cusato to you dated December
3  26, 2000. Mr. Cusato is the Vice
4  President for Business Affairs at the
5  University.
6      Do you recall receiving this
7  memorandum?
8  A. Yes.
9  Q. Okay. Did you meet with Mr. Cusato before
10 this memorandum was written?
11 A. Yes.
12 Q. Who else was present?
13 A. Marc Robillard.
14 Q. Anyone else?
15 A. No, sir.
16 Q. What was discussed?
17 A. John's retaliation over the termination of
18 Lindsey McLean, the termination of Lindsey
19 McLean, how John and I had a pretty good
20 relationship for June, July, August and
21 maybe September, and that it had gone
22 south. Sorry for using that slang. It
23 wasn't, wasn't too good at this point.
24 And that I was trying to stay within

Page 60

1  University channels, that I had gone to
2  John and I had gone to Marc Robillard, and
3  I thought I was shooting myself in the
4  foot by continuing within the University,
5  but it was the appropriate thing to do
6  because he was Marc's boss.
7  Q. He being Mr. Cusato?
8  A. Yes, sir. So that was my next step was to
9  see Mr. Cusato.
10 Q. Anything else discussed at that meeting?
11 A. I remember Marc Robillard called me a
12 liar. I remember Mr. Cusato saying let's
13 get it all out on the table right here. I
14 don't know if that was over language or
15 over specific examples, but I surely
16 remember him saying, you know, let's not
17 hide the ball.
18 Q. You knew Mr. Cusato prior to this meeting,
19 didn't you?
20 A. No, sir.
21 Q. Never met him?
22 A. I don't know if I had ever met him. And
23 if I did, it would be in passing like --
24 Q. Okay.

John Walsh - August 8, 2005  Walsh vs. Boston University

Case 1:04-cv-11240-RCL   Document 19-4   Filed 04/21/2006   Page 4 of 5

**Page 73**

1 question and answer before the break,
2 please.
3         (Record read back as requested.)
4 Q. Mr. Walsh, returning to Exhibit No. 14.
5 A. Yes.
6 Q. Mr. Battaglino's first request is that you
7    review your leave records from July
8    through December.
9         Is it your position that you had
10   done that already?
11 A. Yes. And did it again, just so you know,
12   I did it again on this memo. In other
13   words, I had done it prior to this memo.
14 Q. Okay.
15 A. And when he directed me to do it, I did it
16   again.
17 Q. After you received the January 3, 2001
18   memo?
19 A. Yes, sir.
20 Q. Okay. On page two of Exhibit No. 14, the
21   next to last paragraph, Mr. Battaglino
22   writes, "If you have a problem with these
23   tasks or deadlines, let me know
24   immediately."

**Page 74**

1         Did you have a problem with these
2    tasks or deadlines?
3 A. Yes.
4 Q. Did you let him know immediately?
5 A. Yes.
6 Q. Okay. Let's hold on to that for just a
7    moment. Your earlier testimony referred
8    to Verdis Robinson and your concern about
9    his participation in a meeting.
10 A. Yes.
11        (Document marked as Exhibit No.
12   15 for identification.)
13 Q. I am going to show you a document that has
14   been marked Exhibit No. 15 and ask you to
15   identify it, please.
16        (Witness perusing document.)
17 A. I have reviewed this.
18 Q. What is Exhibit No. 15, sir?
19 A. It appears to be notes drawn up by Verdis
20   Robinson of the meeting that John
21   Battaglino and I had.
22 Q. On January 3rd?
23 A. Yes, sir.
24 Q. Have you ever seen this before?

**Page 75**

1 A. No, sir, not that I can recall. No.
2 Q. In the second paragraph of this
3    memorandum, which we have labeled as
4    Exhibit No. 15, next to last sentence
5    reads, "After the meeting, I was asked by
6    Jack Walsh to prepare notes on my
7    interpretation of the proceedings of the
8    meeting."
9         Did you ask Verdis Robinson to
10   prepare notes following your meeting with
11   Mr. Battaglino?
12 A. Yes. With John there, yes, sir.
13 Q. Okay. And this is the first time you have
14   seen these notes?
15 A. Yes.
16 Q. Okay. In your testimony a few minutes ago
17   you said that Mr. Battaglino read a
18   memorandum that he wrote to you at your
19   meeting.
20        Was that memorandum that
21   Mr. Battaglino read to you the one we have
22   just discussed and labeled Exhibit No. 14?
23 A. Yes.
24 Q. Okay. Six lines up from the bottom of the

