101

1  AFTERNOON SESSION
2      MR. ELSWIT: Back on the record.
3  Q. Mr. Walsh, did you submit Exhibit No. 21
4     to -- or did you ask your doctor to submit
5     Exhibit No. 21 to Mr. Battaglino to
6     explain your time off requests?
7  A. Not that one.
8      MS. PONTIKES: Exhibit No. 22?
9      MR. ELSWIT: I mean Exhibit No.
10     22.
11     THE WITNESS: I am just making
12     sure. I asked my doctor to write notes so
13     that I could give it to Mr. Battaglino,
14     yes, sir.
15 Q. To explain your time off requests?
16 A. Well --
17 Q. Or to support your time off requests?
18 A. Yes, I would say that, sir.
19 Q. Okay. When you took -- Doctor Gore's note
20    says he sees you on Tuesdays. Did you
21    take every Tuesday off?
22 A. No.
23 Q. Okay. How much time off did you take on
24    Tuesdays?

102

1  A. It varied.
2  Q. Okay. Did you ever take full days off?
3  A. Yes.
4  Q. Why was that?
5  A. Usually, I would try to schedule the
6     dentist and the general practitioner, if
7     he wanted to see me, and Doctor Gore on
8     the same day. If I did something like
9     that, I would have multiple appointments,
10    I would take the whole day off.
11 Q. The general practitioner is Doctor Abreu?
12 A. Yes.
13 Q. And we haven't talked about the dentist
14    yet.
15 A. Yes, yes, we haven't. You are correct.
16 Q. Who is the dentist?
17 A. Dr. Burt Brandse, B-R-A-N-D-S-E.
18 Q. How often did you see Doctor Brandse?
19 A. An awful lot. I am not sure of the
20    number.
21 Q. Once a week? And by the way, I am just
22    talking about this time period in the
23    spring of 2001.
24 A. Very frequently. But I couldn't tell you

103

1     if it was once a week.
2  Q. Okay. Mr. Walsh, some of your complaints
3     in this lawsuit revolve around your claim
4     that you were improperly denied time to
5     see your physicians. Is that a fair
6     characterization?
7  A. That are some of the complaints, yes, sir.
8  Q. Okay. And there certainly seem to be some
9     e-mail exchanges between you and
10    Mr. Battaglino over your scheduling of
11    your medical appointments, right?
12 A. Yes, sir.
13 Q. Okay. If Mr. Battaglino said you can't
14    take a particular day off, what did you
15    do?
16 A. I didn't take the day off.
17 Q. And did you come to work?
18 A. Yes, sir.
19 Q. Okay. When you made your time off
20    requests, were you asking to be allowed to
21    take sick leave or vacation time as it
22    related to your doctor's appointments?
23 A. Originally, sick leave and then I believe
24    I used vacation time.

104

1  Q. Why is that?
2  A. Because I was having some difficulty in
3     getting the sick leave from John, so I
4     thought I could use a vacation day.
5  Q. If there were days when he denied you sick
6     leave, denied you your request to use sick
7     leave, did you take vacation days instead?
8  A. I may have.
9  Q. On those days, can you remember any
10    specific date when you did that?
11 A. No, I can't recall any specific day.
12 Q. That is understandable. It was a long
13    time ago. On days when you would take
14    vacation time, did you then submit a
15    vacation request slip or whatever it is
16    that allows you to let them know that you
17    are taking vacation time?
18 A. Yes. My standard practice was to inform
19    him orally, get his okay, and follow it up
20    with a slip.
21 Q. Okay. Now, if you took sick leave, you
22    got paid for that day, right?
23 A. Yes.
24 Q. If you took vacation leave, would you get

John Walsh - August 8, 2005    Walsh vs. Boston University

Case 1:04-cv-11240-RCL   Document 155   Filed 04/21/2006   Page 2 of 5

**Page 105**

1  paid for that day?
2  A. Yes.
3  Q. Okay. Can you identify Exhibit No. 23,
4     please, sir.
5        (Document marked as Exhibit No.
6     23 for identification.)
7        (Witness perusing document.)
8  A. Yes. It is an identification of disabled
9     or veterans' status.
10 Q. Is this your identification of disabled or
11    veteran's status?
12 A. Yes.
13 Q. Did you fill this out?
14 A. Yes, sir.
15 Q. Okay. Mr. Walsh, on this form on the
16    first page which has Bates stamped number
17    JW 0690, what is the nature of the
18    disability you describe here beginning
19    with phrase or with the initials CVA?
20 A. Cerebral vascular accident. I had a
21    stroke in 1984. Should I read across it?
22 Q. I would like you to explain first how that
23    is a disability for you.
24 A. It limits my driving a little bit. I have

