**Page 121**

1　　days generally. And generally, more than
2　　four hours.
3　Q. So somewhere between four hours and two to
4　　three days?
5　A. Generally.
6　Q. Were you able to work when you were in the
7　　midst of a migraine attack?
8　A. It all depends on the severity.
9　Q. Okay. All right. Let's return to page
10　　two, please. The accommodation that you
11　　request is the ability to get to your
12　　doctor's appointments, is that correct?
13　A. Yes.
14　Q. Okay. Were there any other accommodations
15　　that you were requesting?
16　A. Well, I asked that I be allowed to use my
17　　sick time.
18　Q. Okay. Why is that?
19　A. Because I found it a lot easier to get
20　　John's approval if I put in for a vacation
21　　day versus a sick time. And I had been
22　　denied on a couple of occasions medical
23　　appointments or the sick time off request,
24　　so I wanted the same standard as other

**Page 122**

1　　people in the department.
2　Q. So that is what that second clause means,
3　　same treatment as others in this
4　　department in use of time?
5　A. Yes, sir.
6　Q. All right. In your opinion or -- strike
7　　that. You were being denied the use of
8　　sick time for your medical -- let me start
9　　that question again. I am sorry.
10　　　Would it be fair to infer from
11　　your request for accommodations that you
12　　were being denied the use of sick time to
13　　attend to your medical needs?
14　A. Sometimes.
15　Q. And that you had to take vacation time?
16　A. At times.
17　Q. Okay. How long had that been going on?
18　　Did that also start in the fall of 2000?
19　A. I really don't know.
20　Q. Mr. Walsh, do these conditions all
21　　persist, the conditions that you have
22　　described in Exhibit No. 23, do they
23　　persist to this day?
24　A. Yes.

**Page 123**

1　Q. Are you able to work?
2　A. Yes.
3　Q. Full time?
4　A. Yes.
5　Q. Okay. Please identify Exhibit No. 24,
6　　sir.
7　　　(Document marked as Exhibit No.
8　　24 for identification.)
9　　　(Witness perusing document.)
10　A. Okay.
11　Q. Mr. Walsh, have you read Exhibit No. 24?
12　A. Yes, sir.
13　Q. Do you remember receiving this letter?
14　A. Yes, sir.
15　Q. Okay. And Exhibit No. 24 is a May 24,
16　　2001 letter from Mr. Monteiro to you with
17　　regard to your complaint of age
18　　discrimination.
19　　　Does Mr. Monteiro touch on a
20　　fairly wide range of concerns that you
21　　brought to his attention?
22　A. I am sorry. Would you say that one more
23　　time?
24　Q. Does Exhibit No. 24 touch on a fairly wide

**Page 124**

1　　range of concerns that you brought to
2　　Mr. Monteiro's attention?
3　A. Yes.
4　Q. Okay. And do you agree with the
5　　conclusions in Exhibit No. 24?
6　A. No.
7　Q. Okay. Do you agree with any of the
8　　conclusions in Exhibit No. 24?
9　　　(Witness perusing document.)
10　A. I don't agree with the conclusions.
11　Q. Any of them?
12　A. Not in its entirety.
13　Q. Well, are there any conclusions that you
14　　can agree with?
15　A. Yes.
16　Q. Which ones?
17　A. May I write on these or --
18　Q. No.
19　A. Okay.
20　Q. You can write on Ms. Pontikes' copy
21　　though.
22　　　MS. PONTIKES: I already wrote on
23　　it, so I don't know if you want me to give
24　　it to him now.

125

1        MR. ELSWIT: No, it is probably
2    not a good idea.
3        MS. PONTIKES: Okay.
4  A. The first paragraph, the fourth sentence,
5     it is clear that friction, that is a true
6     statement.
7  Q. Okay.
8  A. Paragraph two, that one of the reasons
9     Mr. Battaglino was strongly considered was
10    because of his father's position, I agree
11    with that. The following sentence --
12 Q. Excuse me, excuse me. I beg your pardon.
13    Continue. Go ahead, please.
14 A. The following sentence, I would agree with
15    that.
16 Q. "Giving favorable consideration to an
17    applicant for this reason is not
18    unlawful."
19 A. Yes, yes.
20 Q. Okay.
21 A. I would agree with the first paragraph,
22    the first sentence of paragraph three that
23    a detailed response had been given by you,
24    general counsel.

