Page 141

1  problems, did you know what kind of
2  problems? Earlier, you said he was slow.
3  A. I did. And it turns out that, evidently,
4  he is not slow. He is very intelligent,
5  like an IQ of 147, he told me. You could
6  tell he had mental problems. He couldn't
7  sit still. He couldn't keep quiet ever.
8  Nice people were telling me that they had
9  to tell him to shut up.
10 Q. Okay. Do you believe Mr. McLean had
11 Attention Deficit Disorder?
12 A. I -- I do believe that Mr. McLean had
13 Attention Deficit Disorder.
14 Q. Okay. But he never told you --
15 A. Or something --
16 Q. I am sorry?
17 A. Or something along those lines. There is
18 another letter, AHDD or ADD, something
19 where you jump all over the page.
20 Q. Do you think -- are you thinking of ADHD,
21 which is Attention Deficit Hyperactivity
22 Disorder?
23 A. Maybe that is what I am thinking of.
24 Q. Okay. But you said he never told you

Page 142

1  this?
2  A. He did when Mr. Battaglino was the boss,
3  but not when Mr. Sadri was the boss.
4  Q. A moment ago you said Mr. McLean never
5  told you that he had Attention Deficit
6  Disorder. Are you changing your
7  testimony?
8      MS. PONTIKES: Objection.
9  A. I must be changing my testimony.
10 Mr. McLean acknowledged to me that he had
11 some sort of mental disorder. And I don't
12 recall if he used ADD or ADHD, but I know
13 that he told me because that is when I
14 found out that he wasn't slow, he was
15 actually a lot more intelligent than most
16 of us or me.
17 Q. Do you know if Attention Deficit Disorder
18 is a reflection of intelligence?
19 A. No, no.
20 Q. Okay. Would you please take a look at
21 Exhibit No. 10, sir.
22 A. Yes.
23 Q. By the way, when did Mr. McLean tell you
24 that he had an IQ of 147?

Page 143

1  A. Sometime in the fall of 2000.
2  Q. Before he was --
3  A. And I believe that is the number he used.
4  I am sorry. It could have been 138, but
5  it was somewhere up there.
6  Q. Was it before he was terminated or after?
7  A. I am not sure.
8  Q. Did you believe him?
9  A. His IQ or that he had a mental problem?
10 Q. His IQ.
11 A. Oh, I -- I -- I could believe he would --
12 I could believe -- I mean he could go to a
13 mail room and he would remember addresses
14 and capitals and zip codes so I could
15 believe that he was special.
16 Q. Did you believe him when he told you that
17 he had an IQ of 147 or 138, for that
18 matter?
19 A. I believed him.
20 Q. Okay. All right. Please turn to the last
21 page of Exhibit No. 10, sir.
22 A. Okay. Yes.
23 Q. The very last page is page 15 in that
24 document.

Page 144

1  A. Yes, sir.
2  Q. And that is your signature?
3  A. Yes, that is my signature, sir.
4  Q. And you remember this morning I asked you
5  if you signed that under the pains and
6  penalties of perjury and you swore that
7  this was accurate?
8  A. Yes, sir.
9  Q. And you said yes?
10 A. Yes.
11 Q. That is still your testimony?
12 A. Yes.
13 Q. Okay. Please turn to page 12 of this
14 document, sir.
15 A. Yes, sir.
16 Q. And take a look at Interrogatory No. 15
17 and your answer to Interrogatory No. 15,
18 please. Just read those to yourself,
19 please.
20     (Witness perusing document.)
21 A. Yes. I have read the answer.
22 Q. Okay. Your first sentence, the first
23 sentence of this answer states, "The
24 employee I refused to terminate, Lindsey

**Page 145**

1　　　McLean, informed me that he had Attention
2　　　Deficit Disorder after I first hired him."
3　　　　　Now, I am going to ask you this
4　　　question again.
5　A.　Sure.
6　Q.　Did he tell you that he had Attention
7　　　Deficit Disorder?
8　A.　I believe he did.
9　Q.　Okay. He told you this after you first
10　　hired him. When was that? You said he
11　　had worked at BU for several years?
12　A. Yes. That would have been in August of
13　　2000. I didn't originally hire Lindsey.
14　Q. All right. Now, a moment ago you
15　　testified that you weren't sure what he
16　　had or what he told you he had. And I
17　　just want to pin this down. What did he
18　　tell you?
19　A. I thought he told me that he had something
20　　along the lines of ADD or ADHD. I just
21　　remember there was some initials.
22　Q. All right. You are a little more
23　　uncertain now than you were when you
24　　signed this sworn statement?

