John Walsh - August 9, 2005     Walsh vs. Boston University

Case 1:04-cv-11240-RCL    Document 19-8    Filed 04/21/2006    Page 1 of 4

**Page 216**

1  Q. At the end of the day?
2  A. Late in the afternoon.
3  Q. Okay. That was the day in which you and
4      Mr. Battaglino had a conflict in your
5      office?
6  A. Yes, sir.
7  Q. Okay. You were subsequently terminated?
8  A. Yes, sir.
9  Q. Okay. Did you file a criminal complaint
10    against Mr. Battaglino?
11 A. Yes, sir.
12 Q. Okay. What were the nature of the charges
13    you attempted to press?
14       MS. PONTIKES: Objection.
15 Q. What did you charge him with?
16 A. Assault and battery, sir.
17 Q. Okay. Can you be more specific?
18 A. How it happened?
19 Q. No, no, no. With the charges.
20 A. Assault and battery, I think the first
21    clerk said with a dangerous weapon. That
22    may have included a shod foot.
23 Q. A shod, S-H-O-D?
24 A. I am not sure how to spell it.

**Page 217**

1  Q. In other words, a shoe?
2  A. If that is a shoe, yes, sir, then that is
3     -- yes.
4  Q. Okay. Were the charges or did the
5     Magistrate decline to pursue the charges?
6  A. Yes, sir.
7  Q. Okay. The case was dismissed before it
8     ever got started?
9        MS. PONTIKES: Objection.
10 Q. I am not being technical here. I just
11    want to know what happened.
12 A. Yes. He didn't press charges, that is all
13    I knew.
14 Q. Okay. Mr. Walsh, I would like you to
15    describe, I would like you to describe in
16    detail the responsibilities of your job at
17    Boston University.
18 A. I am sure I will leave some of this out
19    but I will try the best I can.
20 Q. That is all I ask.
21 A. Thank you. My position was operations
22    manager in Residential Safety. When I
23    started there, I was responsible for the
24    mail rooms, the computer rooms, the study

**Page 218**

1     lounge.
2        THE WITNESS: Excuse me, please.
3        MR. ELSWIT: Off the record.
4        (Discussion off the record.)
5        MR. ELSWIT: Back on the record.
6        THE WITNESS: Office staff and
7     the Residential Safety staff.
8  Q. Mr. Walsh, was that description of your
9     responsibilities when you started
10    referring to your responsibilities back in
11    1995?
12 A. Yes, sir.
13 Q. Okay. Did that change?
14 A. Yes, sir.
15 Q. How did it change?
16 A. Eventually, the computer labs were taken
17    over by Information Technology.
18 Q. Another branch of the University?
19 A. Yes, sir.
20 Q. Were there any other changes?
21 A. Not that I can recall. No, sir, not that
22    I recall.
23 Q. Did your title change at all?
24 A. No, sir.

**Page 219**

1  Q. Within each of those units or sub units
2     that you described, please tell me what
3     your responsibilities were with regard to
4     each, the particulars.
5  A. The computer labs, I oversaw the --
6  Q. And by the way, when did that
7     responsibility change to Information
8     Technology?
9  A. I am not sure of the exact date.
10    Approximately 1998.
11 Q. Okay.
12 A. And was in charge of having the money
13    collected and the supplies provided.
14 Q. Okay. What kind of supplies?
15 A. Printing paper, ink, getting computers
16    delivered, making reference -- making
17    references for people with computer
18    problems. I didn't have any computer
19    abilities. I could schedule the students.
20    I interviewed the students as well as some
21    of the other salaried staff in the office
22    for this position.
23       The mail rooms, I had a very
24    limited supervisory function over them. I

John Walsh - August 9, 2005     Walsh vs. Boston University

Case 1:04-cv-11240-RCL     Document 19-8     Filed 04/21/2006     Page 2 of 4

**Page 220**

did assist in managing them. Generally speaking, one of the other salaried employees managed the mail rooms. But it would be the same thing with regards to personnel problems, payroll, I would do for them. I would do some interviewing for staffing, not much. Handle considerable parent complaints, usually contact the senior member of the mail room who was managing the mail room if there were problems. For packages, at times, we had special occasions, opening would be one, Valentine's Day was our busiest day of the year, and I would be in charge of setting up UPS or our own staff and setting up some sort of delivery system so that the students received their packages in a timely manner.

And in the study lounges, I handled complaints about the hours. I didn't do any interviewing or any scheduling.

