# O'BRIEN & LEVINE

Court Reporting Services



YOUR BOSTON CONNECTION...WORLDWIDE

## John Walsh v. Boston University

Transcript of the Testimony of:

## John Battaglino

## April 12, 2005

www.court-reporting.com
mail@court-reporting.com

195 State Street
Boston, MA 02109
(617) 399-0130  888.825.DEPO(3376)

Elizabette Afonso   1-14099

```
1              UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF MASSACHUSETTS

3

4            CIVIL ACTION NO.:  104-CV-11240-RCL

5

6   * * * * * * * * * * * * * * * * * *

7   JOHN WALSH,

8            Plaintiff,

9   vs.

10  BOSTON UNIVERSITY,

11           Defendant.

12  * * * * * * * * * * * * * * * * * *

13

14           DEPOSITION OF JOHN BATTAGLINO, taken on

15  behalf of the plaintiff, pursuant to the

16  Massachusetts Rules of Civil Procedure, before

17  Elizabette M. Afonso, Professional Shorthand

18  Reporter and Notary Public within and for the

19  Commonwealth of Massachusetts, at the law offices

20  of Pyle, Rome, Lichten & Ehrenberg, 18 Tremont

21  Street, Boston, Massachusetts, commencing at 10:05

22  a.m. on Tuesday, April 12, 2005.

23

24
```

1

46

1   potential to stay.
2   Q.  At the time Mr. McClean was released from Boston
3       University, do you recall if there was a potential
4       for him to have stayed?
5   A.  No.
6   Q.  At the time Mr. McClean was released, were there
7       other casual employees that continued to work under
8       you?
9           MR. ELSWIT: Do you mean in the same
10          position as Mr. McClean or in other positions?
11          MS. PONTIKES: No. I mean in other
12          positions under him in general.
13  A.  I don't recall specifics, but I'm sure there were.
14  Q.  Do you know what Mr. McClean was hired for?
15  A.  To help out in the mail rooms during the back to
16      school busy period. We set up package rooms, and
17      it's a very busy time in terms of writing up
18      packages and delivering those to students.
19  Q.  Are the people hired for that special package room,
20      do they generally continue to work in your
21      department after the need for the package room is
22      over?
23          MR. ELSWIT: Do you mean do casuals who
24          are hired for that?

47

1           MS. PONTIKES: Yeah, that's what I meant.
2   A.  It would be practice if someone was hired for that
3       specific reason that when that task was over, they
4       wouldn't continue to work.
5   Q.  If another position opened up somewhere else where
6       you could use them, could they be moved into that
7       position?
8   A.  Yes.
9   Q.  Did you speak to Mr. Walsh about terminating
10      Mr. McClean?
11  A.  Yes.
12  Q.  And do you recall what Mr. Walsh thought about
13      terminating Mr. McClean?
14  A.  I don't recall the specifics, but I know he was
15      very upset and would have preferred to not let
16      Mr. McClean go.
17  Q.  Did Mr. Walsh explain to you why he was upset?
18  A.  Again, I don't recall the specifics, but I know he
19      mentioned that Lindsey McClean was handicapped, and
20      he didn't think it was right that we would release
21      Mr. McClean at that time.
22  Q.  Do you recall what you thought at the time about
23      releasing Mr. McClean after Mr. Walsh disclosed
24      that he was handicapped?

48

1   A.  No, I don't.
2   Q.  Did Mr. Walsh give you any other reason for why he
3       was upset about terminating Mr. McClean other than
4       what you testified to about Mr. McClean being
5       handicapped?
6   A.  I don't recall.
7   Q.  If you can look at paragraph 11 of your affidavit,
8       the second sentence, "In my view, Jack exercised
9       extremely, poor judgment in bringing Mr. McClean
10      back to work in the first place." Can you explain
11      to me why you think Mr. Walsh exercised extremely,
12      poor judgment in bringing Mr. McClean back to work?
13  A.  Mr. McClean left our department. He was a casual
14      once before. He made racially, insensitive remarks
15      that some of the union security assistants,
16      full-time security assistants, did not appreciate,
17      and it was disruptive to have Mr. McClean back in
18      our ranks.
19  Q.  Is there something particular that was disrupted?
20  A.  The security assistants -- a few of the security
21      assistants that I mentioned, commented that they
22      didn't appreciate Mr. McClean being back.
23  Q.  Do you recall at this point who?
24  A.  I don't recall.

