## MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION

JOHN B. WALSH,                                   )
                                                 )
    Complainant,                                 )
                                                 )
        v.                                       )     Docket No. 00133805
                                                 )
BOSTON UNIVERSITY and                            )
JOHN BATTAGLINO, JR.                             )
                                                 )
    Respondents.                                 )

### AFFIDAVIT OF JOHN BATTAGLINO, JR.

The affiant, John Battaglino, Jr., being duly sworn, states:

1. I am the Associate Director of Housing/Residential Safety at Boston University. I was hired as the Assistant Director, and began work on June 26, 2000. (My position was upgraded two months ago.) I am responsible for the overall management of residential safety in the University's on-campus dormitories. I direct security operations and oversee professional staff, security assistants, and part-time staff. I am also responsible for payroll, scheduling, staff training and development, and long-term planning.

2. Immediately before beginning employment with the University, I worked for approximately five years for Barnes & Noble Corporation, managing bookstores at Plymouth State University and, most recently, the University of Michigan. Before that, I worked for 660 Corporation, Boston University's for-profit subsidiary that manages various business enterprises, including, until 1995, the Boston University Bookstore.

While working at 660 Corporation, I got to know various members of Boston University's administration and staff.

3. Shortly after I assumed my responsibilities as Assistant Director in the Office of Housing, I became aware that the complainant, Jack Walsh, was extremely resentful of the fact that I had been given the position. He let it be known that he thought I was given the job solely because my father is a member of the Board of Trustees of Boston University. Therefore, and in addition to the responsibilities one feels when assuming a new job, I felt additional pressure to establish myself as a fair and capable manager who could succeed independently.

4. One of my first responsibilities was to determine how much accrued vacation and sick leave time various members of the Residential Safety staff had in the "bank." My staff were highly critical of my predecessor's record keeping, and complained -- with some justification, in my opinion -- that the timekeeping records were incomplete and did not reflect either how much time the employees had accrued or how much time they had taken as vacation or sick leave. I tried to establish a "baseline" for each employee, so that he/she would know what I thought, based on available records, that employee had accrued. I then gave each employee the opportunity to contest my judgment. I also established a recording and reporting system to assure that, going forward, all accrued and used sick and vacation leave time would be accurately recorded.

5. I eventually reached agreement with every one of my employees regarding his or her accrued time -- except Jack Walsh. Some of the employees accepted my initial calculations. Others established, by providing evidence or compelling arguments, that the

records I was working from were inaccurate. When the process was complete, however, all of the employees were satisfied with the outcome, except Mr. Walsh.

6. On several occasions, I spoke with Jack, and followed up in writing, regarding his disagreement with my assessment of his accrued vacation time. I asked him to let me know if, or where, he disagreed with my analysis. (See, for example, my e-mails of October 24, November 15, and November 22, 2000, and my memo of December 5, 2000, all of which are attached to this affidavit.) Yet Jack was unwilling to cooperate in reconciling his monthly leave records. At one point he told me he had evidence at his parents' home that would prove that my records were inaccurate, but he never produced it. Although this issue has been dragging on for more than six months, Jack has neither produced evidence to show that my records are inaccurate, nor agreed that my records are accurate.

7. Regardless, and as Jack knows, management employees who have worked at Boston University for less than fifteen years receive 1.67 accrued vacation days per month. Employees are allowed to "bank" no more than forty days. After that, accrued vacation time falls into the "use it or lose it" category. That means that, if an employee has forty days of accrued vacation time, all subsequent accrued time must be used during the month in which it is accrued, or it is lost forever. On August 3, 2000, I told Jack he had accrued forty days' vacation. He disagrees, and claims he is owed far more than forty days. I cannot change Boston University policy, and have made numerous requests for information that would resolve the disagreement.

8. My relationship with Mr. Walsh has been extremely trying. He has baited me and tried to intimidate me, both physically and verbally. For example, in late August

2000, he hired a temporary employee, known at the University as a "casual," named Lindsay McLean, to assist in the Rich Hall mailroom at the beginning of the school year. One of our staff members asked why he had been returned to work (before I arrived, Mr. McLean had also worked as a casual, but was let go in April 2000, in part because he used racially derogatory and insensitive language).

9. I asked Jack why he had brought Mr. McLean back to work. He told me that he needed McLean's help in the beginning of the school year. A few days later, I went to Jack's office and told him that he could stay until the early crunch subsided, but then he would be released. At that point, Jack exploded. He stood up from his chair, pointed his finger at me, and yelled, "Lindsay McLean is handicapped. How would you like it if someone treated your brother [who has Down's syndrome] like that? I'm sure your daddy would be very proud of you treating someone this way."

10. I was hurt and offended by Jack's comments, and taken aback by his aggressive tone. Later in the day, I told him never to mention either my brother or my father in that context again. I told him that there was no reason for him to ever discuss my family in the context of work. At that, Jack again pointed his finger at me, "Are you threatening me? Get the fuck out of my office." He repeated the phrase several times in a loud and aggressive tone. I should note that I am 5'5" tall and Jack, who works out regularly, is well over 6' tall.

11. Ultimately, I released Mr. McLean. In my view, Jack exercised extremely poor judgment in bringing Mr. McLean back to work in the first place, and was rude and insubordinate in the way he expressed himself to me. However, I did not discipline him

at the time because I was relatively new and I was still hopeful that Jack and I could somehow manage to work harmoniously together.

12.    Mr. Walsh's resentment over the fact that I am his supervisor has come out in a variety of different ways. On the evening of December 6, after receiving several confrontational e-mails over the preceding days (samples attached), I was walking past a dormitory on Babcock Street, a man walking in the other direction passed me, and, as he did, he said, "Say hello to your daddy for me," and kept on walking. I was stunned. It was Jack Walsh.

13.    Jack has created an enormous paper trail by sending e-mails misrepresenting our interactions and misrepresenting his remarks. For instance, he disavows the event in the preceding paragraph. He regularly accuses me of threatening my father's influence, which, in fact, does not exist in the Office of Housing; as a member of the Board of Trustees, he has absolutely no involvement with the day-to-day operations of the University. (See, e.g., e-mail exchange of January 8, 2001, attached.) This allegation is complete nonsense. As a new manager with a large staff, I am, as noted above, making great efforts to establish myself as a capable individual, and to combat the perception that some may have that I was given this position because of the fact that my father is a Trustee. It is awkward enough, and there would be absolutely no reason for me to try to succeed by relying on my father.

14.    The written communications between Jack and me that are attached to this affidavit show a consistent theme. I am trying to manage my staff and my responsibilities, and while Jack proclaims his support and cooperation, and loyalty to the University, he basically attempts to undercut me.

15. I recognize that reasonable people can disagree with my interpretation of our relationship. However, there is absolutely no basis in any of our communications, or in any of the documents that I have generated -- or, for that matter, any of the many e-mails Jack has written -- that can lead a reasonable person to conclude that any of the decisions I have made relate to age discrimination, or are in retaliation for his complaints about the way I do my job. I understand Jack's resentment over the fact that he does not have my job, and I do not question his right to dislike me or my management style. However, I have looked at the record in this case and I have looked in my heart, and I can find absolutely no basis for his allegation that I am responsible for age discrimination.

Further affiant sayeth not.

Subscribed and sworn under the penalties of perjury.

_____
JOHN BATTAGLINO, JR.

Date: January 30, 2001