# O'BRIEN & LEVINE

Court Reporting Services



YOUR BOSTON CONNECTION...WORLDWIDE

## John Walsh v. Trustees of Boston University

Transcript of the Testimony of:

## Marc Robillard

## April 7, 2005

www.court-reporting.com
mail@court-reporting.com

195 State Street
Boston, MA 02109
(617) 399-0130   888.825.DEPO(3376)

Rosemary F. Grogan   1-14098

```
1                UNITED STATES DISTRICT COURT

2                  DISTRICT OF MASSACHUSETTS

3                         CIVIL ACTION NO. 04-11240-RCL

4    - - - - - - - - - - - - - - - - -

5    JOHN WALSH,                          :

6                   Plaintiff,            :

7         V.                              :

8    TRUSTEES OF BOSTON UNIVERSITY,       :

9                   Defendant.            :

10   - - - - - - - - - - - - - - - - -

11           Deposition of MARC ROBILLARD, a witness called

12   by counsel for the Plaintiff, taken pursuant to the

13   applicable provisions of the Federal Rules of Civil

14   Procedure, before Rosemary F. Grogan, a Registered

15   Professional Reporter, CSR No. 112993, and Notary Public

16   in and for the Commonwealth of Massachusetts, at the Law

17   offices of Pyle, Rome, Lichten, Ehrenberg &

18   Liss-Riordan, P.C., 18 Tremont Street, Boston,

19   Massachusetts, on Thursday, April 7, 2005, commencing at

20   10:20 a.m.

21

22

23

24
```

                                                                 1

**Page 22**

1   A. Yes.
2   Q. Who was that?
3   A. Who was it?
4   Q. At the time Mr. Walsh worked there?
5   A. It would have been a number of different
6   people; secretary position.
7   Q. Okay.
8   A. That probably turned over two or three times
9   in the time Mr. Walsh was there.
10  Q. And why don't you tell me what the positions
11  were that reported to Mr. Battaglino?
12  A. Secretary position.
13  Q. And you said one other one?
14  A. No.
15  Q. So Mr. Walsh and the secretary reported to
16  Mr. Battaglino?
17  A. Yes.
18  Q. And underneath Mr. Walsh, were they called
19  supervisors?
20  A. Yes.
21  Q. Do you recall at the time Mr. Walsh worked
22  there, how many there were that reported to Mr. Walsh?
23  A. I believe there were four full-time
24  supervisors and one part-time supervisor. There may

**Page 23**

1   have been five. We have four right now.
2   Q. Underneath the supervisors was there another
3   level then that was the security assistants?
4   A. Yes.
5   Q. Was there anyone under the security assistants
6   or are they at the bottom?
7   A. We don't like to think of it as the bottom.
8   There's another group of employees who are mailroom
9   assistants. They are equal to the security assistants.
10  Q. I'm not trying to imply anyone's position is
11  the bottom.
12      Did you ever hire students to work -- let
13  me put it this way: Did B.U. hire students into
14  positions who would be reporting to Mr. Walsh --
15  A. Yes.
16  Q. -- I should say the operations manager, I'm
17  sorry?
18  A. Yes.
19  Q. Are these considered on the same level as
20  security assistants and mailroom assistants?
21  A. No.
22  Q. Do they report to the security assistants
23  or --
24  A. No, they don't. There could be students that

**Page 24**

1   report to the mailroom assistants, but there would not
2   be students that report to security assistants.
3   Q. And at the time Mr. Walsh worked at B.U.,
4   there was also a practice of hiring what is called
5   casuals; is that correct?
6   A. Yes.
7   Q. And these were basically temporary employees?
8   A. Yes.
9   Q. Are there particular positions that the
10  casuals are hired to fill or were hired to fill at the
11  time?
12  A. Yes.
13  Q. What positions were the casuals hired to fill?
14  A. They're hired to be security assistants; to be
15  mailroom assistants. That's it.
16  Q. Are there times in the year when the casuals
17  are hired?
18  A. They're hired all year long.
19  Q. What determines whether or not B.U. is going
20  to hire a casual?
21  A. Our need for staff.
22  Q. Are there times of the year when the need for
23  staff increases?
24  A. Yes.

