126

1 was; so I had a question whether he could do his job.
2 Q. Do you know if anyone sent Dr. Abreu a
3 description of Mr. Walsh's job?
4 A. I don't know.
5 Q. Did you have something in mind that you were
6 looking for from Dr. Abreu to demonstrate to you that
7 Mr. Walsh could do his job?
8 A. I didn't need it. You know when we wrote to
9 Mr. Walsh in late August, we asked for medical release
10 so a medical person of our choosing could make the
11 determination.
12 Q. Did a medical person of your choosing ever
13 make a determination about Mr. Walsh's ability to do his
14 job?
15 A. I don't know if it was never communicated to
16 me.
17 Q. Do you know if a medical person of B.U.'s
18 choosing was ever provided documentation about
19 Mr. Walsh's medical issues?
20 A. I don't know that.
21 Q. I take it you never got anything from a
22 medical specialist that B.U. had chosen regarding
23 Mr. Walsh's ability to work or not work?
24 A. That's correct.

127

1 Q. If you look on page two of Exhibit 18, where
2 you write, Without proper advanced notification of
3 proper documentation concerning your health, what are
4 you referring to by. Without proper documentation
5 concerning your health?
6     MR. ELSWIT: Before you answer, please read
7     the entire paragraph so you have the context.
8         (Witness reviewing document)
9 A. Could you repeat the question for me?
10 Q. Sure.
11     The part of the very last sentence that
12 goes over on to page two of Exhibit 18 ends with,
13 Without proper documentation concerning your health, my
14 question is: What does the Without proper documentation
15 concerning your health, et cetera mean?
16 A. The appropriate doctor's note and notification
17 of limitations.
18 Q. So Mr. Walsh had provided some documentation,
19 but is it fair to say your position is that it was not
20 proper documentation?
21 A. It wasn't sufficient documentation.
22 Q. Do you have requirements about what doctor's
23 notes excusing absences need to say?
24 A. No.

128

1 Q. Did you ever speak to Mr. Walsh about what the
2 doctor's notes he was providing should contain?
3 A. I did not.
4 Q. Do you know if anyone did?
5 A. I don't know.
6 Q. Is this letter of August 27, 2001 disciplinary
7 towards Mr. Walsh?
8 A. No.
9 Q. When you wrote this letter, Exhibit 18, did
10 you think Mr. Walsh was not cooperating with the B.U.?
11 A. Yes.
12 Q. And why did you think he was not cooperating?
13 A. Because for a year and a half we haven't been
14 able to reconcile his time and attendance records, and
15 it is bad form to essentially send an e-mail to your
16 immediate supervisor saying, I'm not coming to work
17 tomorrow or the next week, and then a doctor's note
18 without talking to your immediate supervisor about your
19 plans, especially given the fact it was the week before
20 school started and our busiest week of the year.
21 Q. What does Mr. Walsh's reconciling the time
22 records have to do with his ability to work?
23 A. I don't know.
24 Q. In your letter of August 27, 2001, do you

129

1 mention anywhere Mr. Walsh reconciling his time records?
2     (Witness reviewing document)
3 A. No, I don't specifically mention in the letter
4 that he failed to reconcile his time records, time-off
5 records.
6 Q. Was that something that was in your mind when
7 you wrote this letter in August 27, 20001?
8 A. I don't know if it was in my mind or not.
9 Certainly Mr. Walsh's extended absence over the previous
10 eight months was in my mind.
11 Q. So when you say, Over the previous eight
12 months, does that mean Mr. Walsh's, what you're calling,
13 excessive absences started in January of 2001?
14 A. Yes.
15 Q. Is that related at all to him reconciling his
16 time record?
17 A. No.
18 Q. Your testimony about a manner in which
19 Mr. Walsh notified Mr. Battaglino about his need for
20 time off, is that what you're referring to in the third
21 paragraph on the first page of Exhibit 18 where it says,
22 In addition to ignoring long-established Boston
23 University policy?
24     (Witness reviewing document)

33 (Pages 126 to 129)

