## MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION

| | |
|---|---|
| JOHN B. WALSH, <br><br>  Complainant, <br><br> v. <br><br> BOSTON UNIVERSITY and <br> JOHN BATTAGLINO, JR. <br><br> Respondents. | ) <br> ) <br> ) <br> ) <br> ) <br> ) Docket No. 00133805 <br> ) <br> ) <br> ) <br> ) <br> ) |

### AFFIDAVIT OF MARC ROBILLARD.

The affiant, Marc Robillard., being duly sworn, states:

1. I am the Director of the Office of Housing at Boston University. I have held the position since 1987. I am responsible for the university's undergraduate housing and residential safety programs, and supervise approximately 100 full-time employees.

2. I have known the complainant, Jack Walsh, since he came to work at Boston University in 1995. He is an Operations Manager in the Department of Residential Safety, a branch of the Office of Housing.

3. When Assistant Director of Housing Babak Sadri, Jack's immediate supervisor, assumed another position within my Office last spring, Jack made it very clear that he hoped to be promoted to the then-vacant position of Assistant Director. Ten candidates, including Jack Walsh, filed applications for the position. Among them was John Battaglino, Jr.

4. In mid-May, 2000, Joseph P. Mercurio, the University's Executive Vice President, asked me to give serious consideration to Mr. Battaglino's application. Mr. Mercurio said that he knew Mr. Battaglino quite well because he (Battaglino) had held a variety of positions in 660 Corporation, the University's for-profit subsidiary that operates a variety of University-related businesses. When, in 1995, the University entered into an agreement with Barnes & Noble to run the University's Bookstore (Barnes & Noble operates hundreds of college bookstores across the country), Mr. Battaglino switched employers and began working for Barnes & Noble. He managed the bookstores at Plymouth State College and the University of Michigan. Mr. Mercurio told me that Mr. Battaglino wanted to return to Massachusetts.

5. I also talked to Peter Smokowski, who was the CEO of 660 Corporation and Mr. Battaglino's supervisor. He offered high praise of John's skills and abilities, and said that he thought John could handle the challenges of the position (as I described it). Mr. Smokowski also said that John had proved to be a good manager and that his "people skills" would enable him to succeed as he learned the responsibilities of the position.

6. I weighed all the various factors as I considered the candidates for the position, and ultimately decided to offer the job to Mr. Battaglino. I will state in this sworn affidavit, and, if necessary, under oath at a public hearing, that no thought of the age of any of the candidates crossed my mind as I made this decision. I believe that Mr. Walsh's claim of age discrimination is a complete fabrication, and reflects his unhappiness that he was not given the position, rather than any real belief that he is the victim of discrimination prohibited by law.

7. To the best of my memory, I have never participated in discussions about age-related issues, with one exception. From time to time, I and other managers express concern that young staff members who work in the security booths and mailrooms of the dormitories occasionally socialize with, and date, undergraduates. As a matter of policy, this is not prohibited, but I am always concerned that my staff members behave with the highest standards of integrity and treat undergraduates with the utmost respect. Some members of the staff of the Office of Housing/Residential Safety are in their early- to mid-twenties, and when these individuals socialize with undergraduates, I am concerned to make sure that they behave appropriately. Other than that, I have no idea what Mr. Walsh is referring to when, in the complaint, he claims that "due to my employers past comments and behavior I believe age discrimination was involved [in the decision to offer the position of Assistant Director to Mr. Battaglino]."

8. On June 21, 2000, a few weeks after I told Jack that Mr. Battaglino had been appointed Assistant Director, I received the attached e-mail, in which he raised a series of issues relating to my management of the Office of Housing. His concerns about accumulated vacation and leave time, which persist to this day, are addressed in more detail in Mr. Battaglino's affidavit, and in a letter from Manuel Monteiro, Director of the Office of Personnel, dated January 19, 2001 and attached to Mr. Monteiro's affidavit. Some of Jack's concerns about management issues were raised shortly after John Battaglino began work on June 26, when Jack, John, several other managers and I met with Peter Cusato, Vice President of Business Affairs. Some of his vague allegations about "double standards" and managers seeking a "fair shake" remain, in my mind, as vague and unclear today as they were when Jack first used these phrases in his June 21 e-mail.

