

# BIOBEHAVIORAL TREATMENT CENTER

1051 Beacon Street, Suite 101, Brookline, MA 02446
(617) 738-4814
Fax (617) 232-9247

---

Director
Alma Dell Smith, Ph.D.

Staff
Jacqueline Buchin, Psy.D.
Ching King Chieng, Ph.D.
Neil Gore, Ph.D.
Lyle H. Miller, Ph.D.
Ira D. Rudolph, Ph.D.
Joyce S. Taylor, Ph.D

## John Walsh Report

This is a treatment summary of my psychotherapy with Mr. John (Jack) Walsh, beginning 2/5/01, and continuing to the present.

Mr. Walsh was referred to me at the Biobehavioral Treatment Center by his Primary Care Physician, Dr. Steven Abreu. In the first session, Mr. Walsh discussed a number of problems, including anger, a past history of anxiety attacks, possible attention deficit hyperactivity disorder, and job stress. The nature of this job stress appeared primarily to be conflict between Mr. Walsh, in his role as a supervisor in Operations Management and Residential Safety at Boston University, and his managers, in regard to handling of personnel matters regarding patient's supervisee or supervisees. Mr. Walsh stated that he was currently taking Zoloft, and had been out of work for two weeks on medical leave, but was returning the next day.

In the first few sessions, Mr. Walsh elaborated on the details of his current job stress, previous job stress and legal action involving his prior work at Carney Hospital, his current physical symptoms (including teeth grinding/bruxism) and emotional symptoms, including crying spells, anger, and concentration difficulties.

During these initial sessions, I diagnosed Mr. Walsh as having Acute Stress Disorder (DSM 308.3) and with an additional diagnosis of Major Depression, Recurrent (296.30). At a later point in treatment (January 2002), I added the further diagnosis of Attention Deficit Hyper-activity Disorder (DSM 314.01). We initially worked on stress management.

In my opinion, the diagnoses above are based on the following considerations. In our first session, Mr. Walsh reported experiencing anxiety attacks, with prior (1993-1994) and current (Feb. 2001) medication treatment. In the first few sessions, his range of topics was fairly constricted, limited mostly to the stresses of his work situation, and how he is attempting to cope. His affect was concerned and worried. In our second session, after he had returned to work, he showed increased agitation, and stood up and walked around the office (after asking my permission to do so). At this time, he reported that he had needed to take increased medication. His presentation and discussion of his work stresses was made in a somewhat disjointed fashion, jumping from topic to topic as opposed to giving a coherent narrative. For our fourth session, Mr. Walsh requested, and was granted, permission to have an extended session (80 minutes instead of 50 minutes). This is an unusual request within my client population, and my opinion is that it demonstrates the high level of acute stress which Mr. Walsh was experiencing.

In the diagnostic manual (DSM-IV), there are a number of specific diagnoses within the Anxiety Disorder group. Strictly speaking, Mr. Walsh's situation and presentation do not fit any of these exactly. Generalized Anxiety Disorder seems partially accurate because in my opinion, Mr. Walsh seemed to have good reason to worry about job conflict in the late winter of 2001, conflict which did seem to carry a risk to Mr. Walsh of job loss, income loss, and further shame and humiliation. I chose Acute Stress Disorder as a working diagnosis at the time, because it descriptively captures these qualities. In the strict diagnostic code, Acute Stress Disorder is essentially the early stage reaction, which may lead to Posttraumatic Stress Disorder as a more chronic condition; and the criteria confine this to situations involving "actual or threatened death or serious injury, or a threat to the physical integrity of self or others." Clearly Mr. Walsh was not facing such a <u>physical</u> threat, but in my opinion the threat of job loss and associated humiliation was tantamount to the same effect, especially occurring after the highly stressful circumstances of Mr. Walsh's legal situation with the Carney Hospital.

The diagnosis of Major Depression, Recurrent, began to be apparent by the fifth session when he reported a history of "terrible crying fits," which he originally experienced during the Carney case, and which had now returned. Over the entire course of our treatment, these "crying fits" have remained a very significant and only minimally controlled symptom (i.e. on 7/29/03, Mr. Walsh's psychiatrist reported that Mr. Walsh had shown a little improvement: instead of 5-6 hours crying daily, his crying was down to 2-3 hours per day). In addition, Mr. Walsh meets the necessary number of diagnostic criteria for this diagnosis, including depressed mood, diminished interest, agitation, fatigue, feelings of worthlessness, and diminished ability to think or concentrate. The medications with which Mr. Walsh has been treated are compatible with, and are apparently aimed at treating the diagnoses of depression and anxiety.

