# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

JOHN WALSH,  )
      Plaintiff  )
   )
v.  )    Civil Action No. 04-CV-11240-RCL
   )
BOSTON UNIVERSITY  )
      Defendant.  )
   )

## PLAINTIFF'S RESPONSE TO DEFENDANT'S RULE 56.1 STATEMENT OF UNDISPUTED FACTS

## PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS TO WHICH THERE IS A GENUINE ISSUE TO BE TRIED

Pursuant to Local Rule 56.1, Plaintiff, John Walsh ("Walsh") hereby submits this

response to the Defendant Boston University's ("BU") statement of facts. He follows with

his statement of material facts in dispute.

## I.    Response to Statement of Facts[1]

    1.    Agreed.

    2.    Agreed that Battaglino and Walsh's relationship was poor after the fall of

        2000. Disputed as to the reason why. See Walsh's Statement of Additional

        Facts to Which There is a Genuine Issue to Be Tried ("SAF"), ¶¶ 20, 21, 22,

        26, 27, 28, 29, 30, 32, 34-37, 38, 42-44, 46-51, 53, 67, 69, and 70.

    3.    Agreed as to the need to reconcile the vacation time. Disputed that Walsh

        never reached agreement with Battaglino. See SAF ¶¶ 24-29.

    4.    Disputed. See SAF ¶¶ 24-29.

---

[1]    BU has inserted several headings in its Statement of Facts. To the extent these headings characterize the events or the facts, Walsh disputes the characterization. He does not adopt any of the headings or agree to their implications.

1

5.    Agreed McLean was hired as a casual.  Disputed as to the reason for his
      termination.  McLean was terminated because Battaglino thought "there was
      something wrong with him."  See SAF, ¶¶ 16-20.

6.    Agreed Battaglino ordered Walsh to terminate McLean.  Disputed as to the
      reasons for McLean's termination and Walsh's statements to Battaglino.
      McLean was terminated due to his disability, and Walsh protested
      Battaglino's actions as discriminatory.  See SAF, ¶¶ 16-20.

7.    Disputed.  Walsh disputes that the exchange took place in that manner.  See
      SAF, ¶¶ 16-20.

8.    Agreed.

9.    Disputed.  See SAF, ¶¶ 13-15.

10.   Walsh cannot agree or dispute McLean's statements to Robillard and
      Battaglino about his disability.  Disputed that Walsh's testimony is unclear.
      Walsh clearly testified that he knew McLean had a disability.  See SAF ¶¶
      13-15.  He conveyed this to Battaglino as the basis for his protest at
      McLean's termination.  See SAF ¶¶ 16-20.

11.   Agreed Walsh met with Cusato and Robillard and that Cusato sided with
      Battaglino.  The rest of this paragraph purports to summarize the contents of
      BU's Exhibit 13.  Walsh neither agrees nor disputes the representations in
      this paragraph, but states that BU's Exhibit 13 speaks for itself.

12.   Agreed Walsh filed a complaint with the MCAD.  The rest of this paragraph
      purports to summarize the contents of BU's Exhibit 12.  Walsh neither
      agrees nor disputes the representations in this paragraph, but states that

2

BU's Exhibit 12 speaks for itself.

13.     Walsh disputes BU's use of this document as inappropriate at summary
        judgment. The MCAD's findings and decision are not admissible evidence,
        and thus BU cannot rest on its argument about the viability of Walsh's
        claims upon this document.

14.     Walsh disputes BU's use of this document as inappropriate at summary
        judgment. The MCAD's findings and decision are not admissible evidence,
        and thus BU cannot rest on its argument about the viability of Walsh's
        claims upon this document.

15.     Disputed. Walsh's attendance was the same as it had been before
        Battaglino's hire, but Battaglino now required him to make formal Time Off
        Requests for doctors' appointments and penalizing him by deducting
        sick/vacation time for the appointments and even when Walsh present.
        Agreed Walsh protested Battaglino's treatment and was told that he should
        have terminated McLean. See SAF ¶¶ 22, 26, 30.

16.     Agreed as to Walsh's medical leave from January 19, 2001 through
        February 2, 2001. Disputed as to the characterization that the leave was
        "without explanation". Walsh states that Exhibit 15 speaks for itself.
        Battaglino recorded that Walsh had taken vacation time when he was
        present to harass Walsh. See SAF ¶¶ 21, 28, 34, -37, 38, 48, 50, 51.

17.     Agreed that Walsh presented BU with a note from Dr. Gore. Walsh states
        the contents of the note, BU's Exhibit 18, speak for themselves. Disputed
        that Walsh missed an entire day when he met with Dr. Gore. Walsh

3

contends that Battaglino charged him an entire vacation day when Walsh was in fact present to make it appear that Walsh was abusing sick leave. See SAF ¶¶ 35-37

18.  Agreed that Walsh sought a formal reasonable accommodation from BU on May 22, 2001. The rest of this paragraph purports to summarize the contents of BU's Exhibit 21. Walsh neither agrees nor disputes the representations in this paragraph, but states that BU's Exhibit 21 speaks for itself.

19.  Disputed. Walsh's health conditions affect his ability to concentrate, think, urinate, eat, and sleep. See SAF ¶¶ 5-9.

20.  This paragraph purports to summarize the contents of BU's Exhibits 22 and 23. Walsh neither agrees nor disputes the representations in this paragraph, but states that BU's Exhibits 22 and 23 speak for themselves.

21.  Agreed that Battaglino was frustrated by Walsh's need for time off for doctor's appointments. Disputed as to the rest of this paragraph. Walsh provided more notice than he was required to provide. See SAF ¶¶ 48, 49, and Exhibit 11, attached to Walsh's Statement of Additional Facts.

