**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| | ) | |
| JOHN WALSH, | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-CV-11240-RCL |
| | ) | |
| BOSTON UNIVERSITY | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S OPPOSITION TO THE DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

The Plaintiff, John Walsh ("Walsh") worked for the Defendant, Boston University
("BU"), for over six years. His performance was praised and he was a considered an asset to
BU until the hire of a new supervisor, John Battaglino ("Battaglino") in 2000. In the fall of
2000, Battaglino commenced a campaign of retaliatory harassment against Walsh for
refusing to terminate an employee whom he thought Battaglino was discriminating against.
That campaign culminated in Walsh's termination in November, 2001. It is Walsh's
*termination* which gives rise to this lawsuit. He contends that his termination was the
culmination of one year of retaliatory harassment, disability discrimination, and violations of
the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq*. BU's Motion for
Summary Judgment confuses the issue about the timeliness of Walsh's claim regarding his
*termination* with issues about Walsh's ability to collect for the over one year's worth of
retaliatory harassment from Battaglino. However, there is *no question* that Walsh's claim
regarding his *termination* is timely, and his discrimination and retaliation claims are not
barred.

BU's argument that Walsh's claim for violation of the FMLA is untimely for lack of evidence of willfulness must likewise fail. As further explained below, Walsh has evidence that BU, and Battaglino in particular, knew that he required time off to attend medical appointments, yet penalized him for taking the time and harassed him about his medical conditions. The "retroactive" FMLA leave BU purports to have given Walsh was actually a *suspension* BU forced upon Walsh at a time he wanted to return to work. Walsh's evidence, if credited by a jury, demonstrates that BU willfully violated the FMLA and would extend the statute of limitations for the claim from two years to three years.

The Court must also deny BU's Motion for Summary Judgment on the other grounds it raises. BU's Motion for Summary Judgment alleges that it terminated Walsh for poor performance, insubordination, and abuse of sick leave. Walsh vehemently denies any performance problems, insubordination, or abuse of sick leave. To grant BU summary judgment, this Court must credit BU's version of Walsh's performance and behavior in the workplace over Walsh's. The Court cannot credit BU's version of the events if Walsh has evidence that a reasonable jury could conclude otherwise.

As further developed below, Walsh has such evidence. Throughout his employment at BU, he took time out during the day to attend doctor's appointments to treat several chronic, serious, health conditions, including kidney stones, migraine headaches, shingles, post traumatic stress disorder, and dental problems. Until Battaglino began his campaign of retaliatory harassment, no one at BU complained about Walsh's performance or disciplined him for taking this time to attend to his health. To the contrary, Walsh's performance was praised.

A sea change occurred after Walsh opposed Battaglino's directive to terminate a disabled employee simply because Battaglino thought "there is something wrong with him." Immediately following his protest, Battaglino made frequent snide and humiliating remarks

2

about Walsh's chronic medical conditions. He also falsified Walsh's vacation and sick bank records by making deductions from Walsh's sick and vacation bank when Walsh was present at work. Battaglino's false records are the basis for BU's claims of sick leave "abuse." He further penalized Walsh for taking time out of his day (generally on his lunch hour) to attend medical appointments by charging Walsh a half day of vacation or sick time even though he was gone for less than four hours—in contrast to the usual policy at BU to not deduct from exempt employees' sick or vacation banks for less than a four hour absence. Other similarly situated employees were not charged vacation or sick time for the same sorts of absences. In fact, BU tolerated much more egregious behavior from other employees without penalty. He made onerous demands on Walsh for proof of his whereabouts and stated that Walsh could not be an effective manager if he took time out during the day for medical appointments. The entire crux of this matter is the dispute between BU's explanation of what occurred in the workplace versus Walsh's, a quintessential question of fact. Given such vehement disputes, the resolution of Walsh's case must be by a jury, not by the Court on summary judgment.

## FACTS

Walsh refers the Court to his Statement of Additional Facts submitted pursuant to Local Rule 56.1 for the facts in his case.

## ARGUMENT

**A.     Summary Judgment Standard**

Rule 56(c) of the federal Rules of Civil Procedure both provide provides that the Court shall grant a motion for summary judgment *only* "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56 (c). BU has the uphill battle in that it must demonstrate

3

the absence of factual disputes on all relevant issues, while the Court must view the facts in the light *most favorable* to Walsh. Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

The Court's purpose on summary judgment "is issue *finding*, not issue *determination*." [emphasis added] Lee v. Trustees of Dartmouth College et al., 958 F.Supp. 37, 39 (D.N.H., 1997). "[T]he weighing of the evidence and the drawing of legitimate inferences from the facts are jury functions." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-255 (1986). In short, "[i]f a reasonable finder of fact could return a verdict in favor of plaintiff, even if a verdict could equally easily be returned for the defendant, then summary judgment must be denied." Bogdahn v. Hamilton Standard, 973 F. Supp. 52, 57 (D. Mass. 1997), citing, Mack v. Great Atlantic & Pacific Tea Co., Inc., 871 F. 2d 179, 181 (1st Cir. 1989). The Court's pronouncement in Bogdahn is particularly applicable to Massachusetts state discrimination claims where summary judgment is particularly *disfavored.* Finney v. Madico, Inc., 42 Mass. App. Ct. 46, 49 (1997);  Abramian v. President & Fellows of Harvard College, 432 Mass. 107, 117-118 (2000); Lipchitz v. Raytheon Co., 434 Mass. 493, 502 (2001).

**B.**   **Walsh's Claims Regarding His Discriminatory Termination are Timely, and His Termination is the Final Act of Over One Year's Worth of Retaliatory Harassment Perpetrated by Battaglino.[1]**

Walsh timely filed his claims as to his termination, brought under M.G. L. c. 151B ("Chapter 151B") and the Americans with Disabilities Act ("ADA"), 29 U.S.C. § 12101 *et seq.*, both with the state administrative agency, the Massachusetts Commission Against Discrimination ("MCAD"), and in court.[2] There is *no question* that his termination is timely.

---

[1]   In its earlier Motion to Dismiss, BU conceded the timeliness of Walsh's claims as to his termination and merely sought to limit the amount of recoverable damages.

