# MASSACHUSETTS LAWYERS WEEKLY

www.masslawyersweekly.com

Want to jum
your legal re

Tuesday, November 21, 2006                                              Lawy

Try 3 Free | Subscriber Services | Our Newspapers | Other Products | Advertise | Help

From the December 30, 2002 Massachusetts Lawyers Weekly.

| DISCUSS Story on our Forum | SUBMIT a Letter to the Editor | Order a REPRINT of this Story | |

**Feature Story**

## Lawyer Of The Year

### Shannon E. Liss-Riordan

*Boston*

**Born**: May 29, 1969; Houston

**Education**: Harvard Law School, 1996; Harvard College, 1990


ADVERTISEMENT

Get client newsletters tailored to your practice areas!

Click here for more information.

**Massachusetts bar admission**: 1999

**Legal experience**: Pyle, Rome, Lichten & Ehrenberg, partner (1998-present); law clerk to U.S. District Court Judge Nancy F. Atlas, Houston (1996-1998)

**Bar affiliations**: Massachusetts Bar Association, National Employment Lawyers Association

Her record speaks for itself.

In 2002, Shannon E. Liss-Riordan won two key discrimination cases and two federal injunctions protecting the First Amendment rights of employees, and began work on several cases that could affect future plaintiffs.

"My favorite cases are ones that require pushing the law," she says.

In January, Liss-Riordan was one of the lead lawyers in the trial of *Dahill v. Boston Police Department*, in which a federal jury awarded more than $800,000 to a Boston Police Academy recruit who was fired when the department concluded that his use of hearing aids was dangerous. In that case, the Supreme Judicial Court decided by certified question that individuals with correctable disabilities may bring discrimination cases under Chapter 151B, a ruling that rejected the applicability of the U.S. Supreme Court's ADA decision in *Sutton v. United Airlines*.

Seven months later, Liss-Riordan teamed up with the Disability Law Center in federal court to win a $1.1 million award against United Airlines for its refusal to hire an experienced airline mechanic because he was deaf.

In a third case, she also won federal injunctions ordering the Massachusetts State Police to admit one recruit who had been disqualified for owning adult bookstores and another who was wrongly disqualified for living with a former felon.

Her year's work also featured 11 class action lawsuits against food service establishments that are allegedly skimming tips from wait staff, discrimination suits for a kidney transplant recipient and an insulin-dependent fireman, and a suit against the City of Everett for allegedly requiring an employee to violate federal equal access laws.

And she did most of this while pregnant with her second child.

In fact, she loves her work so much that she continued working from home during maternity leave in November and was talking to a co-worker about her pending cases just hours after giving birth.

* * *

Q. What were your most satisfying victories last year and why?

A. Both the *Sprague* [the airline mechanic] and *Dahill* [the police officer] cases were most satisfying. In both, my team represented someone with a lifelong dream of pursuing a career and they were held back for illegitimate reasons. It was great to see both plaintiffs get their jobs and the opportunity to get back their dreams.

Q. In the *Dahill* case, what was the key to victory?

A. Legally, the key was convincing the SJC that the [U.S.] Supreme Court took a wrong turn when it limited who could pursue a disability claim. That gave us the chance to go to trial. [At trial,] the key was putting all the pieces together from different angles to undermine the Police Department explanation for terminating Mr. Dahill. Those pieces included audiological experts, the plaintiff's own testimony, witnesses who were in the police academy with Dahill, and another hearing-impaired police officer who could testify to his ability to perform with hearing aids.

Q. What are the special challenges of representing plaintiffs with hearing impairments?

A. There are societal misperceptions [that] can influence an employer's decision about an individual's ability to do a job. Juries can come to trial with their own misperceptions too. A plaintiffs' lawyer has to make sure that stereotypes won't influence a jury's decision. That's partly what led us to waive a jury in the *Sprague* trial. We were worried that lay people would feel uncomfortable about letting a deaf person work on airplanes. We felt a judge could better sift through the evidence and decide the matter factually. But we were also pleased to see the *Dahill* jury overwhelmingly reject the Police Department defense.