**Page 76**

1    first page of Exhibit No. 14 is the
2    following sentence. "Jack also expressed
3    concerns that the deadlines in the memo
4    were unreasonable and felt that it was in
5    retaliation against him."
6         Is that, did I read it
7    accurately?
8 A. Yes, you did.
9 Q. Okay. And does this sentence accurately
10   reflect your view that the deadlines were
11   unreasonable and retaliatory?
12 A. Yes.
13 Q. Retaliation for what?
14 A. For filing the MCAD charge.
15 Q. Okay. At this meeting did Mr. Battaglino
16   tell you that he did not know about the
17   filing of the MCAD charge?
18 A. He did tell me that.
19 Q. Okay. Please identify Exhibit No. 16,
20   sir.
21        (Document marked as Exhibit No.
22   16 for identification.)
23        (Witness perusing document.)
24 A. Yes, sir. I recognize this.

**Page 97**

1  thinking that is what he wanted, and I was
2  hoping -- I was disappointed is my
3  impression.
4  Q. Did you think it was reasonable to request
5  16 days off out of a total of 22 working
6  days in one month?
7      MS. PONTIKES: Objection.
8  A. I thought John was putting a spin on that.
9  Q. Well, did you request 16 days off?
10 A. No.
11 Q. How many days off did you request?
12 A. I couldn't tell you without seeing the
13 time off request. But without seeing it,
14 I can assure you, A, they weren't for full
15 days off; and B, I surely made myself
16 available. I waited until after
17 graduation was going to take place, until
18 it was a very quiet time of the year.
19 Originally, I had seen Doctor Gore on
20 Mondays. I made sure I changed that to
21 Tuesdays just so he wouldn't think I was
22 trying to grab a long weekend or anything
23 else. And as I mentioned in my original
24 response to him, we had, you know, one

**Page 98**

1  supervisor leaving early and another one
2  couldn't come in until later but I would
3  be available for coverage. And John had
4  told me to write down anything possible.
5  He needed to know any possible, any days
6  that I could possibly be out in the month
7  of May. So I did. Or time off I would
8  need. He didn't say days.
9  Q. Did you end up taking those days off or
10 did you end up taking care of your medical
11 appointments such that you weren't at work
12 without regard to how they were treated?
13 A. I am sorry. I am not following your
14 question.
15     MS. PONTIKES: Objection.
16     MR. ELSWIT: It is a poor
17 question. I will try to restate it.
18 Q. Did you miss any medical appointments in
19 the month of May, if you remember?
20 A. I can't recall.
21 Q. All right.
22 A. Mr. Elswit, when I filled this out too I
23 didn't know Verdis was leaving. So I mean
24 when you asked me what my impression was,

**Page 99**

1  I was a little discouraged there too
2  because if you know someone is leaving,
3  you may be able to do more for the boss.
4  Q. All right. Mr. Walsh, please identify
5  Exhibit No. 22, sir.
6      (Document marked as Exhibit No.
7  22 for identification.)
8      (Witness perusing document.)
9  A. Yes, sir. This is a note from Doctor Gore
10 dated May 15, 2001, verifying the fact
11 that he sees me on Tuesdays for
12 counseling.
13 Q. Was this a request to be out of work on
14 Tuesdays?
15 A. John had asked me for some documentation.
16 Q. Okay. On Tuesdays, how much time did you
17 take off to see Doctor Gore?
18 A. I only saw Doctor Gore for about an hour.
19 Q. Did you come to work when you were done or
20 before you saw Doctor Gore?
21 A. Both.
22 Q. Before and after?
23 A. Both.
24 Q. Did you ask Doctor Gore to write this note

**Page 100**

1  because you felt like you had to tell your
2  supervisor that you were in therapy?
3  A. John told me --
4      MS. PONTIKES: Objection. Go
5  ahead.
6  Q. Why did you ask Doctor Gore to write this
7  note?
8  A. Because John told me he wanted a note from
9  a doctor.
10 Q. What kind of a note?
11 A. He didn't say. In the beginning, he asked
12 me for the doctor's name. I provided that
13 with phone numbers. Subsequently, he
14 asked for notes from the doctor that I was
15 going to see them.
16 So --
17     MR. ELSWIT: All right. Do you
18 know, if it is all right, I would like to
19 start our lunch break.
20     MS. PONTIKES: Okay.
21     MR. ELSWIT: Is that okay with you
22 folks?
23     MS. PONTIKES: Sure.
24     (Luncheon recess.)