**Page 106**

1  some problems with my peripheral vision
2  and acuity.
3  Q. Okay.
4  A. So I mean that is it.
5  Q. Okay. So the first line on this form
6     where you are describing your disability
7     all relates to the CVA, cerebral vascular
8     accident of 1984?
9  A. Yes, sir.
10 Q. Okay. Other than the need to see a
11    physician on occasion, did that cause you
12    to -- did that interfere with your ability
13    to do your job?
14 A. I don't believe it did.
15 Q. Okay. What is next in your description of
16    your disability?
17 A. PTSD.
18 Q. What does PTSD stand for?
19 A. Post-traumatic stress disorder.
20 Q. And do you believe that post-traumatic
21    stress disorder interfered with your
22    ability to do your job?
23 A. At times.
24 Q. Okay. What was the trauma, what was the

**Page 107**

1  initial trauma?
2  A. Termination from another job.
3  Q. The Carney Hospital job?
4  A. Yes, sir.
5  Q. Okay. So when you write PTSD here, are
6     you referring to stress that followed the
7     trauma of termination from the Carney
8     Hospital job?
9  A. Stress that is job related, and the Carney
10    Hospital was the trigger of that stress.
11    And subsequently, I was usually very leary
12    and careful. I never wanted to lose a job
13    again.
14 Q. The Carney Hospital termination took place
15    in 1995, right?
16 A. 1991.
17 Q. '91?
18 A. Yes, sir.
19 Q. All right. And were there subsequent
20    traumas for which post-traumatic stress
21    disorder would apply?
22       MS. PONTIKES: Objection.
23 A. I don't understand.
24       MR. ELSWIT: Excuse me. What is

**Page 108**

1  the basis for that objection, please?
2        MS. PONTIKES: We are getting very
3     close to asking for things that are
4     medical therapy kinds of opinions and I am
5     not sure he -- A, I don't think the
6     question was very clear. And B, I am not
7     sure he is qualified to testify to in
8     terms of from a mental health point of
9     view what triggered what and what was
10    continuing from what.
11       MR. ELSWIT: Okay. Let's see if
12    we can clear this up.
13 Q. Mr. Walsh, so far you have testified that
14    your post-traumatic stress disorder
15    evolved from the termination of your
16    employment at Carney Hospital in 1991.
17 A. Yes.
18 Q. Were there any other acute -- strike that.
19    Would it be fair to say that that was a
20    pretty acute traumatic event?
21 A. That would be fair, sir.
22 Q. Okay. Were there any other comparable
23    acute traumatic events between the
24    termination from Carney Hospital and the

John Walsh - August 8, 2005            Walsh vs. Boston University

Case 1:04-cv-11240-RCL    Document 19-5    Filed 04/21/2006    Page 3 of 5

Page 109

1   date of Exhibit No. 23, which appears to
2   be May 22nd of 2001?
3 A. I don't know.
4 Q. Were you ever diagnosed with
5   post-traumatic stress disorder?
6 A. Yes.
7 Q. By whom?
8 A. Doctor Abreu. Prior to him, I am not
9   sure. Prior to him, I am not sure.
10 Q. Do you know when Doctor Abreu made his
11   diagnosis?
12 A. I do not.
13 Q. Have you ever been diagnosed with
14   post-traumatic stress disorder by a
15   psychologist, psychiatrist, therapist or
16   comparable qualified mental health
17   professional?
18 A. I can't recall.
19 Q. Other than Doctor Gore, have you seen
20   other mental health professionals?
21 A. Yes.
22 Q. Who?
23 A. Dr. Wayne Brunnel.
24 Q. How do you spell that, please?

Page 110

1 A. B-R-U-N-N-E-L.
2 Q. When did you see Doctor Brunnel?
3 A. Sometime in the spring of 2002.
4 Q. Okay.
5 A. It might have been early summer 2002.
6 Q. I don't recall offhand, but do you recall
7   whether you authorized your attorney to
8   provide those medical records to me?
9 A. I believe I did.
10      MR. ELSWIT: Rebecca, did you
11   produce those records?
12      MS. PONTIKES: I want to say I did
13   because I know the name, it sounds
14   familiar. But tell me if you don't have
15   it and I will get them for you.
16      MR. ELSWIT: Okay. Thank you.
17 Q. Anyone else?
18 A. Doctor Perry. That was prior to 5/22/01,
19   sometime after the Carney case happened.
20 Q. Do you know if you authorized your
21   attorney to produce those records for
22   Boston University?
23 A. I believe I did.
24      MR. ELSWIT: Rebecca, do you know