126

1        I would agree with the first
2    paragraph, first sentence of paragraph one
3    on page two which is dated May 23rd, it is
4    just a different date than the heading
5    letter. I would partially agree with
6    paragraph number three, the very last
7    sentence, "This employee confirmed to me
8    he returned your telephone call and met
9    with you and discussed the personal matter
10   with you at the place of your second
11   employment, Cambridge City Hospital."
12 Q. This is the third paragraph on page two?
13 A. Yes.
14 Q. Okay.
15 A. That part of that statement is true.
16 Q. Which part?
17 A. "This employee confirmed to me that he
18    returned your telephone call." He did.
19 Q. Okay.
20 A. I would agree with paragraph five, the
21    first sentence, that the use of racially
22    and sensitive names and nicknames could be
23    construed as racially insensitive. That
24    would be it, Mr. Elswit.

127

1  Q. Other than the things that you have
2     mentioned, is there anything else in
3     Exhibit No. 24 that you can agree with?
4  A. I don't believe so.
5  Q. Okay. Mr. Walsh, did you speak with Kim
6     Randall in May of 2001?
7  A. I may have.
8  Q. Who is Kim Randall?
9  A. She was at that time the Equal Employment
10    Opportunity Officer.
11 Q. Do you remember a conversation with her?
12 A. I know I wrote to her. I am not sure if
13    we talked.
14 Q. Okay. All right. Who is Lindsey McLean?
15 A. That is a long answer. Lindsey McLean was
16    a casual employee that came to us. We
17    were in dire need of casuals and every
18    full-time employee we hire goes through
19    the casual process. How much should I get
20    into this?
21 Q. Well, let me just stop you right here for
22    the moment.
23 A. Okay.
24 Q. What is a casual employee to the best of

128

1     your understanding?
2  A. Someone that is hired by the University in
3     our department, in our department a casual
4     employee was someone hired at the
5     University who would work hours at our
6     discretion, would not be a member of the
7     union, and would receive no benefit with
8     the exception of their pay. If they
9     performed well as a casual employee, they
10    would become a full-time employee on the
11    next opening.
12 Q. Okay. All right. So Lindsey McLean was a
13    casual?
14 A. Yes, sir.
15 Q. When?
16 A. I believe in 1999 he started for us.
17 Q. During what?
18 A. Most probably security. We had a large
19    department. We had the computer rooms and
20    we had the mail rooms. He may have done
21    some casual work in there. But most of
22    our hires were in the security department,
23    so he worked predominantly in the security
24    department, I believe, in 1999 and in the

**129**
1　year 2000. And in March or April of 2000,
2　well, that was Lindsey McLean.
3　Q. What happened in March or April of 2000?
4　A. Thanks. I wasn't sure where I should --
5　in March or April of 2000, by that time
6　quite a few of the security assistants had
7　called me, as well as the management staff
8　in the office had talked to me about
9　Lindsey and about Lindsey acting
10　strangely. He always talked. He talked
11　about all strange things. Some of the
12　security assistants didn't want to work
13　with him. All of the supervisors thought
14　he did a good job, but he definitely was a
15　character of different sorts.
16　　　In March or April of 2000, a
17　security assistant reported Lindsey, in
18　March or April of 2000, my boss, Babek
19　Sadri came to me and wanted the man,
20　Lindsey McLean terminated. He referred to
21　Lindsey as retarded. I refused.
22　Q. Why?
23　A. Because Lindsey was slow, I thought, but
24　he tried hard. He came to work all the

**130**
1　time. I had asked all my managers if they
2　wanted me to terminate him and every
3　single one of them said no. He tries, he
4　does the job, he just needs to be
5　reminded. And we were in terrible need of
6　help.
7　Q. Who were the managers who said no when you
8　discussed the possibility of terminating
9　Mr. McLean?
10　A. Patricia Grant. Brian Clougher. Albert
11　Morse. There were a couple of others.
12　Jean Dalton. I talked to some security
13　assistants who I had quite a bit of
14　confidence in, and they said the only
15　thing is that occasionally Lindsey needed
16　to be told to shut up.
17　Q. Were these individuals your subordinates?
18　A. The security assistants were, sir, yes.
19　Q. And so by definition, they would be your
20　boss's subordinates?
21　A. Yes, sir.
22　Q. Okay. So at least up to this point you
23　were asked to terminate him, and you
24　didn't based on your judgment and the