**Page 146**

1　　　　MS. PONTIKES: Objection.
2　A. No, I knew Lindsey had a mental impairment
3　　and it was pretty obvious to a good six,
4　　eight, ten people. So I am not uncertain
5　　that he had a problem.
6　Q. Were any of the people to whom it was
7　　pretty obvious mental health providers?
8　　Were they clinicians, for instance?
9　A. I don't think so.
10　Q. Okay. Were they your colleagues in
11　　Residential Safety?
12　A. Most, yes.
13　Q. Okay. Were any of them trained in
14　　assessing learning disabilities?
15　A. I couldn't tell you.
16　Q. Okay. Your next sentence in answer to
17　　Interrogatory No. 15 is, "Additionally, my
18　　observations of Mr. McLean's behavior
19　　indicated that he had Attention Deficit
20　　Disorder." That is the first clause of
21　　that sentence.
22　　　What were your observations that
23　　led you to conclude that he had Attention
24　　Deficit Disorder?

**Page 147**

1　A. First observation would have been the
2　　information coming from the field.
3　Q. What was the information coming from the
4　　field?
5　A. He talked too much, he tried to do his job
6　　too well. We were having students come up
7　　to the office because sometimes he wanted
8　　two and three picture I.D.'s because it
9　　didn't -- he wanted to make sure he was
10　　letting the right person into the dorm.
11　　That created havoc. You couldn't do that
12　　to everybody. But Lindsey was just trying
13　　to be particularly good about letting
14　　people into the dorms. Then I stationed
15　　him with a couple of security assistants
16　　and they came back to me and said that he
17　　works hard but he never shuts up and he
18　　overly checks people's I.D.'s to get them
19　　in, creating long lines and problems. And
20　　finally, at that point, and it may not
21　　have been in this exact order, I spoke to
22　　the supervisory staff, who worked more
23　　with Lindsey than myself or anybody. And
24　　they also said that there was something

**Page 148**

1　　wrong with Lindsey.
2　Q. Is there anything else that supports your
3　　conclusion that Mr. McLean had Attention
4　　Deficit Disorder?
5　A. Not that I can recall right now. Just
6　　that people out in the field, my
7　　supervisors, myself meeting him, and
8　　conversation with Lindsey, which would
9　　have been meeting him. So that is all I
10　　can recall, Mr. Elswit.
11　Q. To the best of your knowledge, did
12　　Mr. McLean ever request an accommodation
13　　for any condition he might have had?
14　A. I am not sure if he asked to be moved out
15　　of the security stations and go to the
16　　mail room or if that was our idea. So I
17　　don't know if he asked for that
18　　accommodation or we suggested it.
19　Q. Was that an accommodation or just a job
20　　change?
21　A. I am not sure.
22　Q. Okay. But in your view, he did his job
23　　well enough regardless?
24　A. In the mail room he did.

John Walsh - August 8, 2005     Walsh vs. Boston University

Case 1:04-cv-11240-RCL     Document 19-7     Filed 04/21/2006     Page 3 of 5

Page 153

1    you requested FMLA leave.
2          Did you agree with him? In your
3    mind had you requested FMLA leave?
4   A. Yes.
5   Q. Okay. When?
6   A. I don't know.
7   Q. Did you ever fill out forms? Well, as of
8    May 24, 2001, had you filled out forms
9    requesting leave under the Family and
10   Medical Leave Act?
11 A. I don't believe so.
12 Q. Okay. Please take a look at the next
13    paragraph, the one beginning, "Finally, to
14    comment on your statement regarding your
15    reference to minimize disruptions."
16 A. Yes.
17 Q. Ready?
18 A. Yes, sir.
19 Q. Okay. Mr. Battaglino quotes your
20    statement to that, your effort to minimize
21    disruptions, and describes it as
22    disingenuous.
23 A. Yes.
24 Q. And then he goes on to list your

Page 154

1    attendance between May 15th and May 31st.
2          To the best of your memory, is
3    this an accurate list of the days that you
4    were at work and the days that you were
5    not at work during the last two weeks of
6    May 2001?
7   A. I don't remember.
8   Q. Okay. Please take a look at Exhibit No.
9    26, Mr. Walsh.
10         (Document marked as Exhibit No.
11   26 for identification.)
12 A. Yes.
13 Q. Tell me when you are ready to discuss
14    Exhibit No. 26.
15         (Witness perusing document.)
16 A. Yes, sir.
17 Q. Mr. Walsh, in the third paragraph you
18    write, "In your mailbox I left a change to
19    my TOR. I had a terrible case of the
20    shingles which appears job related."
21        Is this the first time you
22    informed Mr. Battaglino that you had
23    shingles?
24 A. I don't know.