In the office, I supervised the student staff in the office along with my

**Page 221**

co-managers.

And the biggest part of it would probably be Residential Safety, where I listened to the union grievances. I did the payroll, talked to my co-managers considerable amount of times about safety issues. Incident reports were a big part of the project there.

Q. What does that mean?
A. Whenever an unusual occurrence occurred, students being transported to the hospital for alcohol poisoning or -- it was required to be written up. Whenever people's -- if there was an accident on the premises or a report of the rape at Loretto, a report would be written up. If there were unusual visitors coming at odd hours, a report would be written up. If something was stolen, reported to a security assistant versus the Boston University Police, a report would be written up.

Q. Who was responsible for writing the reports?

**Page 222**

A. The security assistants at the stations.
Q. And they would send them to you?
A. They would send them to the office, yes, to the supervisor. And the supervisors would usually put them in my mailbox.

If students were giving them a difficult time about showing their I.D., then that would usually come to my attention. And from that point I would usually go down to the office of Residence Life and try to work things out for them. A tremendous amount of touring with security in particular.
Q. Touring?
A. Yes, sir. When I was hired, it was made clear to me that my job was to be out in the campus for the staff to see me, for me to get involved with all three shifts. So I did a considerable amount of touring, speaking to the ORL, which is the Office of Residence Life staff.
Q. Excuse me again. But when you say touring, you are talking about going from dormitory to dormitory?

**Page 223**

A. Yes, sir.
Q. Okay.
A. Sometimes --
Q. Across the entire campus?
A. Yes, sir.
Q. All right. Sorry to interrupt.
A. No, that is fine. I would make meetings regularly with the ORL staff to make sure that they were pleased with the help.

There was probably more union grievances out of security than most our departments because of the numbers, so I would try to act as an intermediary to resolve issues. I assisted in evaluations.

There is a job description, I am sure that would add a few more things to my job duties. I dealt with parents on a considerable basis. I met with the students whenever their I.D.'s were confiscated, which would be pretty frequently. I met with parents but mainly spoke with them on the telephone. And then on occasion, because the title was

John Walsh - August 9, 2005     Walsh vs. Boston University

Case 1:04-cv-11240-RCL    Document 19-8    Filed 04/21/2006    Page 3 of 4

**224**

1      Residential Safety, I would have parents
2      talk about, you know, fire egresses and I
3      would act as an intermediary to refer to
4      the appropriate department because we
5      didn't deal with the fire code issues or
6      whatever that would be. Training, I did
7      some training with the staff.
8      Presentations, there were a number of
9      meetings where I was required to go to to
10    present to ORL staff or to parents, you
11    know, an overview of how Residential
12    Safety worked and the purpose of us having
13    I.D.'s. I did a minimal amount of work
14    with the equipment at the University. We
15    have a lot of security equipment at the
16    University in the dorms. To be a presence
17    on campus, I guess, would really be a
18    synopsis of one of my duties.
19 Q. Okay. Mr. Walsh, was there only one
20    operations manager in Residential Safety?
21 A. Yes, sir.
22 Q. Okay. So if I understand both you and the
23    way the department, the Office of Housing
24    is organized, most all of the sub units

**225**

1      within the Office of Housing report
2      through you. Is that correct? Reported
3      through the operations manager? Sorry.
4 A. Actually, the office manager reported
5      directly to the Associate Director. The
6      computer rooms reported actually to the
7      Associate Director. The mail rooms, I
8      know Marc Robillard had a direct line so I
9      don't know if they would report directly
10    through him. And Security reported to --
11    most of Security stuff did come through
12    me.
13 Q. Okay. That would be the largest portion
14    of your job?
15 A. I would say with regards to the number of
16    employees, mail rooms was a huge because
17    of the volume we dealt with, I think about
18    9,000 students' mail, so even though the
19    numbers working in the departments were
20    not large, probably 50 or 60 people total,
21    and that includes students.
22 Q. Student employees?
23 A. Yes, sir. There was considerable work
24    because of the volume of the mail.