49

1   Q.  Did you have to approve Mr. McClean's hire?
2   A.  I don't recall.
3   Q.  After finding out about the racially, incentive
4       remarks, did you approach Mr. Walsh about that?
5   A.  Yes.
6   Q.  And was it at that point that you told Mr. Walsh
7       you were going to terminate Mr. McClean?
8   A.  I don't recall.
9   Q.  Do you recall what, if anything, Mr. Walsh said in
10      response to your telling him about the racially,
11      insensitive remarks?
12  A.  I don't recall the specifics. But I believe that
13      he didn't think that the people that made those
14      comments about Mr. McClean, made valid comments.
15          MS. PONTIKES: Let's mark this as
16          Exhibit 28.
17          (Whereupon the Stenographer marked
18          Exhibit No. 28 for identification.)
19  Q.  Mr. Battaglino, I'm going to put in front of you
20      what's been marked as Exhibit 28, and ask you to
21      review that, and then identify it for me when
22      you're done reviewing it?
23  A.  (Witness complies.)
24  Q.  Mr. Battaglino, do you recognize what's been marked

### Page 86

1  Robillard; is that 4? The second progress down,
2  Robillard 4, "Revise the supervisor schedule, so
3  that Roberta is on Monday through Friday 8:00 to
4  4:00." If you look at Exhibit 32, it's on the
5  second page of it under Project No. 2.
6  A.  Mm-hmm.
7  Q.  That's where Mr. Walsh reported to you about his --
8  what he did for Project No. 2; is that correct?
9  A.  Yes.
10 Q.  And did Mr. Walsh satisfactorily complete Project
11 No. 2?
12 A.  It's stated that he completed the task. I just
13 didn't have the revised schedule.
14 Q.  When you say that "it's stated," are you referring
15 to Robillard No. 5?
16 A.  Correct.
17 Q.  So is it fair to say he completed that
18 satisfactorily?
19 A.  Yes.
20 Q.  And by "that," I meant Project No. 2?
21 A.  Yes.
22 Q.  Take a look at Exhibit 33. Exhibit 33 is
23 Mr. Walsh's completion of Project No. 3; is that
24 correct?

### Page 87

1  A.  Yes.
2  Q.  And did Mr. Walsh satisfactorily complete Project
3  No. 3?
4  A.  He completed -- I don't know that I was thoroughly
5  satisfied, but he certainly -- this is a
6  description of exactly what I asked for -- not
7  exactly, but of what I asked for.
8  Q.  Is there something in particular that you were not
9  satisfied with about the completion of Project
10 No. 3?
11 A.  I don't know. I'm sorry.
12 Q.  Okay. If I can turn your attention to Robillard 5
13 on page 2, it's the first full paragraph under
14 where it says "Project No. 3," it starts with, "In
15 our January 3rd, 2001 meeting."
16 A.  Yes.
17 Q.  There's a sentence right before the end that says,
18 "However, I asked you to complete three simple
19 tasks in a 16-hour period and not one was
20 completed," do you see where I'm reading?
21 A.  Yes.
22 Q.  Was Project 2 completed in the time period?
23 A.  No. As I mentioned a moment ago, what I was still
24 missing was the revised schedule. It was stated

### Page 88

1  that Roberta's schedule was changed, but I did not
2  have the revised schedule.
3  Q.  Do you know approximately how long it would take
4  Mr. Walsh to put together a revised schedule?
5  A.  I have no idea.
6  Q.  Do you know what went into having to put together a
7  revised schedule?
8  A.  Yes.
9  Q.  And what was that?
10 A.  He'd have to communicate with the parties involved,
11 and edit the current schedule, which I believe was
12 kept on his computer, and then print that copy.
13 Q.  The first project, the vacation requests, do you
14 know how long it took Mr. Walsh to review all of
15 the days that he disagreed with?
16 A.  I have no idea.
17 Q.  We were looking at six months worth of time; is
18 that correct, from July 2000 to December 2000? I'm
19 looking at Exhibit 32.
20 A.  Yes. But your question was how long --
21 Q.  Do you know how long it took for Mr. Walsh to
22 complete Project No. 1 that you had asked him to
23 do?
24 A.  I have no idea.