**Page 25**

1   Q. I'm talking about in your department now. I'm
2   not talking about otherwise.
3       What times of year is it that the need
4   for staff increases?
5   A. Fall.
6   Q. And I asked you the last question in the
7   present tense.
8       Was the need for increase in staff in the
9   fall also true when Mr. Walsh worked for B.U.?
10  A. Yes.
11  Q. If I can go back now to the questions I was
12  asking about with respect to request for accommodation.
13      When an employee presents you with a
14  request for accommodation is there a procedure you're
15  required to follow?
16  A. Not a set procedure.
17  Q. Do you have a practice that you follow when an
18  employee presents you with a request for accommodation?
19  A. Yes.
20  Q. And can you describe what that practice is to
21  me?
22  A. We immediately call our personnel department
23  and ask them what to do.
24  Q. Good idea.

### Page 38

1   Do you recall if Mr. Sadri put any of his
2   complaints in writing?
3   A. I don't recall.
4   Q. If there were any complaints in writing, would
5   these be in Mr. Walsh's personnel file?
6   A. Yes.
7   Q. Do you recall if Mr. Sadri's complaints had to
8   do with Mr. Walsh's skills?
9   A. Do I remember?
10  Q. Yes.
11  A. No, I don't.
12  Q. And when I say, Skills, I'm differentiating
13  that from behavior; for example, you testified about
14  excessive absences. That's an example of behavior.
15  That's the differentiation I'm making. I just want to
16  make sure you understand what I'm asking; okay?
17      Do you understand?
18  A. I understand.
19  Q. From the period of 1995 to the time that
20  Mr. Battaglino was hired, was Mr. Walsh considered a
21  good employee?
22      MR. ELSWIT: Objection.
23  A. I'm not sure -- who considered Mr. Walsh a
24  good employee?

### Page 39

1   Q. Well, we'll start with you. Did you consider
2   Mr. Walsh a good employee?
3   A. Yes.
4   Q. Did you, between 1995 and Mr. Battaglino's
5   hire, did you ever socialize with Mr. Walsh outside of
6   work?
7   A. Yes.
8   Q. Can you recall how many times?
9   A. No.
10  Q. Was it something that happened regularly or
11  once in a while?
12  A. Mostly during college basketball season.
13  Q. Is this going to the games together?
14  A. Yes.
15  Q. Do you recall any other things you did with
16  Mr. Walsh to socialize together?
17  A. No.
18  Q. Did you and Mr. Walsh continue to go to
19  basketball games together after Mr. Battaglino was
20  hired?
21  A. I don't remember.
22  Q. Do you know if Mr. Sadri thought that
23  Mr. Walsh was a good employee?
24  A. Could you repeat that question?

### Page 40

1   Q. Do you know if Mr. Sadri thought Mr. Walsh was
2   a good employee while Mr. Walsh worked for Mr. Sadri?
3       MR. ELSWIT: Objection.
4   A. I don't think Mr. Sadri thought Mr. Walsh was
5   a good employee.
6   Q. Did Mr. Sadri ever tell you why he didn't
7   think Mr. Walsh was a good employee?
8   A. Yes.
9   Q. And what did he tell you?
10  A. I don't remember the specifics. Mr. Sadri is
11  very good at computers, and one thing --
12      MR. ELSWIT: Just answer the question. You
13      don't remember any specifics.
14  BY MS. PONTIKES:
15  Q. So what is your answer to the question?
16  A. Mr. Sadri was good at computers. He didn't
17  think Mr. Walsh was good at computers.
18  Q. And that was the reason he told you that
19  Mr. Walsh was not a good employee?
20  A. Yes.
21  Q. Did you say anything when Mr. Sadri told you
22  that Mr. Walsh was not very good at computers?
23  A. Yes.
24  Q. What did you tell him?

### Page 41

1   A. I don't know what I told him.
2   Q. Did Mr. Sadri ever want to terminate
3   Mr. Walsh?
4   A. No.
5   Q. Did Mr. Sadri's complaints that Mr. Walsh was
6   not good at computers concern you?
7   A. I'm sorry?
8   Q. Concern you.
9   A. Concern, no.
10  Q. So was it your opinion at that time that
11  Mr. Walsh should keep his job?
12  A. Yes.
13  Q. Did you ever receive any complaints about
14  Mr. Walsh from Mr. Walsh's subordinates? And let's
15  restrict the time period right now to 1995 -- between
16  1995, and when Mr. Walsh was hired and when
17  Mr. Battaglino was hired.
18  A. I don't remember any complaints about
19  Mr. Walsh from his insubordinates.
20  Q. Did you ever get any complaints from student
21  employees about Mr. Walsh during the same time period
22  between 1995 and Mr. Battaglino's hire?
23  A. No.
24  Q. Did you ever receive complaints from casuals,