138

1  Act request?
2  A. I don't know.
3  Q. Was it in relation to your request on
4  August 27, 20001?
5  A. My thinking at the time, it was related to my
6  request of August 27, 2001.
7  Q. And what did you say to Marilyn Walsh and what
8  did she say to you?
9  A. I don't know the exact conversation, but I
10 said, Do we have sufficient documentation? And she
11 said, Not yet.
12 Q. Did you have more than one conversation with
13 Marilyn Walsh inquiring about whether or not there was
14 sufficient documentation --
15 A. Yes.
16 Q. -- from Mr. Walsh?
17 A. Yes.
18 Q. Do you remember how many conversations you had
19 with --
20 A. No, I do not.
21 Q. -- Mrs. Walsh.
22    Did there ever come a time when Marilyn
23 Walsh said, We've got some documentation?
24 A. No.

139

1  Q. Mr. Walsh eventually returned to work; is that
2  correct?
3  A. Yes.
4  Q. Before the end of 2001?
5  A. Yes.
6  Q. Do you recall when it was he returned to work?
7  A. I don't remember the exact date, but it was on
8  or around November 26.
9  Q. Thanksgiving time?
10 A. Yes.
11 Q. Did Mr. Walsh contact you before he returned
12 to work?
13 A. No.
14 Q. He just showed up?
15 A. Yes.
16 Q. Do you know if Mr. Walsh contacted anyone
17 before returning to work?
18 A. I don't know. I know he was told to come back
19 to work by Miss Walsh.
20 Q. Do you know why Miss Walsh told him to come
21 back to work?
22 A. I don't know.
23 Q. Did you have any discussion around
24 November 2001 with anyone about Mr. Walsh returning to

140

1  work?
2  A. Yes.
3  Q. Who was that?
4  A. I don't remember exactly, but I'm sure I had a
5  conversation with Marilyn Walsh that Jack was in fact
6  back to work.
7  Q. Did you speak to anyone before Mr. Walsh
8  returned to work about him returning to work?
9  A. Yes.
10 Q. And who was that?
11 A. Marilyn Walsh and John Battaglino.
12 Q. And was this more than one conversation?
13 A. Yes.
14 Q. Can you estimate how many conversations it
15 was?
16 A. No, I can't.
17 Q. The first conversation that you had about
18 Mr. Walsh returning to work with Marilyn Walsh and/or
19 John Battaglino, do you recall what anyone said?
20 A. No.
21 Q. Did you discuss with Marilyn Walsh and John
22 Battaglino at any point during these discussions before
23 Mr. Walsh returned to work, telling Mr. Walsh he had to
24 return to work?

141

1  A. Yes.
2  Q. Do you recall what you said or what they said?
3  A. No, I don't recall.
4  Q. Do you recall what the gist of the
5  conversation was?
6  A. It was in the context, we wanted Jack to come
7  back to work prior to on or around November 26th, and
8  Marilyn Walsh wanted to have a meeting upon Jack's
9  return at her office in the Office of Personnel when he
10 first came back; so we talked about setting that up.
11 Q. Why did you now want Mr. Walsh to return to
12 work?
13 A. Because we hadn't, to our satisfaction,
14 received the medical information justifying his
15 continued absence; so we wanted him back to work.
16 Q. What happened between your letter of
17 August 27th, 2001 and these conversations with Marilyn
18 Walsh and John Battaglino that made you think Mr. Walsh
19 was able to come back to work?
20 A. From my own mind it appeared that we were not
21 going to get the information that we were requesting to
22 support the restricted duty, so we asked Mr. Walsh to
23 come back and work full time.
24 Q. In your August 27th letter, I thought your