9. In that June 21 e-mail, Jack suggested for the first time that it was illegal to terminate the employment of Lindsay McLean (on the first page of the e-mail, he refers to "L.McClean"). Mr. McLean was a "casual." That meant that he was not a permanent Boston University employee. Rather, he was brought in specifically to work as a part-time security assistant and a part-time mailroom clerk. He was neither promised nor assured permanent employment. Mr. McLean was released in April 2000 because other employees had complained of his use of insensitive and racially derogatory language.

10. At the time, I did not understand what Jack was referring to in his June 21 e-mail when he called Mr. McLean's termination "illegal." Much later, I learned that Jack claims that Mr. McLean has Attention Deficit Disorder. If that is so, I did not know about it until long after McLean had left employment with the University. It was never brought to my attention or, for that matter, to the attention of any other supervisor (other than Jack). Mr. McLean certainly never brought that fact, if it is a fact, to the attention of the University's Office of Disability Services. And he never requested any accommodations for his alleged disability.

11. Jack's unhappiness over some of the issues that he raised in the June 21 e-mail persisted throughout the summer. It is noteworthy that, despite all of his complaints, and his obvious frustration at having to report to Mr. Battaglino, he never once said _anything_ about discrimination. However, over time Jack became increasingly provocative and more frequently expressed his anger and displeasure over various management decisions. Not surprisingly, most of his mean spirited remarks have been directed toward Mr. Battaglino.

-4-

12. As a matter of practice, I do not like to waste time to "build the record" by writing down every decision I make, or e-mailing in response to every issue brought to my attention. Since Mr. Battaglino was hired, I have received a massive volume of e-mail from Jack, much of it relating to tensions with Battaglino. Generally, I did not respond. But over the course of the past seven months, Jack's tone has become harsher and more mean-spirited. His criticisms are increasingly personal and less and less constructive.

13. On December 7, 2000, Jack and I met with my supervisor, Peter Cusato, the University's Vice President for Business Affairs. Notwithstanding the University's size, most of the ranking executives, including Mr. Cusato, are relatively accessible to employees who have grievances of one form or another. I provided Mr. Cusato with some background information and documents that I thought might help him understand the nature of Jack's complaints. Jack voiced a wide range of grievances, and immediately after the meeting he sent me a lengthy e-mail challenging some of my remarks. That e-mail, and my reply of the same day (December 7) are attached.

14. Attached to this affidavit is Mr. Cusato's December 26 memo to Jack, responding to some of his concerns. What is most striking to me, in the context of the proceeding before this Commission, is that, at our meeting with Mr. Cusato, Jack did not raise any claims of age discrimination. Instead, he complained about management decisions made by me and John Battaglino. Mr. Cusato's response tries to address some of these issues and makes plain that he will not tolerate some of Jack's "insulting and inflammatory" communications. Mr. Cusato also admonished Jack to stop spreading unsubstantiated and irrelevant stories that had no purpose except to hurt various employees of the University.

15. On December 28, Jack filed his complaint before this Commission.

16. I am personally perplexed and troubled by this complaint. I understand that Jack has reason to be unhappy with the fact that he was not promoted, and he has every right to complain about management decisions he believes are unfair. But nothing I or, to the best of my ability to determine, John Battaglino have done reflects any bias because of the fact that Jack is forty-five years old. I firmly believe that Jack is using the fact that he is older than John Battaglino as an "angle" to bring his grievances before this Commission. I respectfully believe that they do not belong here.

Further affiant sayeth not.

Subscribed and sworn under the penalties of perjury.

_____
MARC ROBILLARD

Date: January 30, 2001