Our psychotherapy proceeded on a once-a-week basis until July 2001, and then we resumed weekly treatment in September 2001. During the period from March to July 2001, Mr. Walsh experienced some slight improvement in depressive symptoms, probably due to medication changes. However, he became concerned in May about "getting some flak about time off requests," and that his boss had complained about patient requesting "excessive time off" this month. Mr. Walsh asked me to provide him with a letter for work to document his weekly psychotherapy appointments, which I did. He also stated that he was undergoing or seeking to undergo treatment for an abscessed tooth and for kidney stones. He expressed fear that his bosses might be out to fire him, and that they seemed to be giving him a hard time on a number of issues, including time off for medical appointments. He cancelled our appointment for 5/29/01, reporting that he had not been allowed time off.

My opinion is that work stress was a predominant cause of Mr. Walsh's anxiety during 2001. Work difficulties were the main topic in every psychotherapy session. He reported frequent experiences of feeling harassed and provoked by management at work; e.g. session #2 on 2/12/01: "busting my balls" demands; a note from Mr. Walsh dated 6/1/01 canceling our next session: "Boy they are busting chops." My opinion is that he was in a constant state of worry during this period of time, making every effort not to say or do anything which could cause trouble for himself. It is noteworthy that one of his presenting problems was "anger management." However, over our treatment sessions I noticed that he seldom if ever acted angry

or demonstrated anger in sessions; and that the few instances of anger he reported were not very severe, and were confined exclusively to situations outside of work, such as driving situations. My conclusion from this is that he was making every effort to avoid any angry confrontations at work, which he probably sensed would bring further difficulties on himself. However, my opinion is that such suppression of emotion added to his anxiety.

We met for four sessions in June and early July. During this time, Mr. Walsh had developed shingles, possibly a stress-related disorder. He continued to discuss work difficulties. Then on 7/17/01, he cancelled further appointments, stating that his boss was denying him time off. Mr. Walsh planned to protest this, probably by filing a request for time off through F.M.L.A. In my opinion, it was not acceptable for Mr. Walsh to be denied time off to attend therapy appointments during the period from 7/17/01 to 9/9/01. At the time of this discontinuation of treatment, Mr. Walsh had been continuing to experience physical and psychological symptoms, and personal distress. At best, in my opinion, his coping had enabled him to stabilize himself slightly. Our implicit treatment plan had been to continue once-a-week psychotherapy sessions until he deemed that he had made sufficient improvement.

We resumed treatment 9/9/01. Mr. Walsh stated that he was now being charged for vacation days when he had medical appointments, and that his boss would be asking for second opinions on his medical problems. He reported teeth grinding, abscessed teeth, and kidney stones continued as medical problems. At the 9/18/01 session, Mr. Walsh reported that he is on suspension, that he is not allowed back at work until he can come back full-time. We continued our regular meetings through 11/19/01, when he reported that Boston University had denied his F.M.L.A. request, supposedly due to non-receipt of requested medical information. Mr. Walsh disputes the accuracy of this reason. He also states that B.U. sent him a letter to report back to work on 11/12/01, but that he did not receive this letter until 11/16/01.

I was never contacted by Boston University personnel or their representatives, either as a follow-up to my letter of 5/15/01 (certifying his attendance at psychotherapy sessions) or at any other time, as to the need for Mr. Walsh to be in psychotherapy, or on any other matter.

On 11/21/01, Mr. Walsh cancelled his upcoming appointment for 11/26/01, stating he had been ordered back to work that day. Then, between 11/28/01 and 12/3/01, I had a series of phone messages from Mr. Walsh and brief phone conversations with him, in which he related that there had been an incident at work on or about Tuesday 11/27/01, in which his boss had pushed and kicked him, and that he had been "canned" (i.e. suspended or fired). Mr. Walsh reported that he filed or attempted to file an assault charge against his boss.

Mr. Walsh returned to therapy in December 2001, and we have continued our meetings until the present. He has continued to have significant psychological difficulties: Major depression which has been resistant to many different medications; attention deficit problems which are apparent in my interactions with him; continuing anxiety and anger; and an intense sense of shame and loss of self-respect for his perceived lack of success in his jobs, particularly his experience at Boston University, and in his overall career—this sense is a strong basis for his depression. My opinion is that his job loss at Boston University, and his perceived treatment by his employers prior to his job loss, have substantially contributed to his emotional problems. In

addition, Mr. Walsh has suffered the deaths of both his parents in the last four years, losses which have compounded his depression. He is a cooperative and likeable therapy patient, although he is somewhat discouraged about his lack of symptom improvement, and failure to establish a more satisfactory life and career situation.

In regard to the lack of improvement in his depression over the last four years of treatment, my opinion is that his own disappointment in himself, in his failure to sustain early career successes, and to live up to his potential, have generated massive shame and sense of humiliation. My opinion is that this sense of shame and humiliation have fueled his ongoing depression. The loss of his job at Boston University, and his perceived treatment by his employers prior to his job loss, have substantially contributed to shame and humiliation.

I hereby state that I have not testified as an expert witness in any case within the last four years. I am not charging a fee for providing this report nor for any subsequent required testimony. The sources of data for this report are my psychotherapy notes and related correspondence in Mr. Walsh's medical record.

Neil S. Gore, Ph.D.
Licensed Psychologist

12/22/05