22.  Agreed that Dr. Abreu provided a note to BU on Walsh's behalf. The rest of this paragraph purports to summarize the contents of BU's Exhibit 24. Walsh neither agrees nor disputes the representations in this paragraph, but states that BU's Exhibit 24 speaks for itself.

23.  Agreed Robillard sent Walsh BU's Exhibit 5. Disputed as to the rest of the paragraph. Robillard suspended Walsh without Walsh's knowledge because

4

the letter was sent to the wrong address. When Walsh arrived back at work on September 1, 2001, Battaglino took his identification card, keys, and banned Walsh from the premises. See SAF ¶¶ 58-60.

24. Agreed that Walsh requested FMLA leave on September 19, 2001 and that Dr. Abreu provided a note for Walsh on October 1, 2001. Disputed as to the rest of the paragraph. See SAF ¶¶ 61-68.

25. Disputed. Walsh disputes BU's characterization of his emails and contends that Exhibits 26, 32, and 33 speak for themselves. Battaglino had been harassing Walsh and falsely portraying their interactions. BU completely took Battaglino's side. See SAF ¶¶ 32, 39-40.

26. Agreed.

27. Agreed.

28. Agreed that Walsh returned to work on November 26, 2001. Disputed as to the rest of the paragraph. Walsh was suspended from September 1, 2001 through November 26, 2001. BU's calculation of days he missed during 2001 is disputed because Battaglino artificially increased Walsh's absences by charging Walsh vacation or sick time when Walsh was present. See SAF ¶¶ 35-37, 58, 59, 60.

29. Disputed. Battaglino began the altercation and assaulted Walsh. BU terminated Walsh as the culmination of Battaglino's retaliatory harassment. See SAF ¶¶ 68-71.

30. Agreed Walsh filed another complaint with the MCAD on May 23, 2002. Walsh disputes the disparaging characterization BU takes of his MCAD

5

> complaint. Such characterization does not constitute an "undisputed fact"
> and does not advance BU's summary judgment argument. Walsh disputes
> BU's use of Exhibit 37, the findings of the MCAD, as inappropriate at
> summary judgment. The MCAD's findings and decision are not admissible
> evidence, and thus BU cannot rest on its argument about the viability of
> Walsh's claims upon this document.

31. This paragraph is a quote from Exhibit 37 which Walsh does not agree or
dispute, but states that it speaks for itself. Furthermore, Walsh disputes
BU's use of Exhibit 37, the findings of the MCAD, as inappropriate at
summary judgment. The MCAD's findings and decision are not admissible
evidence, and thus BU cannot rest on its argument about the viability of
Walsh's claims upon this document.

## II. Walsh's Statement of Additional Facts to which there is a Genuine Issue to be Tried

### Walsh's History at BU

1. BU hired Walsh as an Operations Manager in Residential Safety on March 13,
1995. After his hire, he was regularly given raises and thanked for his good
performance by the Director of the Office of Housing, Marc Robillard
("Robillard"). Walsh reported to Babak Sadri ("Sadri"), the Associate Director of
Residential Safety. See Boston University Leave Record of John Walsh ("Walsh
Leave Record"), attached as **Exhibit 1**; letters from Robillard to Walsh March 22,
1996-January 24, 2000, attached as **Exhibit 2**; the Affidavit of John Walsh ("Walsh
Affidavit"), ¶ 3, 18, attached as **Exhibit 3**.[2]

---

2    Walsh has two other affidavits to support his Opposition to BU's Motion for Summary Judgment.

6

2.    Walsh supervised the office staff, the mailroom, and the security staff. The mailroom had six full time employees and forty to fifty students working in it. The security staff had six or seven supervisors, seventy-five full time security officers, twenty part time security officers and ten students. See the Deposition of John Walsh ("Walsh Deposition"), pp. 217-230, attached as **Exhibit 4**.

3.    Walsh's position was not a 'nine to five" position. Residential Safety is a twenty-four hour, seven day a week operation. As the Operations Manager, Walsh was expected to be available at any time of the day or night. Walsh's position also did not entail sitting at his desk. Rather, he was expected to patrol BU's grounds to supervise the security officers at their positions, and visit the mailroom. Walsh worked weekends, after hours, during BU's intercession, and during inclement and severe weather. See the Walsh Affidavit, ¶¶ 1, 2, 4.

4.    Until Sadri was replaced by John Battaglino ("Battaglino"), Walsh was considered a good employee, performed his job well, and had no performance complaints lodged against him. Walsh's performance was praised by other employees in the Office of Resident Life and Events, and Walsh received many notes thanking him for his exceptional service. See the Deposition of Marc Robillard, ("Robillard Deposition"), pp. 36-42, attached as **Exhibit 5**; Walsh Affidavit, ¶ 3.

## Walsh's Disabilities and Chronic Health Conditions

5.    Walsh has several serious, chronic health conditions, including a mental health condition. He suffers from post traumatic stress disorder ("PTSD"), migraine headaches, shingles, kidney stones, and teeth grinding. See medical records of Dr.

---

All affidavits are attached at Exhibit 3.

Steven Abreu, Dr. Brandse, Dr. Neil Gore, Dr. Pang, Dr. Babayan, and Dr.

Steinberg (collectively "Walsh Medical Records"), attached as **Exhibit 6**.

6. Walsh's migraine symptoms include severe headache and nausea. Shingles cause rashes, stinging, itching, and large puss-filled pockets all over his body. Kidney stone attacks cause burning and pain upon urination and loss of urine control. PTSD causes sudden crying episodes and anxiety. The grinding of his teeth causes infections, often requiring dental intervention. When these symptoms are present, Walsh is generally incapacitated and cannot concentrate, eat, urinate, think, work or sleep. Walsh requires frequent treatment for these chronic health conditions to keep them under control. See the Walsh Deposition, pp. 85-86 119, 247-251; the Walsh Medical Records; Walsh Affidavit, ¶¶ 5-15.