[2]   At the time of the events underlying Walsh's complaint, the deadline for filing Chapter 151B claims with the MCAD was six months from the accrual of the claim. The deadline for filing the ADA claims with the agency is 300 days. The deadline for filing Chapter 151B claims in court is three years

4

BU's argument is really over whether Walsh's termination can anchor a pattern of retaliatory harassment, disability discrimination, and violations of the FMLA by Battaglino which took place from the fall of 2000 through November 30, 2001, the date of Walsh's termination, such that Walsh can collect damages for the earlier period. Battaglino's harassment created a hostile work environment for Walsh. As explained below, the continuing violation doctrine allows the fact finder to consider actions taken by BU, which would otherwise be untimely, because they are a pattern perpetrated by Battaglino in retaliation for Walsh's opposition to the termination of an employee with a disability, Lindsey McLean ("McLean"). Battaglino compounded the liability by harassing Walsh based upon his disabilities and in violation of the FMLA.

## 1. The Continuing Violation Doctrine Applies Makes Battaglino's Retaliatory Harassment Actionable

Walsh's claims for discrimination and retaliation based upon his *termination* on November 30, 2001 clearly fall within the statute of limitations and are timely. Battaglino's ongoing harassment--which began when Walsh refused to terminate McLean in September, 2000, increased in severity after Walsh filed a charge at the MCAD in December, 2000, and culminated in his termination--created a hostile work environment for Walsh. See Walsh's Rule 56.1 Statement of Additional Facts to Which there is a Genuine Issue to be Tried ("SAF") ¶¶ 20, 21, 24-29, 30-32, 34-35,37, 38,42-44, 46-51, 58-59, 67-71. Both federal and Massachusetts law recognize that hostile work environment discrimination claims "involve a series of related events that have to be viewed in their totality in order to assess adequately their discriminatory nature and impact." Cuddyer v. Stop & Shop Supermarket Co., 434 Mass. 521, 531, 750 N.E.2d 928 (2001) ("Cuddyer"). Hostile work environment claims, by their nature, involve repeated conduct. They do not occur on any particular day, but over

---

from the accrual of the claim. There is no such three year deadline for filing the ADA claims in court, so long as they are filed within 90 days of a dismissal by the EEOC.

many days, weeks, or months. National Railroad Passenger Corporation v. Morgan, 536 U.S.

101, 115-117 (2002) ("Morgan") (explicating hostile work environment as "a series of

separate acts that collectively constitute one 'unlawful employment practice,'" (quoting 42

U.S.C. § 2000e-5(e) (1)).

In such circumstances, Massachusetts recognizes the difficulty in determining the

date a plaintiff's situation converts to an actionable legal claim. Cuddyer, 434 Mass. 534-

539. Therefore:

> a plaintiff who demonstrates a pattern ... that includes conduct within the six-month statute of limitations, may claim the benefit of the continuing violation doctrine and seek damages for conduct that occurred outside the limitations period, **unless the plaintiff knew or reasonably should have known that her work situation was pervasively hostile and unlikely to improve**, and, thus, a reasonable person in her position would have filed a complaint with the MCAD before the statute ran on that conduct.
>
> ... Our test, **more favorable to a plaintiff, focuses on the plaintiff's knowledge of the hopelessness of her work environment, and allows her to litigate alleged, otherwise time-barred, acts of sexual harassment unless her delay in initiating the lawsuit, considered under an objective standard, was unreasonable**.

Cuddyer, 434 Mass. 539, 750 N.E.2d 941-942 [emphasis added].    Similarly, Morgan holds:

> ... it does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

Morgan, 536 U.S. at 117. Thus, for a charge of hostile environment discrimination to be

timely under Title VII, "the employee need only file a charge within ... 300 days[3] of any act

that is part of the hostile work environment." Morgan, 536 U.S. at 118. "[A] charge alleging

a hostile work environment claim ... will not be time barred so long as all acts which

constitute the claim are part of the same unlawful employment practice and at least one act

---

[3]     At the time of the events in Walsh's complaint, the relevant statute of limitations was six months.

falls within the time period." Morgan, 536 U.S. at 122. Because Walsh's termination was the culmination of Battaglino's previous harassment, the termination anchors the prior ongoing harassment, allowing the jury to consider all of Battaglino's previous actions against Walsh for liability and damages.

Cuddyer and Morgan are sexual harassment and racial harassment cases, respectively. In 2005, both the Massachusetts Supreme Judicial Court and the First Circuit recognized that the continuing violation doctrine applies to claims for retaliation and that the creation of a hostile work environment in retaliation to an employee's exercise of his rights is cognizable as an independent claim. Clifton v. MBTA, 445, Mass. 611, 616-617 (2005); Noviello v. City of Boston, 398 F. 3d 76, 89-91 (1st Cir. 2005).[4]

Taking all inferences in a light favorable to Walsh, the evidence demonstrates that Battaglino's harassment and Walsh's termination are all part of the same claim. The road that led to Walsh's termination was paved with Battaglino falsifying Walsh's vacation and sick bank records to read that Walsh was not at work when he was actually present, his harassment when Walsh sought time off to attend medical appointments, his intense monitoring of Walsh's whereabouts, his taunts and belittling, his statements to Walsh's subordinates that Walsh was destroying the department, and his targeting Walsh for undue criticism. He began his campaign *immediately* after Walsh refused to terminate McLean— BU does not dispute the timing of these events in relation to the termination of McLean. When Walsh protested the treatment he was receiving, Battaglino retorted that Walsh "should have fired Lindsay". Battaglino's harassment intensified after Walsh filed his first MCAD complaint, and, particularly with the falsification of Walsh's time off records, he continued building a case against Walsh. See SAF, ¶¶ 21, 22, 27, 30, 32, 34, 35, 37, 38, 42-44, 46-51.

---

[4]       As Battaglino was Walsh's superior, BU is strictly liable for his harassment under Chapter 151B and vicariously liable under the ADA, subject to defenses BU might have. Noviello, 398 F.3d 94-95. That BU has defenses merely highlights the need for a jury—it does not make summary judgment appropriate.