Q. What were the special challenges in your First Amendment cases?

A. The plaintiffs I represented were denied jobs for reasons that might not seem sympathetic to the general public. By its very nature, First Amendment work often means representing someone with unpopular beliefs or someone who associates with people engaged in some activity that is not publicly supported. One plaintiff I represented owned adult bookstores and that is obviously not popular with large segments of the public. Another plaintiff was a woman with a boyfriend who served time for drug trafficking and weapons possession. It was a challenge to persuade the court that both individuals had constitutionally protected rights at stake that outweighed the employer's concerns about them as police officers.

In one case, the police argued that the mere presence of a man who owned adult bookstores could create an uncomfortable environment for women officers, but we argued that his First Amendment rights protected what he did on his own time. In the case involving a police recruit, who had a boyfriend with a felony record, the police argued that the man would illegally have access to a gun because police are required to keep one with them at all times. But it was not clear that her weapon had to be kept at her home. We argued it could be kept in a relative's house next door or in another accessible location under lock and key.

Q. How do you decide what cases to take and what you screen out?

A. That's a complicated question. There's a balance of many factors. I love listening to people's stories. Generally, I have a really hard time turning down a good case with a compelling story. Bad cases are when the facts are so cloudy that it is uncertain whether we can obtain a good result for them. Sometimes, people have great facts and the law is not on their side, but I take some of those to push the law, too.

Q. Why did you choose to represent plaintiffs in employment law?

A. I went to school for civil rights law, and found a natural gravitation to employment. I still do some civil rights work that is not employment related, but I think people's jobs and careers are most important to them. I also find it fascinating to learn about so many different fields of occupation. This year alone I learned about police work, the printing industry and the restaurant industry — and I basically learned how to take an airplane apart and put it back together. Every time I go into a new field I get more insights into what different people do every day.

Q. You have successfully sued police departments and the police academy a number of times. How do you respond to people who say this just raises the cost of policing?

A. Police officers have rights like everyone else. Because we have laws against discrimination, I think it is especially important for government entities to follow the law. Lawsuits in general increase societal costs, but society has decided to pass laws giving people workplace rights. Having decided that discrimination should not be tolerated, we must prohibit it. Plaintiffs' lawyers are essentially upholding these laws.

Q. How do you respond to those who say that plaintiffs' lawyers just increase the amount of "red tape" for employers?

A. When a plaintiff files suit and prevails, that individual has had to overcome many obstacles to demonstrate that law was broken. For every person who wins, many more are not able to overcome those obstacles, and many never sued but could have. Those who are successful have immeasurable impact on and benefit to others who don't have to go to court in the future. Every case resolved through the courts gives employers and employees more idea of what their rights and responsibilities are and thereby prevents some litigation in that regard.

Q. What kind of response are you getting to the 11 class actions you filed against restaurants for allegedly skimming portions of tips from servers?

A. There has been a great deal of response. These suits have raised awareness in the restaurant industry about the Massachusetts wage law that protects tipped employees. Although it has been on the books for a long time, many people have not been aware of it. The law says that wait staff get to control tips received, and service charges should be distributed to employees actually engaged in service. The sense I got from speaking with many waiters is that this law has been often ignored. There is much excitement about making sure that owners and managers are not taking part of the tips intended for servers.

Q. What keeps you inspired?

A. I love working with people. I get excited about trying to help people. That's why I went into law. I relish a good challenge. I also love that my career brings together many different kinds of work. I have to do legal analysis, writing, speaking and interviewing of others. I see myself as entrepreneurial and creative. I have to create a suit with specific theories and figure out how to get a certain result and remedy. I love the strategy and putting the pieces together to get the results.

Q. *What is the single biggest problem facing plaintiffs in employment law?*

A. I think the trend of employment law has been moving against plaintiffs for many years. The biggest challenge is having to deal with new procedural and substantive obstacles constantly in the way of pursing an employment suit. Every time a new decision like *Sutton* comes down, it makes it more difficult and fewer plaintiffs get to be heard.