Page 111

1   if you have produced Doctor Perry's notes?
2      MS. PONTIKES: I think Doctor
3   Perry was beyond the scope of what we
4   discussed for medical records.
5      MR. ELSWIT: Thank you.
6 Q. Do you remember when you saw Doctor Perry?
7   It was in the early '90's?
8 A. Yes, sir.
9 Q. As opposed to the late '90's?
10 A. Yes, sir.
11 Q. Okay. Were you seeing Doctor Perry at any
12   time during your employment at BU?
13 A. No, sir.
14      MR. ELSWIT: All right. Excuse
15   me one second.
16 Q. Do you know if Doctor Brunnel diagnosed
17   you with post-traumatic stress disorder?
18 A. I don't know.
19 Q. Did Doctor Perry?
20 A. I believe so, but I couldn't swear.
21 Q. Okay. Mr. Walsh, in your opinion, did
22   certain aspects of your job cause
23   post-traumatic stress?
24 A. Help me out a little bit. When you say --

Page 112

1 Q. Sure, sure. And I am not asking for a
2   clinical diagnosis. I am really asking
3   you to look at yourself and tell me what
4   things caused the post-traumatic stress
5   disorder. You have told me in very clear
6   and concise terms the source of the
7   initial trauma which relates to the Carney
8   Hospital termination. Now I would like to
9   know what causes the post trauma stress.
10 A. Being a marked target in employment causes
11   me problems.
12 Q. That is a fairly general characterization.
13 A. Yes.
14 Q. Do you feel like you are a marked target
15   at Boston University?
16 A. At times I did.
17 Q. Okay. Who marked you?
18 A. Mr. Battaglino.
19 Q. Okay.
20 A. Mr. Robillard. Mr. Cusato. Respectfully,
21   and it may just have been your job, I
22   thought possibly yourself.
23 Q. Anybody else?
24 A. Mr. Monteiro. And that is -- those are

## Page 113

```
 1      possibilities, I thought.
 2  Q.  Mr. Walsh, the next item on your list of
 3      disabling conditions is acute stress
 4      disorder.  Is that different from
 5      post-traumatic stress disorder, if you
 6      know?
 7  A.  I don't.
 8  Q.  Okay.  Have you been diagnosed with acute
 9      stress disorder?
10  A.  I believe so.
11  Q.  By whom?
12  A.  I believe it is the cause of my migraines,
13      stress disorder.  So that would be going
14      way back to 1965, '62.
15  Q.  So you have had migraines for many many
16      years?
17  A.  Yes, sir.
18  Q.  Okay.  And depression, how does that link
19      into all of this, if you know?
20  A.  Well, I have been told I was depressed.
21      And when I filed this, it was because of
22      Lindsey didn't file one of these so I
23      thought maybe I should file one for
24      accommodation.
```

## Page 114

```
 1  Q.  Okay.  We are going to need to talk about
 2      Lindsey at some point and I don't want to
 3      get too far from where we are going here.
 4  A.  Sure.
 5  Q.  So let's save him for a bit later then.
 6      All right?
 7  A.  Yes, sir.  Yes, sir.
 8  Q.  Everybody needs to remind me to talk about
 9      Lindsey McLean.  Okay?
10          So Mr. Walsh, at some point you
11      obviously decided that you needed to file,
12      to make a formal request for
13      accommodations?
14  A.  Yes, sir.
15  Q.  And this was your formal request?
16  A.  I believe, yes, it was a formal request.
17  Q.  Why didn't you file this document eight
18      months earlier when you said you were
19      first being denied accommodations back in
20      September and October of 2000?
21  A.  I wanted to keep a low profile, try to
22      keep it in my department, and I was hoping
23      we could work it out.  I thought in time
24      John would see I was a good worker, I was
```

## Page 115

```
 1      available 24, seven.  I wasn't trying to
 2      cause him any trouble.  Because of those
 3      reasons, I didn't think I would have to
 4      file it.  And embarrassment, a little bit.
 5  Q.  Okay.  Please turn to the second page of
 6      Exhibit No. 23.
 7  A.  Yes.
 8  Q.  Now, there is a bunch of handwritten text
 9      under the section of Request for
10      Reasonable Accommodation.  I gather that
11      is your handwriting?
12  A.  Yes, sir, it is.
13  Q.  Okay.  Now, you write here, tell me if I
14      have read this correctly, "Ability to
15      attend medical appointments and follow
16      treatment without interference, which is
17      limited to use of accrued sick time.  Same
18      treatment as others in this department on
19      use of time."
20          Did I read that correctly?
21  A.  Yes, you did, sir.
22  Q.  Okay.  Mr. Walsh, one of your claims in
23      this case is that you were denied this
24      accommodation.
```