**131**
1　judgment of your subordinates. Is that
2　correct?
3　A. Yes, sir.
4　Q. Okay. And what happened?
5　A. I took a day off and Lindsey was fired for
6　being a racist, for making racist
7　comments. I asked to see the report.
8　There was no report. And Lindsey was
9　fired.
10　Q. Do you know who fired Mr. McLean?
11　A. I don't.
12　Q. Well, would you have a surmise?
13　A. Yes.
14　Q. What is your surmise?
15　A. Probably my boss, who was Babek,
16　B-A-B-E-K, Sadri, S-A-D-R-I.
17　Q. This is before Mr. Battaglino arrived?
18　A. Yes, sir.
19　Q. Okay. Did you ever talk to Mr. Sadri
20　about the termination of Lindsey McLean?
21　A. Yes.
22　Q. When?
23　A. Sometime in the spring of 2000.
24　Q. What did you say and what did he say?

**132**
1　A. He told me that he couldn't -- he didn't
2　belong here and that he was to be let go.
3　And I told him that he was -- the word he
4　used was retarded. I said he was slow,
5　but the kid tries hard as hell. He has
6　been with us for a couple of years and it
7　is just a few people in the organization
8　that are complaining about him. And as a
9　matter of fact, if he talked to the
10　supervisory staff as well as some of the
11　more reputable security assistants, they
12　would find that Lindsey was a good worker
13　and better than some of the workers we
14　had.
15　Q. What was Mr. Sadri's response to those
16　remarks?
17　A. Mr. Sadri said that he was going to be
18　fired for racist comments. And I asked
19　for the report and we didn't have one.
20　And I thought that was unusual. And I
21　asked who did the complaining, and he told
22　me it was Claude Green. And I explained
23　to him that this is outrageous,
24　considering that Claude Green is called

133

1  "chocolate thunder" to his face and there
2  are a couple of other nicknames that had
3  to do with his color, and that Roberta in
4  the office had been referred to as
5  "buckwheat" on a number of times and we
6  had a supervisor who used the N word. So
7  I thought it was pretty -- I am trying to
8  think of an appropriate word -- it is not
9  hypocratic. It was very -- it begins with
10 H, whatever the word is. It is not
11 hypocratic because I know that is a
12 medical oath. But it was wrong, wrong to
13 terminate him.
14 Q. This was in the spring of 2000?
15 A. Yes, sir.
16 Q. Okay. Did you bring Mr. McLean back to
17    work at Boston University?
18 A. No, sir.
19 Q. Did you hire him again?
20 A. No, sir.
21 Q. Did Mr. McLean come back to work at Boston
22    University?
23 A. Yes, sir.
24 Q. When?

134

1  A. I believe it was August of 2000.
2  Q. By this time Mr. Sadri had moved to
3     another position?
4  A. Yes, sir.
5  Q. And Mr. Battaglino had come in, is that
6     right?
7  A. Yes, sir.
8  Q. How did Mr. McLean get a job at BU the
9     second time around?
10 A. He came into the office. I was talking to
11    John Battaglino about the need for help
12    for opening. And I had a call, I was
13    sitting in John's office and they said
14    there was a Lindsey McLean out in the
15    lobby to see me.
16        I went out to the reception area,
17    saw it was Lindsey, and went back to John
18    and asked John's permission to bring him
19    in and explained to John that he was
20    terminated the prior spring for racist
21    comments and explained the situation and
22    the report, some of the other people's
23    behavior in the organization, and asked
24    him if he would meet Lindsey. And Lindsey

135

1  came into John's office and sat down and
2  spoke to John for about, I would guess,
3  ten or 15 minutes. And Lindsey had a job,
4  I believe it was at BU, and he wanted to
5  get a full-time job with benefits so he
6  could go back to school. And that was
7  pretty much it, you know, on Lindsey.
8      You know, I talked to John about
9  it and John said we could hire him. And
10 he was up-to-date 150 percent of
11 everything going on then.
12 Q. Okay. How long did he stay?
13 A. I would guesstimate, that is all I can do,
14    probably two months. It might have even
15    been less.
16 Q. Why did he leave?
17 A. John Battaglino terminated him.
18 Q. Why?
19 A. Originally, I was called in and told
20    because we were missing goods, missing,
21    you know, stolen property, some things
22    were stolen in the mail room. And then I
23    was given a second reason. I gave John my
24    answer to that.