Page 155

1   Q. Why do you believe that your condition is
2    job related?
3   A. Because John -- I never had the shingles
4    or so I thought.
5   Q. When did you first develop them?
6   A. I believe approximately six months prior
7    to that, but I didn't know they were the
8    shingles. I thought it was a terrible
9    heat rash. Then in June, I went to see
10   Doctor Abreu about migraines and I said I
11   can't get rid of this terrible heat rash.
12   And I showed him the rash and he said,
13   "That's not a heat rash, that is
14   shingles." And he gave me some medication
15   and I asked him, you know, how the heck I
16   caught them. I hadn't been sexually
17   active and anything else. And he asked me
18   about stress at work and I said it was
19   pretty bad to terrible, so I thought they
20   were probably job related.
21 Q. Did he tell you it was job related, Doctor
22    Abreu?
23 A. I don't recall.
24 Q. Okay. Did he tell you that shingles is a

Page 156

1    stress-related condition?
2   A. I don't recall.
3   Q. Mr. Walsh, did you talk to Kim Randall
4    during the summer of 2001 about your
5    relationship with your job?
6   A. I am not sure.
7   Q. Okay. Did you talk to Kim Randall about
8    your relationship with Mr. Battaglino?
9   A. I am not sure.
10 Q. Did you talk to Kim Randall about taking
11    time off from work?
12 A. I know there was some written
13    correspondence, but I am not sure if we
14    had a conversation. I wouldn't be
15    surprised if we did.
16 Q. You had some e-mails with Kim Randall
17    about time off?
18 A. About getting an accommodation, I think.
19 Q. Okay. Did you ever talk to Josephine
20    Tompkins about taking time off?
21 A. I believe so.
22 Q. All right. When?
23 A. September 1st, 2001, I know I sent her a
24    letter.

John Walsh - August 8, 2005            Walsh vs. Boston University

Case 1:04-cv-11240-RCL    Document 19-7    Filed 04/21/2006    Page 4 of 5

**Page 165**

1      gap, not that I suspect anything improper
2      happened, but considering how important it
3      is in this case --
4           MS. PONTIKES: Yes.
5           MR. ELSWIT: The absence of
6      records here is peculiar.
7           MS. PONTIKES: Let me check mine
8      and see if something happened.
9           MR. ELSWIT: Yes.
10          MS. PONTIKES: And we will
11     certainly send out another release to
12     Doctor Abreu.
13          MR. ELSWIT: If you have the
14     ability to check them this evening so that
15     we can pick up on this tomorrow, I would
16     appreciate it.
17          MS. PONTIKES: Okay.
18          MR. ELSWIT: Thank you.
19    Q. In any event, Mr. Walsh, do you recall
20      telling Doctor Abreu that you could work
21      double shifts but not more than that?
22    A. I don't recall.
23    Q. Okay.
24    A. I recall telling him I had to be there

**Page 166**

1      opening weekend.
2    Q. Okay. Did you tell him what the limits of
3      your ability to work were?
4    A. I don't recall.
5    Q. Okay. Exhibit No. 28 certainly doesn't
6      tell us what the limits of your ability to
7      work were, does it?
8          (Witness perusing document.)
9          MS. PONTIKES: Objection.
10    A. It doesn't set limits.
11    Q. Mr. Walsh, Exhibit No. 29 is a letter from
12      Marc Robillard to you dated August 27th of
13      2001. Please read it to yourself, sir.
14          (Document marked as Exhibit No.
15      29 for identification.)
16          (Witness perusing document.)
17    A. Yes, sir. I have read it.
18          MR. ELSWIT: Off the record.
19          (Discussion off the record)
20          MR. ELSWIT: Back on the record.
21    Q. Mr. Walsh, have you read Exhibit No. 29?
22    A. Yes, sir.
23    Q. Third paragraph, the next to last
24      sentence, the last complete sentence on

**Page 167**

1      page one of Exhibit No. 29 reads as
2      follows.
3          "You will have been absent from
4      work for at least some portion of 97 days
5      of 166 scheduled work days between January
6      1st, 2001, and August 31st, 2001."
7          Do you have any reason to
8      disagree with that statement?
9    A. Yes.
10    Q. What is your basis for disagreeing with
11      that statement?
12    A. Records have been kept inaccurately.
13    Q. Okay. Do you have accurate records?
14    A. I have shown some to John, I think it is
15      one of the exhibits where I pointed out
16      months, the dates that I was there on
17      those certain dates. So what we are doing
18      is we are using the information that John
19      supplied to Marc to come up with a number
20      that you were gone for some 97 days of 166
21      scheduled workdays.
22    Q. Okay.
23    A. And I know I was there for some of them.
24      And there are e-mails, telephone calls,