**226**

1 Q. So 50 or 60 employees in the mail room
2    more or less?
3 A. That would be a fair guesstimate on my
4    part.
5 Q. Okay. Were there any employees in the
6    study lounge area?
7 A. Student employees only, sir.
8 Q. And did they report also through you?
9 A. No, sir.
10 Q. You said you handled complaints coming
11    from the study lounge.
12 A. Yes, sir. If it wasn't opened, then I
13    might get a call.
14 Q. I see, I see.
15 A. Or if they wanted extended hours, I might
16    get a call.
17 Q. You said you supervised the student staff
18    along with a co-manager in the offices. I
19    presume you are referring to the dormitory
20    offices now?
21 A. I am sorry. Would you repeat that,
22    please.
23 Q. You testified that with regard to offices,
24    your responsibility for managing offices

**227**

1      involved supervising student staff?
2 A. In the office, I considered myself one of
3      their supervisors, yes, sir.
4 Q. Well, what office? That is my question.
5 A. Oh, I am sorry. The Residential Safety
6      Office.
7 Q. The Central Residential Safety Office?
8 A. Yes, sir.
9 Q. And was that 985 Commonwealth Avenue?
10 A. Yes.
11 Q. How many people were you supervising
12    there?
13 A. There was the manager actually reported to
14    the Associate Director. The students
15    reported to the office manager. I did
16    take part in some supervisory duties with
17    them. I don't know if it was official.
18    And I would say there was one full-time
19    office manager. There was, it varied but
20    probably anywhere from 14 to 20 student
21    staff working in the office, most of them,
22    of course, on a part-time basis. And
23    there were two full-time security
24    assistants assigned to the office on

**228**

1  alternate days. Basically, two,
2  occasionally there would be a third or
3  fourth party involved, a security
4  assistant that would work in the office.
5  Q. You said that security was the largest
6  part of your job, residential safety was
7  the term you used.
8  A. Yes. It had the most employees.
9  Q. How many?
10 A. We had approximately, and this varied
11 tremendously according to the time of the
12 year, we had approximately 70 full-time
13 employees, approximately 25 part-time
14 employees. I should change part time to
15 casual. We had approximately 25 casual
16 employees. And we had each year it
17 differed. There were some years we had
18 three or four students working as security
19 assistants and there were other years we
20 would have two dozen students working as
21 security assistants. So in total, the
22 numbers would vary anywhere from 70 to
23 approximately 120.
24 Q. Who all reported through you?

**229**

1  A. Or the shift manager, whoever the shift
2  manager was.
3  Q. But the shift managers reported to you, is
4  that correct?
5  A. Some of them did, sir.
6  Q. Some of them didn't?
7  A. Yes, sir.
8  Q. What would be the breakdown?
9  A. Cabot Dodge --
10 Q. No, no, no. I am sorry. What would be
11 the characteristics that would make some
12 report to you and some report to someone
13 else? Any job distinctions there?
14 A. Connections at the University, sir.
15 Q. Connections as in the sense of University
16 politics?
17 A. Yes, sir.
18 Q. Okay. How many shift supervisors reported
19 to you?
20 A. That varied from approximately three to
21 seven.
22 Q. Okay. How much time did the training
23 take? You said that you did some
24 training.

**230**

1  A. I was constantly training. I tried to do
2  that every time I was on my job.
3  Customarily, it was on an individual
4  basis. We did have annual and bi-annual
5  sessions with our security assistants.
6  And I don't believe I did any training in
7  the mail rooms whatsoever. I wasn't
8  overly familiar with them.
9  Q. When you are talking about training, you
10 are talking about giving training rather
11 than receiving it, is that correct?
12 A. Yes, sir.
13 Q. So how long did it take you to master your
14 job?
15       MS. PONTIKES: Objection.
16       MR. ELSWIT: Grounds?
17       MS. PONTIKES: Master seems a
18 little -- I mean what exactly do you mean
19 by that?
20       MR. ELSWIT: Fair enough.
21       THE WITNESS: I still answer,
22 right?
23       MS. PONTIKES: Unless he is going
24 to change the question.

**231**

1        MR. ELSWIT: Let me see if I can
2  phrase the question to meet Ms. Pontikes'
3  objection.
4  Q. How long did it take you to feel like you
5  had total control over your job and that
6  you were doing it well?
7  A. I don't think I ever felt that I had total
8  control over the job.
9  Q. This is not the time for humility,
10 Mr. Walsh.
11 A. I mean I believe I set up a great team. I
12 think a sign of a good manager is in his
13 absence that the organization still runs
14 appropriately. I made sure that was a
15 priority with me my whole seven years
16 here. But I don't think I ever mastered
17 the job well.
18 Q. Okay. Did you get good evaluations up
19 until Mr. Battaglino arrived?
20 A. I had a great reputation. I never was
21 disciplined. So I would say yes, I was
22 considered to be a good to very good
23 employee. There were certain departments
24 like ORL, Office of Residence Life, that