### Page 89

1  Q.  My follow-up question was: This was for him to
2  review and account for discrepancy in six months
3  worth of time records; is that correct?
4  A.  Yes.
5  Q.  There were other employees that also had to
6  reconcile their time records; is that correct?
7  A.  Yes.
8  Q.  And do you know how long it took these other
9  employees to reconcile their time records?
10 A.  Each month I prepared a leave record, at most would
11 be a 24-hour period for people to reconcile that
12 month.
13 Q.  Was there any other employees who had to reconcile
14 a full six months?
15 A.  No. They reconciled every month.
16 Q.  And why is it that Mr. Walsh was reconciling six
17 months in January 2001?
18 A.  Mr. Walsh refused to reconcile every month as
19 instructed. He didn't cooperate where everybody
20 else cooperated in reviewing and reconciling
21 records. I had it ready on the last day of every
22 month.
23 Q.  When you first began, there was an issue with
24 reconciling employee vacation records; is that

138

1  Q.  So what you were looking for was for dates that he
2      was not going to be there?
3  A.  Yes. Specifically, when are you going to be in;
4      when are you going to be out, that was my concern.
5  Q.  And the time off requests did not address that?
6  A.  Correct.
7  Q.  Time off requests, you'd have to list the dates
8      when you're not going to be there, right?
9  A.  The time off requests that I received from Jack
10     were confusing. I believe they were uncooperative.
11     MR. ELSWIT: Okay. Just stick with the
12     question.
13 Q.  I think what my question was: Was that you list
14     the dates that you're going to be out on there,
15     right?
16 A.  Yes.
17     MS. PONTIKES: Your counsel looks like he
18     really needs to take a break.
19     MR. ELSWIT: No. I'm fine. It's just
20     we've been going for a long time.
21     MS. PONTIKES: I'll take a break here.
22     Why don't we all take a break and then we'll come
23     back.
24     THE WITNESS: Okay. Thanks.

139

1      (A short break was taken.)
2  Q.  We left off with Mr. Walsh's time off requests.
3      What is it about Mr. Walsh's time off requests that
4      you found confusing?
5  A.  I don't have any specifics for you. But in
6      general, there were cancellations, rescheduling,
7      documents sent in variety of forms, e-mails, time
8      off requests.
9      Again, I'm just -- I'd have to look at
10     the notes specifically. And then around this time
11     in May, I think we're about May, there were --
12     clearly, I had said, "No more. We need to just
13     accurately reflect time that you're here and time
14     that you're not." And we were never able to get to
15     that point.
16 Q.  Is Exhibit 34 when you say you said, "No more," are
17     you thinking of Exhibit 34?
18 A.  There's this, and there's also another form of
19     communication, I don't know where it is in the
20     notes in my file that I asked specifically, "Just
21     tell me the days you're going to be here for May
22     and June." It was very basic. "Forget everything
23     that was sent in the past, just now tell me the
24     dates you're going to be here and the dates that

140

1      you're going to be out for May and June."
2  Q.  Did Mr. Walsh do that?
3  A.  I don't recall. What I recall is that it was not
4      done, and it was pains taking to go through that.
5  Q.  Let me show you what's been marked as Robillard 11.
6  A.  Okay.
7  Q.  Can I have that back for a minute?
8  A.  (Witness complies.)
9  Q.  I thought this was the e-mail where Mr. Walsh did
10     that. Apparently it's not. I'm thinking of the
11     wrong thing, I think. Why don't you keep this in
12     front of you, so I can ask you about that later.
13     Actually, if you can take a look at the
14     memo dated May 15th, 2001. It's one of the
15     Robillard exhibits, Robillard 7.
16 A.  Yes.
17 Q.  Take a look at the second page of Robillard 7, this
18     is a time off request that Mr. Walsh used while the
19     two of you worked together?
20 A.  Yes.
21 Q.  And is this one of the time off requests you found
22     confusing?
23 A.  As I recall, this time off request was denied. But
24     this is an example of a time off request that's

141

1      excessive, and it would be practice to find out,
2      you know, why we needed this kind of time off.
3  Q.  But is this an example of a time off request that
4      was confusing to you?
5  A.  No. This is very clear. The confusing part would
6      be e-mails that would follow-up saying, I want to
7      cancel this; I want to bring on this; I want to
8      cancel that; I switched this to this date; that to
9      that date. And this is an inaccurate assessment of
10     what's going to happen going forward.
11 Q.  I see. That particular request which is dated May
12     2nd, 2001, do you recall if Mr. Walsh cancelled any
13     of those time off requests?
14 A.  I don't recall.
15 Q.  Why don't you look through Robillard Exhibit 7,
16     because I think there might be somewhere in there?
17 A.  Yes. It looks like he cancelled some of the
18     appointments.
19 Q.  And this was at your request; is that correct?
20 A.  Yes.
21 Q.  In addition to the requests for cancellation that
22     you made for the May 2nd, 2001 time off requests,
23     did you at other times also request that Mr. Walsh
24     cancel some of his time off requests?