### 42

1  casual employees, between 1995 and the beginning of
2  Mr. Battaglino's hire?
3  A. No.
4  Q. Between 1995 and Mr. Battaglino's hire, do you
5  recall, other than the testimony you gave about Babak
6  Sadri, any complaints about Mr. Walsh from any source?
7  A. Yes.
8  Q. And what was that?
9  A. I don't remember. I don't remember any
10 specifics.
11 Q. Is it fair to say there was a complaint about
12 Mr. Walsh, but you just don't remember where it came
13 from or what it was about?
14 A. That would be fair.
15 Q. Between 1995 and Mr. Battaglino's hire was
16 Mr. Walsh disciplined; had any formal discipline?
17 A. No.
18 Q. Okay. Let's now move to the time period to
19 after Mr. Battaglino was hired. Once Mr. Battaglino was
20 hired --
21    MS. PONTIKES: I don't want to go through
22    using this exercise. I know there's a lot of
23    things we agree on.
24 BY MS. PONTIKES:

### 43

1  Q. At some point Mr. Battaglino began to voice
2  issues about Mr. Walsh; is that correct?
3  A. Yes.
4  Q. Do you recall at what point that was after his
5  hire?
6  A. I don't recall.
7  Q. Do you recall when he was hired approximately?
8  A. June of 2000.
9  Q. And you don't recall when he began to voice
10 issues about Mr. Walsh?
11 A. No.
12 Q. Do you recall what the first issue was that
13 Mr. Battaglino brought to your attention?
14 A. No, I don't recall the first issue.
15 Q. Why don't I go about it this way: Do you
16 recall what the issues that Mr. Battaglino brought to
17 your attention were?
18 A. Not all of them.
19 Q. Which ones do you recall?
20 A. I recall the recording of time and attendance,
21 trying to straighten out our time and attendance
22 records, and Mr. Walsh was uncooperative in
23 Mr. Battaglino's efforts to do that task.
24 Q. Any other issues Mr. Battaglino bringing to

### 44

1  your attention about Mr. Walsh?
2  A. Yes, I'm not sure how to characterize them.
3  The best I can characterize them as is a hostile
4  demeanor of Mr. Walsh towards Mr. Battaglino.
5  Q. Anything in addition to the failure to
6  cooperate with the recording of time and attendance and
7  the hostile demeanor?
8  A. There may be others; I just don't remember
9  what they are.
10 Q. Is it fair to say those are the two that stick
11 out in your mind?
12 A. Yes.
13    MS. PONTIKES: Off the record for a second.
14    (Off Record Discussion)
15    MS. PONTIKES: Let's go back on record.
16 BY MS. PONTIKES:
17 Q. I'm going to have the stenographer mark a
18 series of exhibits, and I'm going to go through them and
19 ask you, as we were discussing off the record, I'm going
20 to go through them and ask you about each one.
21    MR. ELSWIT: Should we go off the record?
22    MS. PONTIKES: While she's doing that, sure,
23    why not.
24    (Exhibits 2 - 11 Marked for Identification)

### 45

1    (Short Recess)
2  BY MS. PONTIKES:
3  Q. Okay; Mr. Robillard?
4  A. Yes.
5  Q. We placed in front of you Exhibits 2 through,
6  I believe, 11, and I'm going to ask if you -- let's
7  start with the first one -- if you want to look through
8  them all right now, that's fine.
9    MR. ELSWIT: Do you have copies for me?
10   MS. PONTIKES: I do. They're right here. You
11   want them now?
12   MR. ELSWIT: Yes.
13   (Witness reviewing documents)
14 BY MS. PONTIKES:
15 Q. Mr. Robillard, have you had a chance to look
16 at what's been previously marked as Exhibit No. 2?
17   (Witness reviewing document)
18 A. Yes.
19 Q. Okay. Do you recognize Exhibit No. 2?
20 A. Yes.
21 Q. And can you state for the record what this is?
22 A. This is a memorandum from John Battaglino to
23 Jack Walsh asking him to clarify his -- or to review and
24 approve his time-off requests during July, August,