### 142

1  concern was that Mr. Walsh was not able to work; am I
2  not understanding --
3      A. We were unsure of his capacity to work.
4      Q. So at the time you had these conversations
5  with Marilyn Walsh and John Battaglino, you were no
6  longer concerned about his capacity to work?
7      A. Correct.
8      Q. Was there something that had happened between
9  the time you wrote your August 27 letter and the time
10 you were having these conversations that dissipated your
11 concern that Mr. Walsh was unable to work?
12     A. Nearly three months had elapsed and we weren't
13 getting cooperation and we couldn't have a position
14 open. It's a job we need. So we asked Mr. Walsh to
15 come back to work.
16     Q. But my question is: Were you no longer
17 concerned when you had this conversation with Marilyn
18 Walsh and John Battaglino about Mr. Walsh's ability to
19 do his job?
20     A. We were concerned we weren't able to determine
21 whether or not -- or what his capacity was; so we
22 figured we would bring him back to work.
23     Q. So is it fair to say -- strike that.
24         So do I understand properly you did not

### 143

1  receive any information between your August 27th letter
2  and your discussions with Marilyn Walsh and John
3  Battaglino that changed your understanding about
4  Mr. Walsh's ability to do his job?
5      MR. ELSWIT: Objection.
6      A. That's correct.
7      Q. Do you recall Mr. Battaglino expressing any
8  concern about Mr. Walsh's ability to do his job?
9      A. No, I do not.
10     Q. Was there any discussion about terminating
11 Mr. Walsh during these discussions with Marilyn Walsh
12 and John Battaglino?
13     A. No.
14     Q. If Mr. Walsh did not return to work, was the
15 plan to terminate him?
16     MR. ELSWIT: Objection.
17     A. I don't know what the plan was. We wanted
18 Mr. Walsh back to work.
19     Q. Was there a plan in the event Mr. Walsh did
20 not return to work?
21     A. I don't remember. I think there's an e-mail
22 or a message from Marilyn Walsh to Jack telling him to
23 come back. And I believe in that e-mail I read that if
24 he didn't come back to work, that we would consider that

### 144

1  he abandoned his job.
2      Q. And it was after Miss Walsh's communication to
3  Mr. Walsh that Mr. Walsh returned to work?
4      A. Yes.
5      Q. Let me back up a little bit. When you were
6  discussing a reasonable accommodation with Marilyn Walsh
7  for Jack Walsh, was there any question in your mind
8  about whether Mr. Walsh qualified for a reasonable
9  accommodation?
10     A. I don't remember having a conversation with
11 Marilyn Walsh about reasonable accommodation.
12     Q. I thought you testified that you had. Did you
13 testify you had a discussion with somebody about
14 reasonable accommodation about Mr. Walsh?
15     A. No, I don't recall any conversation with
16 anybody about reasonable accommodation about Mr. Walsh.
17         THE COURT REPORTER: "Question: When you went
18 to Marilyn Walsh about Mr. Walsh's -- strike that.
19         About the issue with Mr. Walsh and his
20 absences, did you have any discussion with her about
21 potentially needing to make a reasonable accommodation
22 for Mr. Walsh? Answer: I don't recall the discussion
23 about reasonable accommodation with Marilyn. I'm not
24 sure. Question: Did you have a discussion about

### 145

1  reasonable accommodation with Marilyn at any time?
2  Answer: Yes. Question: Do you recall when that was?
3  Answer: That would be August or September of 2001.
4  Question: Would this have been after Mr. Walsh made the
5  request? Answer: I'm not sure when he made the
6  request. Question: I understand that. But do you
7  recall if your conversation with Marilyn Walsh was after
8  Mr. Walsh had made his request? Mr. Elswit: Objection.
9  Answer: I don't know. Question: And during your
10 conversation with Miss Walsh, was it just you and
11 Miss Walsh speaking? Answer: When? Question: When
12 you spoke to her about reasonable accommodation for
13 Mr. Walsh? Answer: There were probably more than one
14 conversation and some of them would have been Miss Walsh
15 and myself, and others would have been with other people
16 in the room or on the phone."
17 BY MS. PONTIKES:
18     Q. So did you think that Mr. Walsh did qualify
19 for a reasonable accommodation?
20     A. I didn't have an opinion one way or the other.
21     Q. At any time did you question whether or not
22 Mr. Walsh actually had issues with his health?
23     A. No.
24     Q. At any time did you question Mr. Walsh's needs