7. From 1995 to the fall of 2000, Walsh frequently visited his dentist and doctors to treat these conditions. See the Walsh Medical Records. Walsh's health care providers are almost all located at 930 Commonwealth Avenue, Boston, BU's campus. This is down the street from Walsh's office at 985 Commonwealth Avenue. His therapist is in Brookline, and his urologist is in Cambridge. Walsh would generally see them on his lunch break, in the morning, or in the later afternoon. These visits generally took an hour to an hour and a half. Because he was out surveying the campus so often, he would sometimes combine a health care visit with his other duties around the campus. See the Walsh Deposition, pp. 227-228, 252-253; Walsh Affidavit, ¶ 16.

8. In April, 2000, Walsh was having blood in his urine. Between April and November, 2000, he treated for problems with his kidneys, ultimately requiring an

8

operation to remove kidney stones and a procedure called a Lithotripsy in June and July, 2000. He had several follow up visits as a result which continued through November, 2000. See the Walsh Medical Records (Cambridge Health Alliance records).

9.     Walsh also had extensive dental work done which necessitated fifteen dental visits in 2000. See the Walsh Medical Records (Boston University Medical Group Henry M. Goldman School of Graduate Dentistry).

10.    Before the hire of Battaglino, Robillard and Sadri knew that Walsh attended medical appointments during the day. Both often made snide remarks to Robillard's assistant, Andrew Wincel ("Wincel") about Walsh's medical needs and expressed frustration that someone Walsh's age had so many medical problems. See the Affidavit of Andrew Wincel ("Wincel Affidavit"), ¶ 7, attached as **Exhibit 3.**

11.    Walsh never received discipline, complaints, or poor performance evaluations from BU between his hire and October, 2000. See the Walsh Deposition, p.231-232; the Walsh Affidavit, ¶ 3, 40.

## Walsh Stands Up for an Employee with a Disability, Lindsay McLean

12.    During the winter of 2000, an employee named Lindsey McLean ("McLean") began working in security.    See the Walsh Deposition, pp. 127-128; the Walsh Affidavit, ¶ 19.

13.    McLean has attention deficit disorder. When he began working at BU, Walsh, Sadri, and Walsh's subordinates noted eccentricities in his behavior. Sadri called McLean "retarded" and characterized him as having "something wrong with him"

9

and terminated McLean on or about May 1, 2000. Walsh opposed McLean's termination because he thought Sadri was discriminating against McLean. Walsh went to Robillard complaining that McLean's termination was unfounded and potentially discriminatory. Robillard approved the re-hire of McLean again for next school year, 2000-2001. Walsh's subordinate, Brian Clougher, praised McLean's performance. See Walsh Deposition, pp. 128-139; the Walsh Affidavit, ¶¶ 20-22; email from Brian Clougher to Walsh, September 17, 2000, attached as **Exhibit 7**.[3]

14.    After McLean was re-hired by BU, Walsh and McLean discussed his mental health condition, and McLean disclosed that he had Attention Deficit Disorder or Attention Deficit Hyperactivity Disorder. See the Walsh Deposition, pp. 140-143.

15.    Walsh's subordinates, Gene Dalton, David Cyr, Al Morse, Brian Clougher, Roberta Roberts, Al Morse, Bill Carey, and Patricia Grant brought to Walsh's attention that McLean seemed to have a mental health disorder in the winter of 2000. After speaking with his supervisors, Walsh moved McLean to the mailroom for the spring of 2000. McLean's new supervisor, Procita Trotman told Walsh she was pleased with his work. See Walsh Deposition, pp. 127-128, 140-143; the Walsh Affidavit, ¶ 21.

## BU Hires John Battaglino

16.    On June 26, 2000, BU Battaglino as its Director of Residential Safety. See the Deposition of John Battaglino ("Battaglino Deposition"), p. 13, attached as **Exhibit 8**.

---

[3]    This case involves a substantial amount of email. Walsh has attached all the emails, memoranda, and correspondence to which he refers at Exhibit 7. The documents are in chronological order.

10

17.    In July and August, 2000, Walsh and Battaglino worked together well. See the
       Walsh Deposition, p. 35-36, 59; the Walsh Affidavit, ¶ 24.

18.    In August, 2000, Battaglino re-hired McLean. See the Walsh Deposition, p.133-
       135; Walsh Affidavit, ¶ 23.

19.    In approximately September, 2000, Battaglino demanded that Walsh to terminate
       McLean because "there's something wrong with him". Battaglino accused McLean
       of poor performance and stealing. Walsh investigated the complaints about
       McLean from Battaglino, but he could not substantiate them.[4] See the Walsh
       Deposition, p. 126-139; the Walsh Affidavit, ¶ 26.

20.    Walsh opposed McLean's termination because he again perceived that BU sought
       to terminate McLean because of a disability or perceived disability. Walsh refused
       to terminate McLean and argued with Battaglino that terminating McLean would be
       discriminatory. Battaglino ordered Walsh to terminate McLean and threatened
       Walsh's job if Walsh refused. Walsh continued to refuse. Seeing Walsh would not
       terminate McLean, Battaglino terminated him. See the Walsh Deposition, p.135-
       139; Walsh Affidavit, ¶ 27.