After Battaglino set the stage with his falsification of Walsh's absence records, BU

suspended Walsh when he tried to return to work after a medical leave, and during his

suspension, sought to meet with Walsh to discuss the proper use of sick leave. See SAF, ¶¶

58, 59, and 67. When Walsh returned from his suspension, Battaglino had set the stage for

BU to terminate Walsh. See SAF, ¶ 71. Under the standards for application of the

continuing violation doctrine annunciated in Cuddyer and Morgan, applied to retaliatory

harassment as allowed by Clifton and Noviello, the sequence of all these events allow a jury

to infer that Battaglino's actions, and Walsh's ultimate termination, are a series of acts all

rooted in Walsh's refusal to participate in discrimination against a handicapped employee.

A jury could further infer that Walsh had not reached a point of hopelessness before

his termination. When Walsh could not get anywhere with Battaglino, he sought a formal

reasonable accommodation from BU in May, 2001, hoping that Battaglino would have to

comply with a directive from those above him. However, BU never responded to his request

for reasonable accommodation. See SAF, ¶¶ 52, 53, and 55. When an employer does not

respond to a request for reasonable accommodation for a period of time, the employee is not

expected to come forward with a discrimination claim until he is able to appreciate that his

request will not be granted. Ocean Spray Cranberries, Inc. v. Massachusetts Commission

Against Discrimination, 441 Mass. 632 (2004). Viewing the evidence in a light most

favorable to Walsh, particularly Battaglino's comment that "going outside will get you

nothing but trouble,"[5] a jury could conclude that it was not unreasonable for him to continue

his attempts to use BU's channels to ameliorate his situation with Battaglino, not to view his

situation as hopeless, and not to file a claim until after his termination. It is a jury question as

to whether, prior to Walsh's termination, he appreciated that his situation was not going to

improve.

---

[5]     See SAF, ¶ 26.

2.    **BU and Battaglino's Actions Beyond the Statute of Limitations Are Admissible as Background Evidence to Demonstrate That Walsh's Termination Was Unlawful**

In any event, because Walsh's claim as to his termination is timely, even in the event Walsh cannot *recover* for BU's actions beyond the statute of limitations, BU and Battaglino's prior acts are admissible as background evidence demonstrating that Walsh's termination was discriminatory or in retaliation for his refusal to terminate McLean. A "plaintiff who has a seasonable claim may use events that occurred prior to the six-month limitation period as background evidence ... even though she cannot recover damages for the time-barred events" to determine how to view the actions taken within the limitations period. Cuddyer, 434 Mass. 521, 530 n. 10; see also Morgan, 536 U.S. at 112 ("'[previous acts] may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue'" (quoting United Air Lines, Inc. v. Evans, 431 U.S. 553, 558 (1977))). Walsh's evidence is clearly admissible and given that his termination is timely, the Court must deny summary judgment.

B.    **The Evidence Demonstrates BU Engaged in a Willful Violation of the FMLA, Enlarging the Statute of Limitations to Three Years, and Making Walsh's Claims Timely.**

Although the FMLA generally requires plaintiffs to bring their claims within two years of the violation, if the violation is willful, Walsh may bring his claim within three years of the violation. 29 U.S.C. § 2617(c) (2). BU cavalierly asserts that, based upon the requirements annunciated in Hillstrom v. Best Western TLC Hotel, 354 F.3d 27, 33 (1st Cir. 2003), Walsh can make no showing of willful violation of the FMLA Contrary to BU's representations, the record is replete with evidence that BU willfully violated the FMLA.

Hillstrom requires that Walsh prove that BU "either knew or showed reckless disregard" for whether its conduct violated the FMLA. Hillstrom, 354 F.3d at 33. Evidence of a discriminatory animus is the "touchstone" of a willful violation. In particular, this

9

District Court has found that derogatory comments and hostility on the part of a supervisor towards a plaintiff's medical condition are sufficient to defeat summary judgment. Lucasinsky v. Panasonic Service Company, 2004 WL 2915347, *7 (D.Mass.).[6]  Battaglino's taunts to Walsh about his chronic health conditions shows an obvious, open hostility towards Walsh's need to take time out to attend to his serious, chronic, health conditions.  His incorrect contention that Walsh could not do his job if he had to be absent for medical appointments further demonstrates animus. As Robillard's assistant, Andrew Wincel ("Wincel") testifies, Robillard harbored frustration at Walsh's frequent need to care for his health in the years before Battaglino came to BU.  See SAF, ¶¶ 10, 21 (in particular, see the Walsh Affidavit, ¶ 34).  The blatant animus displayed by the two explains their mindset and makes it, at least, a dispute of fact as to the willfulness of their actions.

Furthermore, Battaglino and Robillard's expression of their animus colors their actions.  Walsh presented Battaglino with several doctor's notes, talked to Battaglino about his medical conditions, exchanged many emails about his medical needs and need for time to see his doctors, and brought up use of FMLA leave to Battaglino in May, 2001, requesting forms for it from Battaglino.  Battaglino never provided the FMLA forms to Walsh.  Instead, Battaglino charged Walsh for vacation and sick time when Walsh was present, monitored Walsh's whereabouts like a hawk, and heavily enforced a standard 9:00 a.m. to 5:00 p.m. day.  See SAF, ¶¶ 22, 28, 30, 3547, 48, 50, 51, 53.  Battaglino's knowledge that Walsh wanted FMLA protection for his medical visits, his resistance to Walsh's need to take time out for medical appointments, his concern about the amount of time the medical appointments consumed, and his hostility when Walsh did, including his failure to provide Walsh with the forms to request FMLA leave, evidence, at the very least, a dispute of fact over whether Battaglino denying Walsh the protections of the FMLA.

---

[6]      Walsh attaches this decision as **Exhibit 18**of the SAF.

10

In addition to Battaglino's actions, Robillard *suspended* Walsh when he took a medical leave of absence in August, 2001. BU's contention that this was "retroactive" FMLA leave is disingenuous as a plain reading of Robillard's letter attests and in light of Robillard's expressed hostility to Walsh's taking time out for medical appointments. Additionally, Battaglino demanded Walsh leave as soon as he found Walsh in the office, demanded that Walsh not start "trouble," took Walsh's identification card and keys, and instructed Walsh's subordinates not to have contact with Walsh. See SAF, ¶¶ 58- 60.