Q. *Is there a danger in allowing people with correctable disabilities to sue, and does this open a can of worms?*

A. Not at all. It is the people who are able to overcome their disabilities that the disability discrimination law was designed to help. People who have a way of performing their job despite their disabilities are the very people who should be allowed to work. People who can't overcome their disabilities won't be able to do the job. When the U.S. Supreme Court closed off suit for people who can overcome disability through correctable devices, it really closed off the law to most of the people it was designed to redress.

And there is no merit to the floodgates argument. In Massachusetts, those with correctable disabilities have been protected and there has hardly been a wave of litigation. Almost all federal circuits had gone the other way before the *Sutton* opinion. *Dahill* just took us back to where we were in Massachusetts.

Q. *What do you say to those who contend that policemen or persons in safety-sensitive professions should seek alternative employment if they have disabilities?*

A. In order to win a disability discrimination claim, a plaintiff has to show that he or she is capable of performing the essential functions of job. That includes safety concerns. The only people who can win are those who can show no undue risk to themselves or others. They should not be in position otherwise, and will not win a discrimination lawsuit.

Q. *The MCAD is clogged with cases. Are too many people suing for bias?*

A. The backlog is because we are understaffed and underfunded. The MCAD issues probable cause findings in a small number of cases, and the most resources are used in cases that get past the probable cause stage and have some merit. Non-meritorious claims do not cause the backlog. Also, many people go to the MCAD without lawyers. It is a relatively user-friendly forum, but that can slow down the process a bit because lawyers know how to streamline cases. The MCAD could greatly benefit from having more resources. They could also help people without lawyers more efficiently.

Q. *What case this year was your greatest challenge and why?*

A. The *Sprague* case was a huge challenge. It involved an industry that was unfamiliar to my co-counsel and me. There was an incredibly vast amount of detail and information regarding airline mechanics and maintenance, and what is required to fix or service an airplane. Preliminary injunction work is also a big challenge. You basically have to compress an entire piece of litigation into days, and put aside all your other work. But it is very satisfying to get a resolution in days and not a matter of years.

*Questions or comments may be directed to the writer at jcunninghgam@lawyersweekly.com.*

### HARVEY A. SCHWARTZ, Boston employment and civil rights lawyer, on Shannon Liss-Riordan ...

Veteran lawyer Harvey A. Schwartz is accustomed to the spotlight, but even he says Shannon E. Liss-Riordan "has been in the middle of an unusual number of high-profile cases this year."

Her record has been all the more impressive, Schwartz suggests, because her achievements came during a year in which she gave birth.

"Shannon's reputation inflated during the course of the year along with her belly, and she developed enormous jury sympathy as a result," he quips.

Schwartz says she is a natural in front of juries. "Her sincerity comes through, and she has a knack for communicating in the courtroom," he says.

He also notes that she is very thorough in preparing her case files.

"Her firm shares office space with us, and her files are expanding throughout the joint space of both firms," he says. "This office generally has a laid-back working atmosphere, but she is the exception - she has been known to burn the late-night oil, even on weekends."

According to Schwartz, Liss-Riordan "is a true believer in people's rights and she is in the profession for the right reasons."

Part of her success, he says, comes from not being afraid to take risks, noting that she has won some difficult cases.

"We both get interesting phone calls from people who feel their rights were violated and some just have oddball cases. I've taken my share of those, but when she told me she was representing a policeman who was terminated because he owned adult video stores, I told her even I would not take that."

Liss-Riordan won that case and several other tough battles this year, and Schwartz predicts more people will know her name in the future.

- John O. Cunningham

© 2002 Lawyers Weekly Inc., All Rights Reserved.

| DISCUSS Story on our Forum | SUBMIT a Letter to the Editor | Order a REPRINT of this Story | |



Try 6 Weeks Free
■ Newspaper

User Agreement For Subscriber-Only Online Benefits  |  Help  |  Our Privacy Policy
Send any questions or comments to comments@lawyersweekly.com