## Page 116

```
 1  A.  Yes.
 2  Q.  Okay.  Did you ever narrow this request at
 3      all?
 4  A.  Could you help me on that, please?
 5  Q.  Sure.  Did you ever, for instance, sit
 6      down with your supervisors and say I am
 7      going to need to take six hours every
 8      Tuesday because I am stacking my medical
 9      appointments one, two, three in a row?
10      That is an example.
11  A.  Yes.
12  Q.  You did that?
13  A.  Yes.
14  Q.  Okay.  When did you do that?
15  A.  I know I sent an e-mail.  I think it is
16      already one of the documents produced.  I
17      know that when John first -- Battaglino
18      first came on campus, we walked up
19      Commonwealth Avenue, and I know I told him
20      about both my folks being a little bit
21      sick and about me having a stress
22      condition.  And those would be two times
23      that I made John aware.
24  Q.  Okay.  Mr. Walsh, were these disabilities
```

**Page 117**

1 that you listed on Exhibit No. 23, going
2 to the first page again, the same
3 disabilities that you were suffering under
4 in the fall of 2000 when you declined to
5 file this document for the reasons you
6 have testified to a few minutes ago?
7     MS. PONTIKES: Objection.
8     MR. ELSWIT: Grounds?  Bad
9 question?
10     MS. PONTIKES: Well, your use of
11 the word "decline".  I don't think he
12 actually --
13     MR. ELSWIT: Let me start it again
14 and clean it up.
15     MS. PONTIKES: Okay.
16 Q. Mr. Walsh, have these disabilities been
17 with you for some time?  Let me say that
18 differently.
19     Have these conditions, these
20 medical conditions been part of your life
21 for some time?
22 A. Some time would be, Mr. Elswit, more than
23 five years?
24 Q. Yes.

**Page 118**

1 A. I would say yes.
2 Q. Recognizing that they ebb and flow and at
3 times are more prominent in your life than
4 other times, were these conditions part of
5 your life to some degree in the fall of
6 2000?
7 A. I don't know if the depression was part of
8 my life before the fall of 2000.  I don't
9 know if the frequency of migraines, but I
10 did have migraines earlier.
11 Q. Okay.
12 A. And of course, the CVA was a part of --
13 Q. Okay.  Now, you said that the effects of
14 the stroke, CVA, did not generally
15 interfere with your work.  Is that
16 correct?
17 A. I tried not to let it, yes, sir.
18 Q. Okay.  How about PTSD, did that interfere
19 with your ability to work?
20 A. Sure, when my stress level was up.
21 Q. What happened?
22 A. Again, I would get migraines.  I would get
23 depressed.
24 Q. Were you able to work when you had

**Page 119**

1 migraines?
2 A. Sometimes I was.  Sometimes they were real
3 bad.  I had some kidney stone attacks and
4 some loss of urinary control and most,
5 sometimes I could work, sometimes I was
6 embarrassed and would leave.
7 Q. Mr. Walsh, any time you want to take a
8 break because I know this is not fun, let
9 me know and we will stop.  Okay?
10 A. Thank you.
11 Q. When you had -- kidney stones, you didn't
12 write down here as a disabling condition.
13 Why not?
14 A. I wasn't looking to cause trouble.
15 Q. Okay.
16 A. I didn't give it a lot of thought.  I just
17 was hoping by filing this document that it
18 was now in the EEOC Office's hands and we
19 could possibly resolve this.
20 Q. Loss of urinary control, was that related
21 to kidney stones?
22 A. I am not sure.
23 Q. Okay.  Was that a condition that came on
24 relatively recently or was that a

**Page 120**

1 condition that was intermittent and that
2 you had learned to live with during the
3 course of your adult life?
4 A. No.  That came on after my employment at
5 Boston University and after October of
6 2000.  And I can't remember, but there was
7 a medication that I was on for a while for
8 that.
9 Q. Is that kidney stones we are talking about
10 or --
11 A. No.  For the urinary control, so I
12 wouldn't pee myself.
13 Q. Okay.  How about kidney stones, was that a
14 condition that recurred on occasion?
15 A. I never had those, until I came to Boston
16 University, that I knew of.
17 Q. I am told that you know it when you have
18 it.
19 A. Yes.
20 Q. Mr. Walsh, when you had migraines, how
21 long did they last generally or is there,
22 you know, a generally that works here?
23 A. I don't think there is a generally.  I
24 would say generally less than two or three