136

1  Q. What was that?
2  A. That wasn't Lindsey. He had worked in our
3     mail rooms before and we had never missed
4     anything from Lindsey. Lindsey's problem
5     is talking too much or saying some maybe
6     inappropriate things or what somebody
7     might consider to be inappropriate, but it
8     wasn't stealing.
9         Then the second reason was
10    because he was a poor worker. And I
11    explained to John that wasn't true either
12    because I had been watching him and I had
13    talked to the UPS people, I had talked to
14    the supervisor in his mail room whose name
15    is Procida, I don't know her last name,
16    she is still employed here. And I had
17    spoken to the U.S. Mail people and they
18    all thought he did a great job.
19        Then the third reason John gave
20    me was that he was a casual, he was only
21    hired for the opening. And I explained to
22    John that he quit a job, he got canned
23    from here before and he quit a job to come
24    back here. And every full timer we have

Page 137

1   just about, unless they are connected,
2   starts as a casual so that wasn't true
3   either. He wouldn't have quit a job and
4   come back for five weeks and then just be
5   left out in the cold again.
6         Then I think the further reason
7   was because the union was creating a
8   flack, I believe that was the fourth
9   reason that John gave for Lindsey being
10  terminated. And I don't know if he ever
11  mentioned racist comments with me. I
12  believe he did and, of course, I informed
13  him about some of the, you know, the other
14  people's comments, what they tolerated.
15  The black supervisor had came in and was
16  outraged what Claude Green had done,
17  considering what Claude was calling people
18  and being called himself. So John told me
19  -- that was the end of that meeting.
20 Q. Were there any other meetings about
21    Lindsey McLean between you and
22    Mr. Battaglino?
23 A. No. He came by my office about a week
24    later and said, "Are you going to fire

Page 138

1    Lindsey? There is something wrong with
2    him." And I explained to him, I said, "I
3    know there is something wrong with him,
4    but he has done a great job in the mail
5    room." And I gave him the references of
6    Brian Clougher and showed him some e-mails
7    about how good he was doing. And this is
8    what I thought BU was about. And he told
9    me, "It is either you or Lindsey." And I
10   said, "I am not firing Lindsey."
11 Q. What happened next?
12 A. I took off work for some reason and
13   Lindsey was fired or he -- Lindsey wasn't
14   working there anymore.
15 Q. Did Mr. Battaglino terminate Mr. McLean?
16 A. I believe he did.
17 Q. Did or did not?
18 A. I believe Mr. Battaglino did.
19 Q. Mr. Walsh, if my memory is correct, you
20   said Mr. McLean was fired on your day off
21   back in the spring and then again on your
22   day off in the fall?
23 A. Your memory is correct. I did say a day
24   off, a day I wasn't in the office. I

Page 139

1    might have been out in the field. But I
2    had no part in the decision, nor did I
3    know that he was being terminated.
4         Mr. Sadri never informed me after
5    I refused to terminate him that he was
6    going to terminate him. And
7    Mr. Battaglino never informed me that he
8    was going to terminate him after I refused
9    to terminate him. Lindsey did come back
10   about a week later to tell me that
11   Mr. Battaglino had separated his
12   employment, so that is how I surmise it
13   was John Battaglino that told him.
14 Q. Mr. Walsh, this morning you said that your
15   problems began around the time you stood
16   up for Mr. McLean. It sounds like you
17   stood up for Mr. McLean twice.
18 A. Yes.
19 Q. Once in the spring of 2000 and once in the
20   fall of 2000.
21 A. Yes.
22 Q. When did your problems begin, your memory
23   of your history at BU?
24 A. In the fall of 2000.

Page 140

1  Q. Okay. In various documents that you have
2     submitted, including your interrogatories,
3     you may recall stating that you thought
4     Mr. McLean had Attention Deficit Disorder.
5  A. Yes.
6  Q. Did Mr. McLean tell you he had Attention
7     Deficit Disorder?
8  A. I can't recall.
9  Q. All right. You are not a licensed
10    treatment provider for people with
11    learning disabilities or ADHD, are you?
12 A. No, sir.
13 Q. Okay. Do you know if Mr. McLean
14    identified himself as an individual with a
15    disability?
16 A. I know he told me he had problems, but he
17    didn't label it a disability. And I
18    didn't know that people were supposed to
19    identify themselves. We had a number of
20    people, you know, and I wasn't -- I didn't
21    know you were supposed to go to personnel
22    and fill out the reasonable accommodation
23    form or anything else. So --
24 Q. Well, when you say you knew that he had