**Page 168**

1      other people I visited on campus.
2    Q. Okay. Mr. Walsh, I believe that list of
3      discrepancies was in the year 2000, not
4      2001.
5    A. Okay. And I suggest to you that there are
6      some discrepancies also in the year 2001.
7    Q. Okay. But you got paid for all of those
8      discrepancies, didn't you?
9    A. And got docked the time, yes, sir.
10    Q. Your paycheck never suffered though?
11    A. No, sir.
12    Q. Mr. Walsh, Exhibit No. 30 is an e-mail
13      from you dated September 1st, to
14      Josephine. I believe that is Josephine
15      Tompkins.
16    A. Yes, sir.
17          (Document marked as Exhibit No.
18      30 for identification.)
19    Q. Tell me when you are ready to discuss
20      that, please.
21          (Witness perusing document.)
22    A. I am ready to discuss it, Mr. Elswit.
23    Q. Okay. It looks like you are requesting
24      FMLA leave on September 1st of 2001. Is

John Walsh - August 9, 2005   Walsh vs. Boston University

Case 1:04-cv-11240-RCL   Document 19-7   Filed 04/21/2006   Page 5 of 5

212

```
 1            PROCEEDINGS
 2            August 9, 2005
 3            JOHN WALSH,
 4   having been previously sworn, was further
 5   examined and testified as follows:
 6          CONTINUED DIRECT EXAMINATION
 7   BY MR. ELSWIT:
 8   Q. Good morning, Mr. Walsh.
 9   A. Good morning, Mr. Elswit.
10   Q. You recognize you are still under oath
11      from yesterday?
12   A. Yes, sir.
13   Q. Okay. Can you hear me in this tone of
14      voice?
15   A. Yes, sir.
16   Q. Okay. And is there anything related to
17      your health that might interfere with your
18      ability to understand my questions this
19      morning?
20   A. No.
21   Q. Are you taking any medications that might
22      alter your perception of things or to
23      further your ability to understand?
24   A. No.
```

213

```
 1   Q. Okay. Mr. Walsh, yesterday we left off
 2      with Exhibit No. 41, which was, which is
 3      Doctor Abreu's November 16, 2001
 4      handwritten response to -- I am sorry. It
 5      is a handwritten form that the University
 6      requires for medical leave under the FMLA.
 7          Do you remember that we talked
 8      about this document yesterday?
 9          (Witness perusing document.)
10   A. Yes.
11   Q. Okay. Do you know why it took Doctor
12      Abreu until November 16, 2001 to fill out
13      that form? Yes or no.
14   A. No.
15   Q. Okay. Did you ever tell Doctor Abreu not
16      to provide the kind of detailed
17      information that is contained in Section 4
18      and Section 5 of this form, which asks for
19      medical facts about your health and then a
20      narrative description of your condition?
21   A. Not that I can recall.
22   Q. Okay. To the extent that we looked at
23      correspondence yesterday from Marilyn
24      Walsh, and in particular, exhibit, Exhibit
```

214

```
 1      Nos. 37 and 38, in which Ms. Walsh writes
 2      to you that Doctor Abreu refused to
 3      provide documentation to Doctor Babineau,
 4      do you have any explanation for why Doctor
 5      Abreu might have refused to provide that
 6      information?
 7   A. I am unaware of any.
 8   Q. Okay. Take a look at Exhibit No. 38,
 9      please.
10   A. Yes.
11   Q. In the third paragraph Ms. Walsh writes to
12      you, this is on November 8, 2001, "On
13      November 7, 2001, Doctor Babineau was
14      informed by Doctor Abreu that you had
15      instructed him not to provide any medical
16      information to Boston University."
17          Is that an accurate statement?
18          MS. PONTIKES: Objection.
19   A. No, it isn't.
20   Q. Okay.
21   A. I believe you left the word "additional
22      medical information" out.
23   Q. Okay.
24   A. Just for what it's worth.
```

215

```
 1   Q. Okay. All right. Your testimony is that
 2      you never restricted Doctor Abreu from
 3      providing information to Boston
 4      University?
 5          MS. PONTIKES: Objection.
 6   A. I don't recall me ever having Doctor
 7      Abreu, instructing him not to provide any
 8      information to Boston University, sir. No
 9      would be my answer.
10   Q. And as you know, at least as of this
11      moment, we have not received all of Doctor
12      Abreu's medical records for this period of
13      time.
14   A. I just heard that, yes, sir.
15   Q. Okay. Mr. Walsh, did you return to work
16      at Boston University on November 26th,
17      2001?
18   A. Yes.
19   Q. Okay. How long did you stay at work?
20   A. That day, sir?
21   Q. No. That week.
22   A. Two days, sir.
23   Q. Okay. What happened?
24   A. I was asked to go home on November 27th.
```