### 202

1  were you aware of health problems that Mr. Walsh
2  had?
3  A. I was aware that Mr. Walsh had some dental
4  work that he was undergoing, but I can't recall
5  today if I knew of any other health problems he
6  may or may not have had.
7  Q. Do you know how you found out about the dental
8  problems?
9  A. Mr. Walsh would have told me he had some
10  dentist appointments.
11  Q. Did you speak to anyone about Mr. Walsh having
12  dental appointments or dental problems?
13  A. No.
14  Q. Were you aware of Mr. Walsh attending his
15  dental appointments on a regular basis? This is
16  prior to Mr. Battaglino --
17  A. I don't recall.
18  Q. At some point, did you become aware of other
19  health problems in addition to the dental
20  problems that Mr. Walsh had?
21  A. Yes.
22  Q. When was that?
23  A. I don't remember.
24  Q. After Mr. Battaglino was hired?

### 203

1  A. Yes.
2  Q. Was this after the issues with the absences
3  arose?
4  A. I'm not sure.
5  Q. Have you testified to the best of your memory
6  today about the -- when Mr. Walsh's health
7  problems --
8  A. Can you repeat that again? I'm a little hard
9  of hearing.
10  Q. Sure. I'll keep my voice up. It's something
11  other people have said to me. Have you testified
12  to the best of your memory today about when you
13  learned of Mr. Walsh's health problems?
14  A. Yes, I have.
15  Q. I will ask you a few questions now regarding
16  Mr. McLean. Did Mr. Walsh speak to you about the
17  termination of Mr. McLean?
18  A. I don't recall.
19  Q. Did Mr. Battaglino ever speak to you about the
20  termination of Mr. McLean?
21  A. Mr. Battaglino had conversations about Mr.
22  McLean, yes.
23  Q. What did Mr. Battaglino say about Mr. McLean?
24  A. Mr. Battaglino indicated to me that he didn't

### 204

1  know who Lindsey McLean was, but he had received
2  a call from a member of our security staff who
3  wanted to know why he was back on our payroll.
4  Q. Are you finished with your answer?
5  A. Yes. That is my answer.
6  Q. Okay. And what did you say, if anything, to
7  Mr. Battaglino?
8  A. I told Mr. Battaglino that my recollection was
9  that Mr. McLean had worked for us previously,
10  that we had complaints from at least two members
11  of our security and staff about Mr. McLean's
12  language as a security assistant and that we had
13  stopped scheduling him for work and that if there
14  were objections from our staff now, that his
15  services were no longer needed, and we should
16  probably stop scheduling him also.
17  Q. In addition to this conversation with Mr.
18  Battaglino, did you have any further discussion
19  about Mr. McLean with Mr. Battaglino?
20  A. No.
21  Q. And you said no to Mr. Walsh, that you
22  couldn't recall?
23  A. I don't remember any conversation with Mr.
24  Walsh about Mr. McLean.

### 205

1  Q. Can you look in your deposition transcript at
2  page 44?
3  A. Okay.
4  Q. Lines 2 through I think 4 is what I'm going to
5  particularly focus on. You testified that there
6  was a hostile demeanor from Mr. Walsh towards Mr.
7  Battaglino.
8  A. Okay.
9  Q. Did you ever find out what the source of the
10  hostility was that you are referring to in that
11  testimony?
12  A. No.
13  Q. On your first day of deposition we went over I
14  believe it was Exhibits 2, 3, 4 and 5. I will
15  show you a series of e-mails and memoranda
16  between Mr. Walsh and Mr. Battaglino. You can go
17  ahead and review them. My question to you is
18  simply did you ever suggest any other course of
19  action for Mr. Battaglino to take in dealing with
20  Mr. Walsh? My question simply was if you had
21  ever suggested to Mr. Battaglino that he take a
22  different course of action in handling Mr. Walsh?
23  A. I don't remember if I did or not.
24  Q. Did you at any point investigate Mr.