## Walsh's Refusal to Terminate a Disabled Employee Results in Retaliation from Battaglino

21.    After their clash over McLean, from October, 2000 onward, Battaglino retaliated
       against Walsh for Walsh's refusal to terminate McLean. Battaglino made his work
       environment hostile with taunts and sneers about Walsh's medical conditions. On
       top of the harassment, Battaglino also targeted him for unfair criticism, put onerous

---

⁴      On March 9, 2001, Claude Green ("Green"), a subordinate of Walsh's, was interviewed about
McLean making racist remarks. Green never notified Walsh that McLean made racist remarks which upset
him in 2000, and Green was called racist names, but did not complain. See Notes of Interview with Green,
February 7, 2001, BU, attached as Exhibit 17; the Walsh Deposition, pp. 132-133, 137.

11

conditions on his employment to watch his whereabouts, charged Walsh vacation or sick time when Walsh was present at work, falsified Walsh's vacation and sick records by charging him for vacation and sick time when Walsh was not out long enough to be charged, and harassed Walsh for not being present at work when Walsh either was present or was attending to one of his medical conditions. See the Walsh Deposition, pp. 28-30, 33-35, 48-51, 57-58, 70, 104, 316-322; Walsh Affidavit, ¶¶ 29-40; email from Battaglino to Walsh, October 24, 2000, attached at **Exhibit 7**.

22. When Battaglino first started to give Walsh a problem with visiting his medical providers, Walsh tried to explain his medical situation to Battaglino and his need to attend his medical appointments, Battaglino responded with "you should have fired Lindsey," referring to McLean. See the Walsh Affidavit, ¶ 30.

23. Although Walsh's post traumatic stress disorder symptoms had been in remission, when Battaglino began harassing him, they recurred. Walsh began experiencing edginess and insomnia and had to visit Dr. Abreu more often and restart therapy. See the Walsh Medical Records (Dr. Abreu records and Dr. Gore's records).

### Battaglino Refuses to Reconcile Walsh's Vacation Accruals

24. During 2000, the Residential Safety Department miscalculated the vacation accrual of the employees in the department. The employees were asked to reconcile their time sheets and explain where the errors were in the vacation calculations. See the Walsh Affidavit, ¶ 41.

25. Walsh had emails from his BU account (Walsh only sent email from BU at the time) and telephone records showing calls from BU from July, August, September

12

and October, 2000 demonstrating that he was present for days he was charged vacation which he showed Battaglino. Battaglino, however, did not change Walsh's vacation accruals. Other employees in the department who presented Battaglino with no documentation at all had their vacation accruals corrected. Rather than reconcile Walsh's time, Battaglino accused Walsh of not cooperating. See email from Battaglino to Walsh on November 22, 2000, attached as **Exhibit 7**; the Walsh Deposition, pp. 55-58; the Walsh Affidavit, ¶¶ 32, 33, 41, 42.

26.     Walsh confronted Battaglino, stating that he believed Battaglino was retaliating against him for refusing to terminate McLean. Battaglino responded by informing Walsh that "you should have learned" and "you should have fired Lindsey." Battaglino further threatened Walsh "it will do nothing but get you in trouble going outside. Go ahead." See the Walsh Affidavit, ¶¶ 43, 44.

27.     In December, 2000, Walsh again was informed by a subordinate, Grant that Battaglino had been saying that Walsh was destroying the department. See the Walsh Affidavit, ¶ 45.

28.     On December 3, 2000, Walsh explained, through an email, to Battaglino that he was being treated differently when taking time off—for example, Walsh would come to work at 7:00 a.m. and leave at 3:00 p.m. to take lunch. Normally, absences of less than four hours were not charged against an employee's vacation of sick bank, but Battaglino would charge Walsh a half of a vacation day. See email from Walsh to Battaglino on December 3, 2000, attached as **Exhibit 7**; the Walsh Deposition, pp. 56-58; Walsh Affidavit, ¶ 17, 29.

13

29.    Battaglino responded by again accusing Walsh of failing to cooperate in reconciling

his leave records. Battaglino was targeting Walsh. Another employee from

Walsh's department had still not reconciled his time in February and March 2001

and was not accused of failure to cooperate. See Memo from Battaglino to Walsh

and Robillard dated January 11, 2001 (back dated to December 5, 2000), attached

as **Exhibit 7**; Boston University Office of Housing Leave Record, February and

March, 2001 of "Employee #9," attached as **Exhibit 9** (BU 1296 and 1297).[5]

## Battaglino's Retaliation Continues through the Fall

30.    Contrary to the past five years Walsh had worked at BU and to his job description,

Battaglino demanded that Walsh to be in office from 9:00 a.m. to 5:00 p.m.

Battaglino refused to credit Walsh with any time spent doing his duties outside

those hours. Walsh suddenly, for the first time since being employed at BU, had to

account for even short and inconsequential breaks like time in the bathroom and

coffee breaks. Battaglino further demanded that Walsh formally request, in writing,

any time off and that Walsh strictly account for his time off as stated in BU policy

and procedures manual. That same day, Battaglino imposed an "action plan" on

Walsh which had unrealistic deadlines. See Memo from Battaglino to Walsh and

Robillard dated January 11, 2001 and backdated to December 5, 2000, attached as

**Exhibit 7**; Walsh Affidavit, ¶ 47; Battaglino Depo 59-63; Action Plan from

Battaglino to Walsh, dated December 5, 2000, attached as **Exhibit 7**; the Walsh

Deposition, pp. 50, 316-322.

---

[5]    BU produced leave records for nineteen employees. To protect the privacy of these employees, BU redacted (by agreement) the names of the employees. However, Employee #9 has handwriting on his Leave Record which Walsh recognizes as that one of his subordinates.