In response to Walsh's formal FMLA request, BU delayed contacting Walsh's doctor, Dr. Abreu, failed to send Walsh the appropriate forms for applying for FMLA leave, dragged out the inquiry into Walsh's need for leave, set unrealistic deadlines for Walsh to meet concerning documentation, and blamed Walsh for the failure to produce sufficient documentation, although BU had a release for Walsh's medical records. BU then denied Walsh's request. See SAF, ¶¶ 58, 61-68.

From the record, a jury could infer that BU, Battaglino, and Robillard did not follow the law, but rather manipulated it as the perfect excuse to put an end to an employee whom had historically been considered a constant headache because of his need for medical visits. Thus, there is a question of fact, at the very least, as to the three year statute of limitations may apply, and Walsh's FMLA claim should proceed to trial.

**C.      Walsh Has Sufficient Evidence to Demonstrate the Elements of A Retaliation Claim under Both Federal and Massachusetts Law**

The crux of Walsh's claims are that he was retaliated against for opposing the termination of McLean, an act he believed to be in violation of the ADA and Chapter 151B. The *manner* in which BU retaliated against Walsh also violates the ADA and the FMLA, as explained below. However, the center piece of Walsh's claims is the retaliatory harassment

11

to which BU subjected him after he opposed the termination of McLean which led to his termination.

Pursuant to Chapter 151B, §§ 4(4), 4(4A), it is unlawful to "discharge, expel or otherwise discriminate" against any person because "he has opposed any practice forbidden under [chapter 151B]" or to "coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected by [chapter 151B]." M.G.L. c. 151B, §§ 4(4), 4(4A). Likewise, the ADA provides:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

And:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

42 U.S.C. § 12203 (a) and (b).

The procedure for analyzing a retaliation claim under the ADA and Chapter 151B follows the formula of McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973). Mole v. University of Massachusetts, 442 Mass. 582, 591-92 (2004); Wright v. CompUSA, 352 F.3d 472, 478 (1st Cir. 2003); Lukacinsky v. Panasonic Service Co., 2004 WL 2915347, *25 (D.Mass., 2004). To prove a *prima facie* case for retaliation, Walsh must demonstrate that he (1) engaged in a protected activity; (2) suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action. Mole, 442 Mass. 582, 591-92; Wright, 352 F.3d 472, 478. To state a *prima facie* case of retaliation, Walsh must have had a good faith belief that the practices he opposed

12

were unlawful. Tate v. Department of Mental Health, 419 Mass. 356, 364 (1995). There is

no question that Walsh's termination was an adverse employment action. Walsh further

contends that Battaglino's harassment created a hostile work environment in retaliation for

Walsh's opposition to the termination of McLean, constituting an additional adverse action

by BU. Clifton v. Massachusetts Bay Transportation Authority, 445 Mass. 611 (2005);

Noviello v. City of Boston, 398 F.3d 76, 91 (1st Cir. 2005). Rather, BU posits that Walsh

would not have been able to prove that the termination of McLean was disability

discrimination and contests that Walsh's protests over McLean's termination caused his own

termination.

Walsh must demonstrate that BU's stated reason is a pretext to prevail at trial. If

Walsh demonstrates that the reasons for his termination were false, a jury may infer that BU

is covering up a retaliatory intent, motive, or state of mind. Mole v. University of

Massachusetts, 442 Mass. 582, 591-92 (2004). BU's extensive argument that the evidence

demonstrates an abuse of sick time, poor performance, and insubordination effectively

sabotages its Motion for Summary Judgment because it assumes that the Court must adopt its

interpretation of the evidence. The Court, of course, must interpret the evidence in the light

most favorable to *Walsh*.[7]  Doing so, it is evident that there are disputes of material facts that

necessitate a jury trial.

---

[7]     BU improperly cites to the MCAD's issuance of two lack of probable cause findings ("LOPC") to
hoist on the Court a *res judicata*-like argument that because the MCAD did not credit Walsh, this Court
should deny him a jury trial. BU's citation to the MCAD's two LOPC findings is wholly improper.
Significantly, the Massachusetts Supreme Judicial Court has determined that an LOPC finding is "not
determinative" of the plaintiff's burden at summary judgment. Tate v. Department of Mental Health, 419
Mass. 356, 364 (1995). The Court should therefore not give any weight to the preliminary findings of the
MCAD.

The LOPC findings are merely the product of an incomplete and preliminary investigation by the
MCAD. There was no hearing at the MCAD in which witnesses were questioned under oath, nor was there
any opportunity for cross-examination. Walsh was not permitted to take depositions, request documents, or
proffer interrogatories, prior to the issuance of the MCAD LOPC finding. For the second charge, Walsh
had already removed his case to Court and did not provide any information to the MCAD at all. It

13

### 1.    The Record Illustrates Powerful Circumstantial Evidence of Retaliation

Whether or not McLean's termination would eventually be adjudicated to be a violation of anti-discrimination law has no bearing on the viability of Walsh's ability to state a *prima facie* case.  Walsh need only have had a reasonable, good-faith belief that a violation occurred and have acted on it.  If BU knew of his conduct and lashed out in consequence of it, Walsh has stated a *prima facie* case of retaliation.  Mesnick v. General Elec. Co., 950 F.2d 816, 827 (1st Cir., 1991).  Battaglino and Sadri both wanted to terminate McLean because he appeared to have "something wrong with him" or appeared "retarded."  Both expressed this sentiment to Walsh.  Walsh could hardly have a more solid basis to suspect that McLean's termination was disability discrimination.  Although these comments are more than enough to warrant a jury, Walsh investigated Battaglino's purported reasons for terminating McLean and found them unsubstantiated.  Rather, two of Walsh's subordinates, Clougher and Trotman, *praised* McLean as an employee.  See SAF, ¶¶ 13, 15, 19, 20.  Most damning for BU, however, is the Affidavit from Battaglino in which he *admits* that Walsh believed that McLean is handicapped and opposed his termination on that basis.  See the Affidavit of John Battaglino, Jr., ¶ 9, attached to BU's Statement of Undisputed Facts as Exhibit 4.  Taking this evidence in the light most favorable to Walsh, a jury has a basis to infer that Walsh believed he was opposing discrimination.