14

31.     On December 5, 2000, Walsh sent a memorandum to Peter Cusato ("Cusato"), the

        Division Director and to Manuel Montiero ("Montiero"), BU's Vice President of

        Human Resources, describing Battaglino's retaliation. See Walsh Affidavit, ¶ 46;

32.     As Battaglino's harassment increased, Walsh noted more and more distortions in

        Battaglino's representations of their relationship. Battaglino constantly

        misrepresented Walsh as combative and disobedient when Walsh tried his best to

        please Battaglino. See email from Walsh to Battaglino, dated December 5, 2000,

        attached as **Exhibit 7**; Walsh Affidavit, ¶ 43.

**Battaglino Charged Walsh for Time Walsh Was Present At Work**

33.     BU did not mandate that employees take off only a certain amount of sick or

        vacation days at one time. It also did not limit the number of vacation or sick days

        which could be used during one year. See Boston University's Employee

        Handbook, Vacation and Sick time sections, attached as **Exhibit 10**.

34.     On December 1, 2000, Battaglino denied several of Walsh's Time Off Requests

        ("TOR") for February, March, and April, all of which Walsh had submitted to

        Battaglino on November 21, 2000, because the "form" was incorrect. The format

        Walsh used was the same used by others and that Walsh himself would later use.

        See Exhibit 9 and Walsh's Time Off Requests ("Walsh TOR's"), attached as

        **Exhibit 11**.

35.     As part of Battaglino's retaliation, he charged Walsh for sick and vacation days, and

        asserted that Walsh was not present on days when Walsh was actually present.

        Examples of Battaglino's falsification of Walsh's time off records include:

        •       October 16, 2000—Walsh was charged a half day vacation time

15

- October 17, 2000— Walsh was charged a half day vacation time

- October 18, 2000— Walsh was charged a half day vacation time

- October 25, 2000—Walsh was charged a half day vacation time

- November 15, 2000—Walsh was charged a half day vacation time

- November 24, 2000— Walsh was noted as taking the day off

- January 9, 2001—Walsh was charged a half day of sick time

- January 10, 2001—Walsh was charged a half day of vacation time

- January 12, 2001—Walsh was charged a full day of sick time

- February 6, 2001—Walsh was charged a fully day of sick time

- February 14, 2001—Walsh was charged a full day of sick time

- February 15, 2001 –Walsh was charged a half day of sick time

- May 21, 2001·—Walsh was charged a half day of sick time

- May 24, 2001·—Walsh was charged a half day of sick time

- May 25, 2001·—Walsh was charged a half day of vacation time

- June 5, 2001—-Walsh was charged a full day of vacation time

- June 11, 2001·—Walsh was charged a half day of vacation time

- August 20, 2001—Walsh was charged for a half a day of vacation time

- August 22, 2001—Walsh was charged for a half a day of sick time

Walsh has emails sent from his BU account (which he could not access remotely), telephone records from calls he made from his BU telephone, and sign in sheets demonstrating that he was present on the above dates. The emails reference work Walsh had done at different periods of the day or that he had put in for time off and

16

then came to work. See emails, BU Telephone Records, and Sign-in sheets,
attached as **Exhibit 12**; the Walsh Affidavit, ¶¶ 29, 32, 33.

36.     In contrast, another BU employee took time off for a golf tournament and was not
        charged a vacation day. See **Exhibit 9** (Employee # 11)

37.     Battaglino also charged Walsh for a half a vacation or sick day when Walsh was
        gone for less than four hours. BU's policy was to not to charge employees for sick
        or vacation time if they were gone for less than four hours. Other employees at BU
        were not charged a half a day of sick or vacation time for absences of less than four
        hours. In fact, one manager noted to an employee "Exempt employees are not
        eligible for 'personal' time. Exempt staff who take **more than** 2 hrs off can charge
        it off as half-day of vacation time." [emphasis added] See the Walsh Affidavit,
        ¶ 16, 17; **Exhibit 9** (Employee #4, 5, 6, 8, and12); email from Walsh to Battaglino,
        October 31, 2000, attached at **Exhibit 7**; Walsh's Walsh TOR's, December 19,
        2000, April 13, 2001, and May 22, 2001.

38.     When Walsh, tried to discuss the retaliation with Battaglino, Battaglino became
        angry, raised his voice, and threatened Walsh for not dropping the "Lindsey thing".
        One evening, as Walsh passed Battaglino outside BU's dormitories, Battaglino
        snidely commented "I've got you". See Walsh Affidavit, ¶ 37.

## BU's Authorities and Human Resources Representatives Fail to Take Action to Alleviate Battaglino's Retaliation

39.     During the first week of December, 2000, Walsh met with Robillard and Cusato.
        Rather than offer any assistance to Walsh, or investigate his allegations, both
        blamed Walsh and accepted Battaglino's version of events wholesale. Cusato
        demanded that Walsh drop the matter completely. Walsh contested the description

17

and accuracy of the events as Cusato described them, but to no avail. See Walsh's
email to Cusato, Montiero, Robillard, and Battaglino on January 2, 2001, attached
as **Exhibit 7**; Memorandum from Cusato to Walsh, December 26, 2000, attached as
**Exhibit 7**; Walsh Affidavit ¶ 48.

40.    Two days later, on December 21, 2000, Walsh met with Montiero.  Montiero, the
       Vice President of Human Resources charged with investigating discrimination
       complaints in the workplace, demanded to know if Walsh had "gone outside".  He
       did not allow Walsh to take any notes of the meeting. See Walsh Affidavit, ¶ 49.

41.    Seeing that BU's upper management would not be of any assistance, he filed a
       charge with the Massachusetts Commission Against Discrimination on December
       28, 2000. See Walsh Affidavit, ¶ 50.