As to the causal connection, BU asserts that it terminated Walsh because of performance problems, insubordination, and abuse of sick leave.  Again, BU forgets that the Court cannot take its assertions as truth for summary judgment purposes.  At summary judgment, the Court must credit Walsh's testimony that Battaglino retorted that "you should

---

therefore is not admissible evidence, cannot be admitted at trial, and is not probative at summary judgment. EEOC v. Tandem Computers, Inc., 158 F.R.D. 224, 228 (D. Mass. 1994) (trial court excluded EEOC "no-cause" finding on the grounds that it was only a preliminary finding).

have fired Lindsey" and "it will get you nothing but trouble going outside" when Walsh

protested his retaliation. True to his word, after Walsh filed his MCAD complaint on

December 28, 2000, Battaglino's retaliation continued and worsened.[8]  See SAF, ¶¶ 22, 26.

He gave Walsh such a hard time about medical appointments in May and June, 2001 that

Walsh canceled his therapy appointments for July and made no new ones until his medical

leave in August. See SAF, ¶¶ 50, 54, 55. During Walsh's second medical leave, BU

suspended him. Before his return to work, Battaglino assigned Walsh sole responsibility for

the mailrooms—a daunting task which was not in line with any of Walsh's previous

responsibilities. See SAF, ¶¶ 58, 59, 67. On Walsh's second day of work, Battaglino

assaulted him. When Walsh reported Battaglino to the police, BU swiftly terminated him.

See SAF, ¶¶70-72. Taking the evidence in the light most favorable to Walsh, there is, at the

very least, a dispute of fact as to whether Walsh's opposition to McLean's termination caused

his termination.

> **2.   Walsh's Evidence Also Demonstrates That BU's Purported Reason for His Termination is a Pretext**

BU hammers incessantly at its "legitimate" reason for Walsh's termination, as though

it were proven beyond doubt. Unfortunately for BU, the record is not as heavily weighted in

its favor as it represents. Battaglino's taunts and targeting, the issue of Walsh's performance,

and particularly the question of sick leave "abuse" pose quintessential jury questions.

> **a.   Walsh's Performance**

BU does not, and indeed cannot, dispute that Walsh performed his job well from

1995 to the time he challenged Battaglino's discriminatory termination of McLean. His

---

[8]     Walsh's doctors' records bolster his claim that Battaglino began to retaliate against him for opposing McLean's termination in September, 2000. Dr. Abreu's records note that he started suffering from employment stress in October, 2000, right at the moment Walsh says that Battaglino started to retaliate against him. See Medical Records of Dr. Steven Abreu, attached to Walsh's Statement of Additional Facts as Exhibit 6.

15

employment history is devoid of any documented issues with his performance. Even Robillard did not think he could terminate Walsh because Walsh performed well. See SAF, ¶¶ 4, 10, 11. During the time of his acceptable performance, Walsh went to see his doctors as frequently as he visited them after Battaglino took the reins. The records from his physicians and dentist confirm the frequency of his visits pre-Battaglino. See SAF, ¶¶ 7, 9. His visits to his doctors, and the entire issue of sick leave "abuse," only became an issue *after* he challenged Battaglino's termination of McLean on discriminatory grounds. The situation barreled downhill after Walsh filed his discrimination complaint. BU's claims of evidence to the contrary about what was going on in the work place create an ambiguity which requires a fact finder to resolve. Lucasinsky, 2004 WL 2915347 *8 (D.Mass.). Taking the evidence in the light most favorable to Walsh, a jury could reasonably conclude that Battaglino's actions from October, 2000 to November, 2001 were designed to punish Walsh for his refusal to terminate McLean.

### b.   BU Manipulates the Evidence to Support Its Claim that Walsh Abused Sick Leave

Walsh vehemently disputes any "abuse" on his part. He merely continued doing what he had done for the past five years of his employment. BU's argument that Walsh's use of sick time amounted to "abuse" contains an assumption that sabotages its Motion. The very term "abuse" assumes that BU's version of the facts must be credited over Walsh's. This the Court cannot do on summary judgment.

When Battaglino began to retaliate against him, he reprimanded Walsh for each moment that Walsh was not sitting in his office, insisted Walsh account for every second of his time, even trips to the bathroom, and request formal time off for his doctor appointments. These reprimands went against the grain of the job that Walsh had performed since his hire. See SAF, ¶ 30. As the Department ran a twenty-four hour, seven day a week operation,

Walsh had never put in "face time" in his office. Rather, he spent most of his time making rounds on campus to make sure that all ran smoothly. Because he never had to be in any particular place at any particular time, he took time out on his lunch or at the end of the day to visit his doctors, almost all of whom were on BU's campus. See SAF, ¶¶ 3, 7. Battaglino demanded that Walsh submit a formal Time Off Request when he had to be out of the office, so Walsh began submitting Time Off Requests for his doctors' appointments. Most tellingly, Walsh's recorded absences shot up suddenly in October, 2000—right after he contends he had his altercation with Battaglino. See SAF, ¶ 30 and Exhibit 1(Walsh's Leave Records from October, 2000 to November, 2001).

Most of the time, these doctors' appointments did not take more than an hour and a half. BU's policy was not to charge exempt employees for a half day of vacation unless they were gone for over four hours. Walsh has evidence that BU, in fact, did *not* charge other, similarly situated employees, for a half day of sick or vacation time for an absence of less than four hours. [9] One employee was not even charged for a day spent at a golf tournament. See SAF ¶¶ 7, 28, 36, 37. However, Battaglino charged Walsh for a half day of vacation and/or sick time for absences of less than four hours and charged Walsh a half or full day of vacation or sick time even when Walsh was present. See SAF, ¶¶ 35, 37. BU has now used Battaglino's calculations as the justification for its claim that Walsh abused sick leave. As *Battaglino* had responsibility for recording his absences, and it is *Battaglino's* behavior which is in question, BU's entire calculation of Walsh's absences is thrown into doubt. Finally, in late August, 2001, when Walsh went out on medical leave, BU made the baffling move of *suspending* him, even though he sought to *return* to work. See SAF ¶¶ 58-60. BU

---

[9]    Certain employees to whom Walsh compares himself were not in Grade 74 as he was. Walsh argues that these are still apt comparators because the BU policies in question were applied to employees no matter what the grade.

17

now counts the days it forced Walsh on suspension as evidence that Walsh "abused" his sick leave.