#### Battaglino's Retaliation Campaign Continues and Intensifies

42.    Battaglino's campaign continued in earnest in 2001.  On January 3, 2001,
       Battaglino met with Walsh and gave Walsh several extensive projects due the next
       day by 4:00 p.m.  Walsh immediately protested the unrealistic deadlines and asked
       if Battaglino was retaliating against him because of his discrimination complaint.
       See memorandum of Battaglino of January 3, 2001, attached as **Exhibit 7**; email
       from Walsh to Battaglino of January 3, 2001, attached as **Exhibit 7**.

43.    Walsh attempted to comply with Battaglino's unreasonable requests, submitting a
       memorandum responsive to most of the deadlines the very next day, January 4,
       2001.  However, the next day January 5, 2001, Battaglino reprimanded Walsh for
       not having met all the unrealistic deadlines. See memorandum from Walsh to

Battaglino on January 4, 2001, attached as **Exhibit 7**; Battaglino's memorandum to Walsh, on January 5, 2001, attached as **Exhibit 7**.

44.    On January 11, 2001, Walsh received a memorandum from Battaglino, backdated to November, 1, 2000, warning him for making time off requests. See Memorandum from Battaglino to Walsh, dated January 11, 2001 and backdated to November 1, 2000, attached at **Exhibit 7** The next day, January 12, 2001, Battaglino, through another memorandum, reprimanded Walsh for checking in with his subordinates while out of the office. See Memorandum from Battaglino to Walsh, January 12, 2001, attached as **Exhibit 7;** Walsh Affidavit, ¶¶ 51-53.

## BU and Battaglino Continue to Harass Walsh for His Need for Medical Leave

45.    The past months of Battaglino's harassment took their toll on Walsh physically and emotionally. His post traumatic stress disorder symptoms were exacerbated, and he required, for the first time since he began working at BU, a leave of absence for medical reasons. His primary care physician, Dr. Steven Abreu, asked that BU excuse Walsh from work from January 19, 2001 through February 2, 2001. See Note of Dr. Abreu, dated January 19, 2001, attached as **Exhibit 13**;[6] Walsh Affidavit, ¶ 54.

46.    Battaglino picked up his harassment in February when Walsh returned to work and continued throughout the summer of 2001, causing Walsh to miss therapy appointments and medical appointments and causing his health to deteriorate. See Walsh Affidavit, ¶¶ 55, 58; the Walsh Medical Records (Gore records).

---

[6]    Walsh attaches all the doctors' notes he provided BU at Exhibit 13.

19

47. The harassment included teasing about Walsh's health conditions, including a comment that Battaglino did not want to cause Walsh to get "shingles" because of the stress he imposed upon Walsh. See Walsh Affidavit, ¶ 35.

48. In April, 2001, because of Battaglino's demand in the Memorandum of January 11, 2001 (backdated to December 5, 2000), Walsh made formal requests for time off in May, 2001 even for those appointments which he generally would have used lunch or free time during the day to schedule. Additionally, he scheduled multiple appointments for the same day to minimize his time away from the office. This resulted in a large amount of requested time off. Walsh deliberately waited to schedule the time off for May so that the office would be quieter. See Walsh's TOR's April 13, 2001, April 27, 2001, May 2, 2001; Walsh email to Battaglino, May 2, 2001, attached as **Exhibit 7**; Walsh Affidavit, ¶ 58.

49. Walsh gave Battaglino close to thirty days' notice of his need for time off in May, although BU's policy only calls for 3 days' notice for medical appointments. See Exhibit 10.

50. Battaglino refused to accommodate Walsh's requests for time to see his health care providers during the month of May, although most of the time Walsh requested was not an entire days. Walsh canceled two of his appointments in response. See Walsh Deposition, pp. 95-99; email from Battaglino to Walsh, May 3, 2001, attached at **Exhibit 7**; Walsh TOR's April 13, 2001, April 27, 2001, May 2, 2001; email from Walsh to Battaglino, May 10, 2001, attached at **Exhibit 7**.

51. Walsh's request for May spurred Battaglino into a more intense round of retaliation. In a series of emails from May to July, Battaglino harassed Walsh about the time he

20

needed for medical appointments, denied requests for time off, falsely portrayed

their exchanges, demanded Walsh be present in spite of his medical needs, accused

Walsh of poor management because he had to be absent to attend for medical needs,

and issued Walsh a written warning for taking time off without his approval.

Battaglino also feigned that he was unaware of Walsh's conditions and medical

needs, although Walsh had provided explanations in prior emails and provided

notes. See emails between Walsh and Battaglino from February 13, 2001, May 11,

2001, May 14, 2001, May 17, 2001, May 24, 2001; Battaglino's letter to Walsh,

dated July 3, 2001, attached as **Exhibit 7**; Walsh's doctors' notes, attached as

**Exhibit 13**.

## Walsh Requests Accommodation

52.    Seeing only continued harassment and denial of time for his medical appointments,

on May 22, 2001, Walsh formally requested a reasonable accommodation from BU.

The purpose of the accommodation was so that Battaglino would stop harassing

him and allow him to attend his medical appointments. He never received a

response to his request. See Walsh's Request for Accommodation, attached as

**Exhibit 14**; Walsh Deposition, p. 114-116, 119-120; Walsh Affidavit, ¶ 56.

53.    In addition to his request for an accommodation, Walsh approached Battaglino

about leave under the FMLA, but, although Battaglino promised to send him forms

for requesting leave, he never did. Walsh did not receive forms until October,

2001. See email from Battaglino to Walsh, May 24, 2001, attached as **Exhibit 7**;

Walsh Affidavit, ¶ 57.

54.  Due to Battaglino's harassment, Walsh canceled a session with Dr. Gore for July and did not return to see Dr. Gore until September, 2001. See the Walsh Medical Records (Dr. Gore).