Clearly, how much time Walsh spent away from work is disputed, and BU's reliance on its characterization of Walsh's absences to justify Walsh's termination must be examined by a jury. The Court cannot conclude that Walsh's absences were "abuse" on this record. The very crux of this matter is whether Walsh "abused" sick time or whether Battaglino deliberately charged him for time off when he was present or charged Walsh more than other employees were charged in similar circumstances and artificially inflating his absence rate.

### c.    Battaglino's Taunts, Harassment, and Punishment

In addition to falsifying Walsh's leave record, Battaglino also gave new meaning to the comic strip character Dilbert's maxim that "work is hell." No matter what the issue, he made it hostile for Walsh. He refused to accept Walsh's explanations for the discrepancies in Walsh's leave record during the fall of 2000, although he took less proof from other employees in the department, and falsely accused *Walsh* of being uncooperative. He badmouthed Walsh to Walsh's subordinates. He watched Walsh like a hawk. He picked on Walsh for any "misstep" Walsh made. He gave Walsh impossible deadlines. He taunted Walsh about his medical conditions and accused him of poor management because he had to attend to them. No matter what Walsh did to try to accommodate the department, Battaglino would not be satisfied. When Walsh protested, Battaglino reminded him that he should have terminated McLean. See SAF, ¶¶ 21, 22, 24-29, 30, 32, 34-38, 42-44, 48, 54.

With the weight of BU's hierarchy behind him, Battaglino's harassment drove Walsh to need medical *leave* twice, the first year in five years of employment at BU. When Walsh was scheduled to return from his suspension, Battaglino assigned him an impossible task. See SAF, ¶¶ 55, 67. By the end, Battaglino was only looking for a reason to rid himself of Walsh. He accomplished his purpose by starting a physical altercation with Walsh. BU has

18

the audacity to blame that on *Walsh* although it was Walsh who called the police and who pressed charges against Battaglino. The opposing stories about how this altercation came about are set forth in the police report. See SAF, ¶¶ 70-71.

Finally, BU's portrayal of Walsh as the ultimate nightmare employee is belied by the background and behavior it tolerated in its other employees. An assault and battery conviction, arrests for drunk driving, masturbation in the office, threats of violence, and selling drugs and alcohol to minors were not impediments to promotions nor were they worthy of termination. See SAF, ¶¶ 73-76. How BU could terminate *Walsh* and allow employees with criminal backgrounds to remain employed is a jury question. The email exchanges between the two men, the police report, and Battaglino's taunts and reminders that Walsh "should have fired Lindsey" clearly demonstrate that a jury is necessary to determine whose side is more credible. That decision is not for the Court.

### d.     The Timing

Walsh received no punishment for his attending to his health conditions until he refused to carry out Battaglino's discriminatory plan for McLean in September, 2000. Battaglino's retaliation was swift and harsh after this incident. BU does not dispute that the issues between Walsh and Battaglino arose after the altercation over McLean. See Battaglino's Affidavit attached to BU's Statement of Undisputed Facts, Exhibit 4. The timing alone makes a trial necessary.

### e.     The Effect of BU's Retaliation Need Not Be Lost Wages or Confined to the Workplace

Throughout its memorandum, BU heavily implies that Walsh has no damages, and thus no valid claim of retaliation, because he was paid and did not miss any medical appointments. BU is wrong on two fronts. First, Walsh canceled appointments which were important for the upkeep of his health, his vacation and sick banks were fraudulently drained,

19

and he was harassed, taunted, and teased because of his medical conditions.  The harm from

retaliation does not have to take place in the workplace to be actionable.  Burlington Northern

& Santa Fe Railway Company v. White, 126 S.Ct. 2405, 2414 (2006) ("White").  Second,

Walsh need not have suffered monetary damages to have been harmed by retaliation.  Rather,

the actions taken by the employer must be such that a reasonable worker would be deterred

from making or supporting a charge of discrimination.  White, 126 S.Ct. 2405, 2415.  It is no

stretch of the imagination to see how harassment and taunts, falsifying leave records,

draining vacation and sick time, and forcing cancellation of critical health care appointments

would give any employee pause before supporting a discrimination complaint.  In any event,

because Walsh disputes BU's characterization of what went on in his workplace, there is a

dispute as to whether his situation was materially, adversely affected.

**D.      Walsh Has Evidence Demonstrating A Powerful Circumstantial Case of
         Disability Discrimination under Both Massachusetts and Federal Law[10]**

         Battaglino's tools for retaliating against Walsh also had the effect of discriminating

against Walsh because of his disability. As Walsh's evidence is circumstantial, the Court

must employ the burden shifting paradigm set forth in McDonnell Douglass Corporation v.

Green, 411 U.S. 792 (1973), (adopted in Massachusetts in Wheelock College v.

Massachusetts Commission Against Discrimination, 371 Mass. 130, 355 N.E.2d 309 (1976).

**1.      Walsh's Evidence Meets the Requirements to Show A *Prima
         Facie* Case of Discrimination Under Both Massachusetts and
         Federal Law**

         In order to prove a *prima facie* case of discrimination on the basis of his handicap,

---

[10]      Contrary to BU's assertion in its Footnote 7, Massachusetts *does not* necessarily follow the
reasoning of federal appellate decisions applying Title VII in construing Chapter 151B because of material
differences between Chapter 151B and Title VII, the legislative directive that Chapter 151B is to be
interpreted liberally, the delegation of authority to the Massachusetts Commission Against Discrimination
to act forcefully to implement the statute, and the deference afforded to the Commission's policies and
decisions.  Cuddyer, 434 Mass. 521, 536; Dahill v. Police Dep't of Boston, 434 Mass. 233, 239 (2001).

Walsh must establish only the following three elements under both Massachusetts and federal law: (1) that he is an individual with a handicap; (2) that he is qualified, with or without reasonable accommodation, to perform the essential functions of the job in question; and (3) that he was terminated or otherwise subject to an adverse action by his employer because of the handicap. Dartt v. Browning-Ferris Industries, Inc. 427 Mass. 1 (1998); Ward v. Mass. Health Research Inst., Inc., 209 F.3d 29, 33 (1st Cir.2000); Laurin v. Providence Hosp., 150 F.3d 52, 56 (1st Cir.1998). Establishing a *prima facie* case is not meant to be an onerous burden for an employment discrimination plaintiff. Sullivan v. Liberty Mutual Insurance Company, 444 Mass. 34, 40-41, 45 (2005) (citing Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); McDonnell Douglass Corporation v. Green, 411 U.S. 792 (1973).