55.  By the end of the summer, Walsh, who had no response from BU about either his request for reasonable accommodation or forms to apply for FMLA leave, was experiencing health problems because of the appointments he had previously cancelled because of Battaglino's harassment. Dr. Abreu required him to stay out of work between August 22, and September 1, 2001, a total of ten days. Dr. Abreu required restricted duty for Walsh when he returned to work. See Note from Dr. Abreu, attached as **Exhibit 13**; Walsh Affidavit, ¶¶ 56-59; Walsh Email to Battaglino, August 22, 200□, attached at **Exhibit 7**.

56.  September 1, 2001 was critical for Walsh to return to work because September 1, 2001 was the date BU's students were scheduled to move back into BU housing. Walsh therefore made sure that he would be able to return to work during that time period. He also made himself available while he was out of the office for his subordinates. See Walsh Affidavit, ¶ 59; Walsh Deposition, p.159; Walsh Email to Battaglino, August 22, 2001, attached at **Exhibit 7**.

57.  Other employees were allowed vacation time over the opening weekend at BU. See **Exhibit 9** (Employee # 16, 18, and 19); the Walsh Affidavit, ¶ 65.

## BU Suspends Walsh Rather than Accommodate Him or Allow Him to Take FMLA Leave

58.  No one from BU contacted Dr. Abreu or Walsh to have a dialogue about Walsh's need for restricted duty or his time out in August, 2001. Rather, on August 27, 2001, Robillard sent a letter to Walsh, suspending him. The letter was sent to

22

Walsh's former address, although BU had the correct information. Walsh never received the letter. Dr. Abreu had one brief conversation with a doctor from BU about Walsh and recommended that they award Walsh FMLA leave. See Robillard's letter to Walsh, dated August 27, 2001 attached as **Exhibit 7**; Walsh Deposition, p. 172-174; Walsh Affidavit, ¶¶ 62-64; the Affidavit of Steven Abreu, M.D., ("Abreu Affidavit"), ¶ 3, attached as **Exhibit 3**.

59.    Not having received Robillard's suspension letter, on September 1, 2001, Walsh returned to work. Battaglino greeted him by demanding that he leave. When Walsh explained he did not realize he was suspended, Battaglino showed Walsh Robillard's letter, explaining that BU had suspended Walsh. Battaglino took Walsh's keys and identification card, told Walsh not to start "trouble," and demanded that Walsh leave. Battaglino directed Walsh's subordinates not to contact Walsh while he was on suspension. See Walsh Deposition, pp.172-174; Walsh Affidavit, ¶¶ 63-64; email from Battaglino to Roberta Roberts, Al Morse, Sheila Sullivan, Gene Dalton, Roland Akl, Bill Carey, and Brian Clougher, attached at **Exhibit 7**.

60.    Robillard had overstated Walsh's absences because of Battaglino's incorrect numbers. BU's history was to allow employees to use FMLA time for vacations with minimal or no documentation, so the extremes to which BU was treating his doctor's request for medical leave for him was out of character. See Walsh letter to Robillard, dated September 1, 2001, attached as **Exhibit 7**; Walsh's email to Robillard, Battaglino, Attorney Lawrence Elswit, and Marilyn Walsh, attached as **Exhibit 7**; Walsh Deposition, pp. 174-177.

**BU Delays Walsh's Request for FMLA Time**

61.    After being suspended, on September 12, 2001, BU sent Walsh a release so that BU
       could speak to Dr. Abreu about his medical conditions. Walsh signed the release.
       See BU's Records Release Form, attached as **Exhibit 15**.

62.    One week later, on September 19, 2001, Walsh formally requested, in writing,
       intermittent leave to attend his medical appointments from Marilyn Walsh ("Ms.
       Walsh"), even offering to extend his hours to make up the time. See Walsh's letter
       to Marilyn Walsh, dated September 19, 2001, attached as **Exhibit 7**.

63.    Although Walsh had signed the release for BU to speak to Dr. Abreu, no one from
       BU contacted Dr. Abreu after the one conversation in September, 2001. In
       response to the demand for additional documentation, Walsh provided a note from
       Dr. Abreu on October 1, 2001, explaining that Walsh required time to go to doctor's
       appointments to treat his medical conditions. See Dr. Abreu's note, dated October
       1, 2001, attached as **Exhibit 13**; the Abreu Affidavit, ¶ 3, 4; Walsh Deposition, p.
       178.

64.    No one from BU contacted Dr. Abreu in October, 2001, and Dr. Abreu was out of
       his office for three weeks for his wedding and honeymoon. Rather, on October 12,
       2001, Ms. Walsh sent a letter to Walsh demanding that Walsh complete a
       Certification of Physician or Practitioner form because Dr. Abreu's note from
       October 1, 2001 was not sufficient. However, Ms. Walsh did not mail the letter
       until October 16, 2001, and Walsh did not receive it until October 19, 2001. As
       soon as Walsh received Ms. Walsh's letter, he immediately responded, explaining
       that he did not get her letter until that day because she sent it four days after she had

24

written it, and that Dr. Abreu was on vacation. Walsh immediately made an appointment for as soon as Dr. Abreu was scheduled to return to the office, the last week of October. See Ms. Walsh's letter to Walsh, dated October 12, 2001, attached as **Exhibit 7**; the Abreu Affidavit, ¶ 4, 5, 6; Walsh's letter to Ms. Walsh, dated October 19, 2001, attached as **Exhibit 7**.

65.    True to his word, as soon as Dr. Abreu returned to the office, Walsh made an appointment with him and then immediately informed Ms. Walsh that he provided Dr. Abreu with the documentation. See Walsh's note to Ms. Walsh, dated November 1, 2001, attached as **Exhibit 7**; the Abreu Affidavit, ¶ 4, 5, 6.