### a. Walsh Is Clearly An Individual with a Disability within the Meaning of Chapter 151B and the ADA.

In analyzing whether a plaintiff has a disability within the meaning of Massachusetts and federal law, the Court, must make an individualized determination, in a case-by-case manner, based upon whether her or his impairments substantially limit major life activities. Sutton v. United Airlines, Inc., 527 U.S. 471, 483 (1999); Toyota Motor Manufacturing, Inc. v. Williams, 534 U.S. 184, 198 (2002). However, Massachusetts law diverges from federal law in one important aspect: in making the individualized determination, the Court may not consider any corrective devices or actions the individual takes with respect to his handicap. Dahill v. Police Department of Boston, 434 Mass. 233, 240 (2001); Sutton v. United Airlines, Inc., 527 U.S. 471 (1999). For his part, Walsh must offer "'evidence that the extent of the limitation [caused by his impairment] in terms of [his] own experience ... is substantial.'" Wright v. CompUSA, 352 F.3d 472, 476 n. 1 (1st Cir.2003) (quoting Toyota, 534 U.S. 184 (2002)). He has done so.

21

1.      **Walsh has impairments that constitute disabilities under the ADA and Chapter 151B**

The Massachusetts and federal definitions of disability are almost identical.  Both

Chapter 151B, § 1(17) and The Americans with Disabilities Act ("ADA") define a

"disability"[11] as: 1) a physical or mental impairment which substantially limits one or more

major life activities of a person; 2) a record of having such impairment; or 3) being regarded

as having such impairment. M.G.L. c. 151B, § 1(17); 42 U.S.C. § 12102(2) (A-C).  A

"physical or mental impairment" means: any physiological disorder or condition, affecting

one of a list of body systems, including a mental or psychological disorder.  29 CFR 1630.2

(h) (1) and (2); MCAD Guidelines, Employment Discrimination on the Basis of Handicap, II

(A) (2).[12]  Walsh has kidney stones, post traumatic stress disorder ("PTSD"), shingles,

migraine headaches, and grinding of his teeth.  These multiple physical impairments affect

his urinary system, nervous system, mouth, and mental health.  Walsh's conditions are

chronic, and there is little he can do to control when and how often they strike.  He controls

them through frequent visits to his doctors and proper medication.[13]  See SAF, ¶¶ 5-9.

---

[11]      Chapter 151B uses the term "handicap".  Walsh uses these terms interchangeably.

[12]      The deference to which the federal courts must give the EEOC guidelines is not clear.  However, the Supreme Court in Toyota assumed the EEOC Guidelines' definitions to be reasonable and analyzed the proof required by employees with reference to them.  Toyota, 534 U.S. 184, 194-199.  Massachusetts gives deference to the Massachusetts Commission Against Discrimination's guidelines.  Dahill v. Police Dep't of Boston, 434 Mass. 233, 239 (2001) (State agency charged with enforcement of statute entitled to "substantial deference" in interpretation of statute through its issued guidelines).  The MCAD Guidelines adopt the basic structure of the EEOC's Guidelines, but in some instances provide a more expansive definition.  For example, the MCAD defines major life activities to include "mental and emotional processes such as thinking, concentrating and interacting with others".  See MCAD Guidelines, Employment Discrimination on the Basis of Handicap, II (A) (5).

[13]      Walsh's case is the quintessential situation the Supreme Judicial Court had in mind when it decided in Dahill that individual corrective devices or actions should not be considered in analyzing whether an individual is handicapped within the meaning of Chapter 151B.  Dahill, 434 Mass. 233, 240, n. 10.

## 2. Walsh's impairments substantially limit one or more major life activities

A major life activity means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. 29 CFR 1630.2 (i); MCAD Guidelines, Employment Discrimination on the Basis of Handicap, II (A) (5). All Walsh's conditions debilitate him in several major life activities when symptoms are present. Kidney stones make urination painful and cause incontinence. They cause severe pain until he passes them, and when he is passing a stone, he cannot do anything but wait for it to pass because of pain. This is a condition that he will have for the rest of his life. Migraine headaches, a life long affliction of Walsh's, not only cause severe pain, they also cause nausea. PTSD causes crying spells, inability to concentrate, sleeplessness, and severe anxiety. Walsh has a long history of grinding of his teeth, which causes bleeding and puss pockets, impairing his ability to eat and causing him pain. Shingles cause painful rashes on his skin which impede his ability to shower, require that he stay out of direct sunlight on the affected area, and require that he continually lotion his skin. See SAF, ¶¶ 5-9.

The ADA and Chapter 151B require that Walsh's impairments *substantially* limit him. 42 U.S.C. § 12102(2)(A); M.G.L. c. 151B, § 1 (17). To satisfy this requirement, Walsh must demonstrate that his impairments make him unable to perform a major life activity that the average person in the general population can perform, or significantly restrict him in his ability to perform a particular major life activity as compared to the average person in the general population can perform that same major life activity. 29 CFR 1630.2 (j); MCAD Guidelines, Employment Discrimination on the Basis of Handicap, II (A) (6). The Court is to consider the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long term impact from the impairment. For the Massachusetts claims, Walsh's *unmitigated* state is the relevant one. Again, the medical

23

records and Walsh's testimony demonstrate that his impairments are long held, chronic, and incurable. In other words, he will suffer from the effects of his impairments for the rest of his life. BU's argument that the reports of Dr. Abreu and Dr. Gore do not use the word "disabled" is an argument of form over substance. As Dr. Abreu explains in his Affidavit, without the ability to treat his health conditions, Walsh is disabled. See Dr. Abreu's Affidavit, SAF, **Exhibit 3**. From the medical records of his treating physicians, particularly in their unmitigated state, Walsh's conditions meet the standards of the ADA and Chapter 151B.