66.    However, in light of BU's delays, his suspension, and BU's open hostility to him, Walsh asked Dr. Abreu to wait a few days before completing the form so he could obtain legal advice. Dr. Abreu has no memory of speaking to anyone from BU between the time Walsh gave him the medical certification documents, and the time he completed them and returned them to BU. See the Abreu Affidavit, ¶ 3, 4, 5, 6; Walsh Affidavit, ¶ 61.

67.    One week after receiving the update note from Walsh, on November 8, 2001, Ms. Walsh demanded that Walsh return to work on November 13, 2001 for a meeting with Robillard and Battaglino to discuss "the appropriate use of accrued sick leave for medical and/or dental appointments". In preparation for Walsh's return, Battaglino assigned Walsh, his Operations Manager, to mailroom duty exclusively. Battaglino instructed all staff that they were not to handle any mail room problems, but were to refer them all to Walsh. Given the size of BU's mailrooms and staff, this was an enormous and daunting task which differed radically from his usual

25

duties. See Ms. Walsh's letter, dated November 8, 2001, attached as **Exhibit 7**;
Battaglino's November 9, 2001 memorandum to Walsh, attached as **Exhibit 7**;
Walsh Affidavit, ¶ 66.

68.    One week later, on November 16, 2001, the same day Walsh sent the completed
forms, BU suddenly denied Walsh's request for FMLA leave because he had not
provided sufficient documentation. Interestingly, BU admits in its denial that it had
all the tools to make a determination about Walsh's request—namely that he had
signed a release to speak to Dr. Abreu—but refused to use them. The one resource
BU did use, Dr. Abreu, recommended FMLA leave be granted. Walsh was finally
allowed to return to work on November 26, 2001. See Ms. Walsh's letter to Walsh
of November 16, 2001, attached as **Exhibit 7**; Dr. Abreu's completed Certification,
attached as **Exhibit 16**; Walsh Deposition, pp. 198-203; the Abreu Affidavit, ¶ 3.

69.    Upon returning, Walsh found all his belongings boxed, some damaged, and all his
furniture pushed into a corner in his office. Walsh also returned to further
retaliation from Battaglino who did not return Walsh's keys or identification card
and who did not restore his email access. See Walsh Affidavit, ¶ 67; Walsh note,
dated November 27, 2001, attached as **Exhibit 7**.

70.    On Walsh's second day of work, November 27, 2001, he worked a twelve hour day.
That evening, he came to his office to find Battaglino sitting at his computer,
typing. Walsh asked about his damages belongings. Battaglino stood up, smirked
and asked if Walsh was going to get shingles from his behavior, pushed Walsh of
his way, and kicked Walsh in the shin. Walsh called BU's police because of
Battaglino's kicking him and filed a police report. The police report notes that

26

Battaglino was in no fear of Walsh. Walsh also sought to press charges in the Brighton District Court. See BU Police Report, picture of Walsh's injury, and Application for Complaint to the Brighton District Court, attached as **Exhibit 17**; Walsh Deposition, p. 215-217; Walsh Affidavit, ¶¶ 68-69.

71.    Three days later, on November 30, 2001, Robillard terminated Walsh, admitting that Walsh's medical absences were the reason for his termination, overstating the amount of time Walsh had been absent, and blaming him for Battaglino's assault. See November 30, 2001 letter from Robillard to Walsh, attached as **Exhibit 7**.

72.    Interestingly, although Robillard termed Walsh's use of sick leave "abuse," BU tolerated other Housing Department Employees who had histories of negative sick bank balances or who drew paychecks of less than forty hours because of their absences. See **Exhibit 9** (Employee #17); email from Walsh to Battaglino, September 19, 2000, attached at **Exhibit 7**.

## BU Tolerates Violence in the Background of Its Employees

73.    While Walsh worked at BU, other employees in his department had violent criminal records. One, Wayne Chainey ("Chainey"), had an assault and battery conviction as well as arrests for drunk driving. Although he had a history of violent behavior, he was recommended for a promotion to the Building and Grounds department where he would be going to the floors of the students' dormitories and having increased interaction with students. Walsh was against promoting him, but he was promoted anyway. See the Walsh Affidavit, ¶ 70.

74.    Before Battaglino came to BU, Sadri had twice caught Chainey masturbating to pornography in his office, and he disciplined Chainey. After Battaglino's hire,

27

Walsh heard Battaglino and Sadri joking about the incident. See the Walsh Affidavit, ¶ 71

75.    BU and Battaglino also tolerated employees who were violent in the workplace. An employee named William Haley was violent and threatening on at least five occasions between June and December, 2000. However, it was not until December, 2000 that Haley was disciplined, and even at that point, he was merely suspended for fifteen days, although he had threatened to use his car to kill another employee. See the Walsh Affidavit, ¶ 72.

76.    Before Mr. Battaglino's arrival at BU, Shaun Kelly, a BU employee in Walsh's department, was found to have sold drugs and provided alcohol to minors who were in BU's summer program. Mr. Kelly was not terminated until an undergraduate student was hospitalized with alcohol poisoning from consuming alcohol he gave her. See the Walsh Affidavit, ¶ 73.

Respectfully submitted,

JOHN WALSH,
By his attorneys,

Dated: August 28, 2006

Rebecca G. Pontikes BBO# 637157
Pyle, Rome, Lichten, Ehrenberg, &
    Liss-Riordan, P.C.
18 Tremont St., Ste. 500
Boston, MA 02108
(617) 367-7200

## CERTIFICATE OF SERVICE

This is to certify that on August 28, 2006, a copy of the above document was served via hand delivery, upon Lawrence Elswit, Boston University, 125 Bay State Road, Boston MA 02115.

Rebecca G. Pontikes