> **b.    Walsh Is Clearly A Qualified to Perform the Essential Functions of His Position.**

As explained above in connection with Walsh's retaliation claim, Walsh's performance history and the unchanging nature of Walsh's doctor's visits create, at the very least, a dispute of fact as to BU's assertion that he is not qualified due to his attendance. Williams v. Anheuser-Busch, Inc., 957 F.Supp.1246, 1250 (M.D.Fla.1997) (Fact that employee was employed for approximately four years with only one, unrelated incident where disciplinary action was brought against him indicated that he was "qualified individual" for ADA purposes.); Hamlin v. Charter Township of Flint, 165 F.3d 426 (6th Cir. 1999) (issue of whether or not plaintiff can perform the essential functions of the job in question is a quintessential jury question).

> **2.    BU's Reasons for Terminating Walsh Are Discriminatory**

BU's "legitimate" reasons for Walsh's termination are belied by the more favorable way other employees without disabilities were treated when they required time off for personal reasons that had nothing to do with their health, that other exempt employees without disabilities were not charged an entire half day of vacation or sick time for an absence of less than four hours, the failure to respond to Walsh's request for accommodation,

24

Battaglino's refusal to accommodate Walsh, and Battaglino's taunts about his health conditions. A jury could easily infer that BU's behavior constitutes disability discrimination rather than Walsh being an unsatisfactory employee. See SAF, ¶¶ 21, 28, 29, 35, 36, 37, 47, 50, 51, 52, 57, 60, 72.

In addition, Walsh vehemently disputes BU's accusations of insubordination, particularly Battaglino's assault. As demonstrated by the police report, a report made out because *Walsh* notified BU's police department, Walsh entered his office to find Battaglino there. As Battaglino left, he kicked Walsh, leaving a mark on Walsh's leg. See SAF ¶¶70, 71. In light of all that went on before Battaglino's assault, a jury could infer that it was Battaglino, not Walsh, who began the altercation and who then used it as an easy excuse to support Walsh's termination. Finally, BU's chest thumping about the unacceptability of this behavior in the work place is again belied by its tolerance of much more violent behavior and more violent backgrounds of other employees. See SAF, ¶¶ 73-76.

### 3. The Evidence, Viewed in the Light Most Favorable to Walsh, Demonstrates that BU Did Not Accommodate Walsh

BU's baffling argument that it accommodated Walsh further sabotages its Motion for Summary Judgment. BU would have this Court completely ignore that Battaglino charged Walsh for vacation and sick time *when he was present* thus artificially inflating his absence rate and berated him for being away from work too often. See SAF, ¶¶ 35, 37, 51. This is not what Congress had in mind as accommodation. Rather, it is *punishment*. Likewise, Battaglino's harassment, comments, and humiliation of Walsh when Walsh tried to explain the reasons he needed to visit his doctors is not "accommodation" any meaningful sense of the word. Finally, BU's suspension of Walsh from August 27, 2001 to November, 2001 belies any "accommodation." BU clearly had decided to take Battaglino's part and decided Walsh was abusing his sick and vacation time after Battaglino began his campaign of

25

harassment for Walsh's failure to terminate McLean. Its attempts to rewrite history are only more fodder for a jury to examine.

**E.      BU Never Granted Walsh Leave Under the FMLA—Rather, Walsh Was Suspended for Taking a Medical Leave of Absence in August, 2001**

The FMLA requires employers to grant employees twelve weeks of unpaid leave "because of a serious health condition that makes the employee unable to perform the functions of the position of such employee" 29 U.S.C. § 2612 (a) (1) (D). BU did no such thing for Walsh. Its argument that Walsh received his allotted leave under the FMLA is completely disingenuous and contrary to the evidence.

After his medical leave of absence ended on September 1, 2001, Walsh returned with a note from Dr. Abreu stating that he was able to return to work. However, unbeknownst to Walsh, BU had *suspended* him while he was on medical leave. Battaglino took away his email access, keys, and identification card and instructing his employees to have no contact with him. It was *BU* which demanded that Walsh remain out of work, and despite its complaints about uninformative doctor's notes, BU took few steps to ascertain any, failing to contact Walsh's medical providers in August and having only one brief conversation with Dr. Abreu in September, 2001. In the brief conversation, Dr. Abreu recommended FMLA leave for Walsh. Dr. Abreu subsequently left the country on his honeymoon until October 31, 2001, hardly Walsh's fault. Within two weeks of Dr. Abreu's return, BU received the information it claims it required in August and September, 2001. See SAF, ¶¶ 61-68. Taking the evidence in the light most favorable to Walsh, it appears that BU was *punishing* Walsh for needing the medical leave. The removal of Walsh's employee privileges and the failure to follow up with Walsh's doctors in a timely manner, at the very least, create a dispute of fact as to exactly what BU was doing.

In addition to BU's suspension of Walsh in September, 2001, before Walsh was suspended, Battaglino harassed and penalized Walsh when he took time out for his doctor's appointments. Although Walsh had not formally requested FMLA leave, Battaglino's actions discouraged Walsh from taking any time out for doctors' appointments, particularly with his depleting Walsh's sick and vacation bank for time out of the office for less than four hours and fraudulently charging Walsh for time off when he was present. BU cannot seriously advance the argument that it provided all that was lawfully required under the FMLA when Battaglino punished Walsh for when he attempted to make use of it. By harassing and penalizing Walsh for taking FMLA leave or for visiting his doctors, Battaglino effectively blocked Walsh from receiving leave to take care of his serious medical conditions. Taking the evidence in the light most favorable to Walsh, a jury could infer that BU violated the FMLA.

## CONCLUSION

For the reasons explained above, BU has failed to demonstrate that its case merits Summary Judgment. Therefore, its Motion for Summary Judgment should be denied.

Respectfully submitted,
JOHN WALSH,
By his attorneys,

Shannon Liss-Riordan, BBO #640716
Rebecca G. Pontikes BBO# 637157
Pyle, Rome, Lichten, Ehrenberg
    & Liss-Riordan, P.C.
18 Tremont St., Ste. 500
Boston, MA 02108
August 28, 2006                    (617) 367-7200

27

## CERTIFICATE OF SERVICE

This is to certify that on August 28, 2006, a copy of the above document was served via hand delivery, upon Lawrence S. Elswit, Esq., Boston University, Office of the General Counsel, 125 Bay State Road, Boston MA 02215.

Rebecca G. Pontikes